Sarah J. Tugman
Attorney at Law
2509 Eide Street, Suite 4
Anchorage, Alaska 99503
Telephone: (907) 677-7889
Fax: (907) 677-9188
e-mail: sjtugman@gci.net
Attorney for GMW Fire Protection, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE UNITED STATES for the use of GMW Fire Protection, Inc., an Alaska Corporation, <br><br> Plaintiff, <br><br> v. <br><br> KANAG'IQ CONSTRUCTION CO., INC., an Alaska Corporation and WESTERN SURETY COMPANY, a South Dakota Corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

) Case No. A-05-0170 CV (TMB)

## GMW'S OPPOSITION TO
## KANAG'IQ'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GMW Fire Protection, Inc. ("GMW") opposes Kanag'Iq's motion for partial summary judgment for the reasons that follow.

### I.  BACKGROUND FACTS

This dispute arises out of a construction subcontract under which GMW performed work and provided materials for a fire protection requirements contract at Elmendorf Air Force Base. Kanag'Iq Construction Co., Inc. ("Kanag'Iq"), an 8(a) contractor,

had the prime contract from 2000 through 2004.[1]  GMW was its
subcontractor and performed the vast majority of work on the
project.[2]    Steve Frere, the government's project engineer,
explained that, because of this contract and GMW's excellent work,
Elmendorf went from having the worst fire prevention program in the
Pacific Air Force to having the best.[3]

---

[1]  GMW continues to work on the contract at Elmendorf, but the
government has changed the prime contractor.  Deposition of Steve
Frere at 41.

[2]   William Jury, Kanag'Iq's president and sole shareholder
could not say if Kanag'Iq had performed even 10% of the work on the
project.  Deposition of William Jury at 138.  The project engineer
testified that Kanag'Iq did not do anything other than manage the
contract and some outdoor work, including four riser buildings,
about 10 grand each, and some patch work.  Steve Frere's deposition
at 29, 72.  As to Kanag'Iq's management, he testified that it was
not "really involved in their contract," was not an "effective
manager[]," had "little to contribute," and was "fairly clueless,"
having "no idea what was going on in the field."  *Id.* at 36-37.  He
felt that their absence from the construction site was
"staggering."  *Id.* at 84.

[3]  Deposition of Steve Frere at 27-28.

I've never had a better contractor to work with.  As far
as the quality of the work, not one of the jobs we had
ever got rejected.  Okay.

    We – nobody – when we did an inspection, never did
the fire department walk out.  Now that's unusual and
those guys are tough.  So we had the fire department that
trusted them, knew what they were doing.... GMW was the
heart and soul of this project, contract....  I mean,
this was a fire protection system requirements contract.
They did the work.  They deserve all the credit, okay.

    This thing would have been a – think about it, we
went from the worst fire protection program in the
Pacific Air Force, and that's all the – the – the Air
Force bases in Alaska, Hawaii, Guam, Okinawa, Japan and

GMW had no serious complaints during the first years of the project. It performed its work and was paid according to its billings until about two thirds of the way through 2004 when Kanag'Iq stopped paying the amounts indicated on GMW's invoices.[4]

The parties disagree upon the type and terms of the contract. GMW asserts that it is owed money and Kanag'Iq asserts that it was over-billed for the work that GMW did. Kanag'Iq claims that it had "unit price" contracts with both GMW and the government, and GMW asserts that it provided Kanag'Iq with a lump sum price for which it would perform each delivery order and was then instructed to do the work for the price quoted.

A. THE CONTRACTS

Depositions and discovery have shed light on the separate contracts, and the way they operated through the years.

1. THE KANAG'IQ/U.S. GOVERNMENT CONTRACT

In 2000, Kanag'Iq was awarded the contract to "repair or install fire protection systems, and incidental related work, on Elmendorf AFB, AK."[5] The contract, as written, was a "unit price" contract which, Steve Frere explained, is preferred by the

---

Korea. We went from worst to being the best and it was because of this contract.

*Id.* at 84.

[4]    Deposition of Glenn Johnson at 44.

[5]    The first page of the offer and award, and section 01020, ¶1.1, are attached as Exhibit 1.

government due to the fact that it can be easily audited.[6]    The

work was awarded by individual delivery orders.[7]

The following provisions were included in the specifications[8]

in the prime contract:

1.3.1    Joint Measurement

Prior to the issuance of each delivery order and at the
completion of the designated work on the delivery order,
the Government representative and the Contractor will
conduct a joint measurement to determine the work to be
accomplished and the work completed.    Measurements of
work will be verified in writing by the Government's
representative and the Contractor at the time of both
measurements.

1.3.2    Measurements

Actual quantities and bid item numbers shall be specified
in each delivery order.

*  *  *

1.4.2    Invoices

Invoices in four copies shall be submitted upon
completion of each delivery order and shall contain the
following:

*  *  *

---

[6]  Deposition of Steve Frere at 13, 15.

[7]  _See_ Section 01029, ¶1.1 (in Exhibit 1).    The delivery
orders were numbered. The numbers below 5008 were awarded prior to
2004, and in 2004 the delivery orders were numbered from 5008
through 5018.

[8]  The specifications constituted the bulk of the contract
(233 pages), with the other clauses and conditions of the contract
(other than those setting out the Alaska wage rates to be paid)
consisting of about eleven pages primarily incorporating the
Federal Acquisition Regulations.    Due to its length, the entire
contract is not included here.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT - PAGE 4

> 4.  Actual quantity, unit price, and actual cost of each work item.

1.4.2.1    Government evaluation

> The government's representative shall be allotted 10 working days to properly evaluate each completed delivery order, which includes verification of actual quantities and assessment of performance payments, prior to the contractor submitting the delivery order invoice to Contracting for payment.  Upon approval of the actual quantities by the project engineer or project inspector, the contractor may then submit for payment.   The contractor shall consider this time to evaluate the delivery orders by the government in his payment schedule.

The contractor, under the prime contract, was to be paid "based upon actual quantities of work performed that was included on the issued delivery order."[9]

All good intentions aside, the contract did not operate as it was written.  Steve Frere explained that, although the paperwork seemed to be to the contrary, the delivery orders were awarded to Kanag'Iq for certain dollar amounts which reflected amounts budgeted by the Air Force for the project and did not reflect the actual work to be done or materials to be installed as those had not yet been specifically determined.[10]

What was indicated on the joint estimate sheets that Mr. Frere

---

[9]   ¶1.4.2.2.   The foregoing paragraphs of the prime contract are attached as Exhibit 2.

[10]   Steve Frere's deposition at 33, 64-65, 77-78, 101, 103.

prepared and that Kanag'Iq signed,[11] and from which the dollar amounts on the delivery order awards were taken,[12] might bear no resemblance to the materials or quantities that were actually installed.[13] The estimate sheets were just a place to fill in the blanks to get the money for the projects,[14] and the delivery orders were just a convenient vehicle by which the contractor could bill for progress payments.[15]

While Mr. Frere had originally planned to do change orders to make the paperwork more accurate - to reflect the actual work and materials, he would have had to do them continually throughout the project and even then he did not feel that they would have been accurate, so he did not waste his time.[16] Although he did some change orders to move money from one delivery order to another, those were not accurate either.[17]

---

[11] Phil Young, who on behalf of Kanag'Iq signed the estimates prepared by Mr. Frere, admitted that he signed all of the estimates without performing any computations or calculations. He just signed them when he received them. Further, he admitted that, between the government and Kanag'Iq, only the bottom line totals were used. Phil Young's deposition at 63 & 74.

[12] For example, Exhibit 3 is the award for delivery order 5009. It incorporates, on pages 4 and 5, the estimate prepared by Steve Frere.

[13] Deposition of Steve Frere at 67.

[14] *Id.* at 89

[15] *Id.* at 77.

[16] *Id.* at 33, 34, 89, 102.

[17] *Id.* at 65-66, 79.

Kanag'Iq was paid based on the sums shown on the delivery orders that were taken from Mr. Frere's estimate sheets, as modified by any change orders that were executed which increased or decreased the bottom-line dollar amount.[18]   Kanag'Iq was not paid based on any list of actual work done or materials installed, or on any afer-the-fact counts done by Kanag'Iq or the government.[19]

At the end of its contract, Kanag'Iq prepared, signed, and provided to the government, a number of "transfer and acceptance of military real property" forms.   Those forms included the dollar amount Kanag'Iq was to be paid for each delivery order and listed work and materials allegedly, but not actually, comprising each delivery order.   Those documents were, according to Steve Frere, "very inaccurate," "awful bad," and "the most ridiculous documents I have ever seen."[20]

## 2.    THE GMW/KANAG'IQ CONTRACT

At the time the contract was awarded, Kanag'Iq had never had a contract for installing fire alarm or sprinkler systems.[21]   In

---

[18]   Deposition of Steve Frere at 77. Deposition of Phil Young at 51. Deposition of William Jury at 43.

[19]   While Mr. Frere worried that he might have to actually count what was installed, he believed that would happen only if there was a disagreement. Deposition of Steve Frere at 33, 63, 67-68.   He did not do an audit at the end of the projects, because he believed that Kanag'Iq had been adequately paid and because he heard no complaints.   Deposition of Steve Frere at 26-27, 81, 92, 106, 118.

[20]   Deposition of Steve Frere at 53-54, 59, 88.

[21]   Jury deposition at 19.

order to select a subcontractor to perform the lion's share of the work, it asked certain fire suppression contractors to bid a hypothetical project[22] and it then selected GMW Fire Protection, Inc. to work on the Elmendorf contract.

The parties, in 2000, entered into a written contract,[23] which in pertinent part, provided:

> The Contractor, for the full complete and faithful performance of this SUBCONTRACT, agrees to pay the SUBCONTRACTOR:
>
> (a)    Lump Sum of
>
> (b)    Unit Prices as set forth below which on the basis of estimated quantities will involve a gross contract price of approximately **PER ATTACHED FAX QUOTATION** AND 00/100 DOLLARS **Subcontractor will be paid by line items.**
>
> In consideration thereof, the SUBCONTRACTOR agrees as follows:
>
> 1.    To furnish and perform all work described in paragraph 3 ... in accordance with the Contract dated the **29th day of September 2000,** between the OWNER and the CONTRACTOR, and the general special and supplementary conditions of said Contract, and in accordance with the drawings and specifications and addenda for said construction by (ARCHITECTS) and (ENGINEERS) all of which documents in their ENTIRETY are hereinafter referred to as the MAIN CONTRACT and have been made and remain available to the SUBCONTRACTOR.
>
> 2.    To be bound by all laws, government regulations, and orders and all provisions of the MAIN CONTRACT which provisions are incorporated by reference and to be bound by the provisions attached hereto.

---

[22]    Glenn Johnson's deposition at 41 & 44.

[23]    *Id*. at 13.

3.  To provide all design, supervision, installation, materials, labor suppliers, equipment and tools: **For work based on delivery order by 3ʳᵈ Contracting Squadron. Delivery orders will be of random quantities. Contract will be for base year from September 29, 2000 to September 29, 2001.**

SUBCONTRACTOR'S work shall include all items of work listed above plus any items normally performed by SUBCONTRACTOR in association with its work, including such items as may be specified in the plans, drawings and technical specifications of the MAIN CONTRACT.

* * *

Glenn Johnson, president and majority shareholder of GMW, explained that the unit price language of the written subcontract was not followed from the outset of GMW's work at Elmendorf. Instead, Kanag'Iq asked GMW for its price to perform a delivery order and, upon receiving it, GMW was told to go to work.[24]

The way this project was handled throughout, Kanag'Iq asked for a price, GMW provided a price from year one to year – the final year, we were paid on that price we provided, we installed off that price, and we were completely paid off of that. There were not recounts. There was nothing. It was bottom line project every time.[25]

Although GMW used itemized estimate sheets similar to those used by Mr. Frere, those forms were only used as a tool in order to provide Kanag'Iq with GMW's bottom line price for each delivery

---

[24]  Deposition of Glenn Johnson at 14, 24, 51, 54-5.

[25]  *Id.* at 54-55.

order.[26]  Work was done on the project and materials were provided
by GMW for which there were not line items on the bid sheets,[27] and
prices for that work and those materials were listed on line items
describing other work or materials.[28]

Throughout the project, beginning in 2000, GMW provided the
price for which it would do its share of the work on each delivery
order, started the work as directed, and then sent a series of
billings to Kanag'Iq indicating the "contract amount," and the
percent of the work complete on each delivery order, billing
accordingly.[29]    Each delivery order was billed as a separate
contract.[30]  Occasionally, GMW would reduce the original price
quoted and would send revised billings.[31]

_____

[26]   *Id.* at 42-43, 53.

[27]   Deposition of Steve Frere at 93, 96.  Deposition of William
Jury at 65, 112 - 118.

[28]   Deposition of Glenn Johnson at 33, 34, 65.  As Steve Frere
explained, line items listing work like "ceiling tie removal" were
used as "currency" for other work or materials.  Deposition of
Steve Frere at 89, 94.

[29]   Deposition of Glenn Johnson at 40.  *See also* Exhibit *4,*
which relates to work done and materials provided in 2002 for an
ammunition building.  Pages 1 through 15 are GMW's quotes for the
sprinkler and fire alarm work, which correspond to the billings for
a "contract amount" of $186,803.00 and payments made for the same
amount (pages 16-18).

[30]   Deposition of Glenn Johnson at 58.

[31]   On delivery order 5008, the 381st intelligence building, for
example, GMW's original price exceeded the budget, so cabling was
used instead of conduit, and the price was reduced.  Deposition of
Glenn Johnson at 66.  *See also* Exhibit 5 GMW's billing reflecting
a contract amount of $452,067.50 and its revised billing showing a

Kanag'Iq initially paid GMW on those billings, returning its "subcontractor progress payments" form indicating an "adjusted contract" amount which mirrored the amount billed by GMW[32] and making payment based on the percentage of work complete on each delivery order.[33]    Near the end of 2004, that changed.

_____

revised contract amount of $395,617.50.

[32]    Compare Exhibit 6 to Exhibit 5.    Kanag'Iq's "subcontractor progress payments" forms reflect, as the "contract" amount, the figures contained in GMW's original and revised billings for delivery order 5008.

[33]    See for example, Exhibit 7, which follows the progress of delivery order 5015, the Civil Air Patrol building.    Page 1 of the exhibit is a September 19, 2003 fax from Steve Frere to Kanag'Iq asking for a signature on the estimate he prepared.    Pages 2 and 3 are a copy of the estimate signed by Mr. Frere and Kanag'Iq.    Pages 4 through 9 constitute the September 24, 2003 delivery order award (it incorporates the estimate prepared by Mr. Frere and awards the amount shown on that estimate).    Pages 10-13 are the "bid schedule" sent by GMW to Kanag'Iq on June 9, 2004 for a fire alarm system. Pages 13-17 are  another transmission from GMW to Kanag'Iq of the same quote.    Pages  18-24 are a change order reducing the price to be paid to Kanag'Iq for this delivery order.    Pages 25-28 are GMW's revised price for the fire alarm.    Page 29 is GMW's bill to Kanag'Iq reflecting the revised price as the "contract amount" and billing part of that price.    Page 30 shows payment by Kanag'Iq. Pages 31 and 32 are a change order extending the time for performance of this delivery order.    Page 33 is Kanag'Iq's "subcontractor progress payments" form, which indicates a "total adjusted contract" price in the same amount as that indicated on GMW's billing.    Pages 34 and 35 are GMW's next billings.    Pages 36 and 37 are the "transfer and acceptance of military real property" prepared and signed by Kanag'Iq and presented to the government.
Exhibit 8, relates to delivery order 5016. Pages 1-6 are the quote provided by GMW in the amount of $134,369.14.    Page 7- 15 contain billing and payment information. Page 8 is Kanag'Iq's June 11, 2004 "subcontractor progress payments form" indicating a "contract" amount of $134,369.14.    Page 11 is GMW's billing for a "contract amount" of $134,639.14, dated September 24, 2004.    The following pages show that GMW continued to bill that amount through December of 2004.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT - PAGE 11

B.   THE DISPUTE

When Glenn Johnson realized that GMW was not being paid what it billed, he immediately complained.[34] William Jury told him that he thought GMW's invoicing was out of line on two delivery orders and that he wanted Glenn to rework those prices.[35] Glenn looked at the billings and reduced the prices on the Snow Barn and the Susitna Club.[36] GMW continued to work on the projects and was told that it would be paid.[37]   It was not.

Suddenly, Kanag'Iq began asserting that the contract with GMW was based on unit prices[38] and requested that Glenn count the project.[39] Eventually it commenced some counts of its own.[40]

---

[34] Glenn Johnson complained to Phil Young and Bill Jury of Kanag'Iq, and also to various government representatives. Glenn Johnson's deposition at 44, 47, 61.

[35] Deposition of Glenn Johnson at 44-46.

[36] *Id*. at 46.

[37] *Id*. at 47.

[38] Steve Frere explained that the first time he ever heard the term "unit price" was at the end of 2004 when Kanag'Iq started doing some counts.  Deposition of Steve Frere at 63, 22.   He wondered why Kanag'iq was taking that position when it never had before. *Id*. at 30, 111, 117. All he had heard about prior to that was bids. *Id*. at 74.
As to the bids or price quotes received from GMW throughout the project, Mr. Jury testified that they were "estimates," not "quotes" or "bids," but admitted that after they were received GMW was told to do the work. Deposition of William Jury at 29, 42-43, 100, 147, 157.

[39] Deposition of Glenn Johnson at 49-50.

[40] Steve Frere explained that Kanag'Iq had never done counts or surveys prior to 2004. Deposition of Steve Frere at 106. In

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT - PAGE 12

At his deposition,[41] Bill Jury claimed that the agreement with GMW was to pay for what was installed as identified by the federal government, and that the amount it was to be paid would be determined only after each delivery order was complete.[42] He said that he was not responsible for doing the count, the government was,[43] but he did not remember if the government came after the work was done and made a list of what was installed.[44] He also stated that he would not be surprised if the government never counted the project.[45] He testified that, at the time of his deposition in 2006, Kanag'Iq and the government were then determining what GMW should be paid.[46] No offer, or payment has since been received.

II.    THE APPLICABLE LAW.

    A.    THE 2000 CONTRACT, WHETHER IT WAS INTEGRATED OR NOT, WAS MODIFIED BY THE CONDUCT OF THE PARTIES AND KANAG'IQ HA WAIVED THE RIGHT TO ENFORCE IT AS WRITTEN

From its inception in 2000, the parties never followed the

---

2006, Kanag'Iq requested that Mr. Frere participate in its counts. *Id.* at 81, 82.

[41] After his deposition, Mr. Jury provided the court reporter with an eight page list of requested revisions to the deposition consisting of approximately 114 alterations and additions, many of which completely changed his original answers. For the purposes of this opposition, GMW ignores those "corrections."

[42] Deposition of William Jury at 43, 48, 140.

[43] *Id.* at 140.

[44] *Id.* at 43.

[45] *Id.* at 141.

[46] *Id.* at 177.

unit price terms of the written subcontract.  Materials installed

on the project were not counted by Kanag'Iq or the government until

Kanag'Iq suddenly changed its tune hoping to avoid paying GMW the

amounts it was due.  For years, GMW provided its bids, which were

accepted by Kanag'Iq when it received them and then told GMW to go

to work and then paid GMW's invoices in the same amounts as its

bids.

A written contract may be modified either through subsequent

conduct or an oral agreement, and whether a modification has

occurred is a question of fact.  <u>Alaska Statebank v. Fairco</u>, 674

P.2d 288, 292 (Alaska 1983).  <u>Gilbert v. Sexton,</u> 401 P.2d 300, 301

(Alaska 1965)[47]

> It is well established that parties to a contract can, by
> mutual agreement, modify or rescind a contract and adopt
> in its stead a new agreement.  An agreement to change the
> terms of a contract may be shown by the conduct of the
> parties, as well as by evidence of an explicit agreement

---

[47]  *See also U. S. for the use of Ascher Brothers Co. , Inc. v.
American Home Assurance Co.,* 2003 U.S. Dist. LEXIS 21388 at 51-52
(N.D. Ill. E.D. 2003), a Miller Act case, in which it was stated:

  A written contract may be modified by a subsequent oral
  agreement, even where the contract precludes oral
  modification. [*U.S. ex. rel. Specialty Erectors v.*] *Wil-
  Freds Constr.,* 1997 U.S. Dist. LEXIS 75, 1997 WL 11041 at
  3 [N.D. Ill. 1997)], citing *Tadros v. Kuzmak,* 277
  Ill.App. 3d 301, 312, 660 N.E.2d 162, 170, 213 Ill. Dec.
  905 (1995).  Further "[a] contract is validly modified if
  the party which did not propose the changes is shown to
  acquiesce in the modification through a course of conduct
  consistent with acceptance." *Wil-Freds,* 1997 U.S. Dist
  LEXIS 75, 1997 WL  11041 at 3, citing *Maher & Assoc.,
  Inc. v. Quality Cabinets,* 267 Ill. App.3d 69, 78, 640
  N.E.2d 1000, 1007, 203 Ill. Dec. 850 (1994).

to modify.

Matanuska Valley Farmers Cooperating Ass'n v. Monaghan, 188 F.2d
906, 909 (9th Cir. 1951). In Monaghan, the appellate court reversed
the district court which had enforced the terms of a written
contract, where the parties had never followed the contract,
"choos[ing] to abandon the contract as written," thereby modifying
it "by mutual agreement."[48]  The court concluded:

> The circumstances of the operation of the Cooperative
> demonstrate that the parties agreed to modify the written
> contract, substituting therefor another method of
> payment....  The appellee should not be permitted to
> modify the contract when it is to his benefit to do so
> and then reinstate it and insist upon strict performance
> when that position would benefit him most. We think that
> is what he is attempting to do here.[49]

The modification-by-conduct rule applies even when the original
contact was integrated.

> It is a well established rule of law that parties to a
> written contract may modify, waive or make new terms
> notwithstanding terms in the contract designed to hamper
> such freedom.

Davis v. Payne and Day, Inc., 348 P.2d 337, 339 (Utah 1960)
(footnote omitted).[50]

As was recognized in Blough v. United States, 17 Cl. Ct. 186,
189 (1989):

> Contracts "must be interpreted in accordance with the
> parties' understanding as shown by their conduct before

---

[48]  *Id*. at 907-9.

[49]  *Id*. at 910.

[50]  *See also* footnote 47 *supra*.

the controversy." *Julius Goldman's Egg City [v. United States]*, 697 F.2d [1051] at 1058 [(Fed. Cir. 1983)], *accord Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988). Unquestionably, it is a "truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement itself." *Macke Co. v. United States*, 199 Ct. Cl. 552, 556, 467 F.2d 1323, 1325 (1972); *accord Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1566 (Fed. Cir. 1987).

It is far too late for Kanag'Iq to now insist on contract terms that were jettisoned at the beginning of the parties' relationship.

Moreover, Kanag'Iq, as a result of its conduct has waived[51] any right, if any ever existed, to rely upon the "unit price" terms of the written contract. It failed to perform any counts, or to require the government to perform them, for years, and it insisted that GMW perform its work without explaining to it that payment would not be made, as it had been in the past, in the amount of the bids GMW provided. If Kanag'Iq meant to change the rules, it had a duty to speak out and get GMW's agreement. It did not.

---

[51]        Waiver is generally defined as "the intentional relinquishment of a known right."... A waiver can be accomplished either expressly or implicitly. An implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party.

Milne v. Anderson, 576 P.2d 109, 112 (Alaska 1978)(citations omitted).

B.    THE OLD WRITTEN SUBCONTRACT EXPIRED BY IT TERMS

Even though Mr. Jury testified that the subcontract ended in 2001 as the document specified,[52] and that there were only verbal contracts thereafter,[53] Kanag'Iq now argues that the contract continued through 2004 by virtue of the incorporation of the prime contract into the subcontract.

The prime contract nowhere provides, however, that if Kanag'Iq's contract with the government was extended, Kanag'Iq has the right to extend the duration of, and enforce the original terms of, its subcontract with GMW.[54]

Neither does the language of Paragraph A of the subcontract require an extension of the subcontract. Although it provides that the subcontractor will assume toward the contractor all obligations and responsibilities the contractor has assumed toward the owner, that paragraph is limited by the phrase "to the extent of the work herein subcontracted." It applies to the work, not the duration of the subcontract, and the duration of the subcontract is clearly limited.

---

[52]    The subcontract's third paragraph, in boldfaced type, provides that the, **"Contract will be for base year from September 29, 2000 to September 29, 2001."**

[53]    Deposition of William Jury at 40. He testified that there were verbal agreements with the same terms thereafter.   *Id*.

[54]    Under the prime contract, Kanag'Iq was to be paid more each succeeding year for each item of work.   Mr. Jury testified that while the prices paid to Kanag'Iq went up, the prices paid to GMW did not.   Jury deposition at 40-42.

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT - PAGE 17

The incorporation of a prime contract into a subcontract is effective only to the extent that there is no conflict with the specific agreements in the subcontract. It the subcontract contain words of definite limitation, they will be given effect and the reference will be limited accordingly. <u>Perry v. U.S. for the Use of Newell</u>, 146 F.2d 398, 400 (5th Cir. 1945).

Paragraph 2 does not work to extend the subcontract either. That paragraph, provides that the subcontractor agrees:

> [t]o be bound by all laws, government regulations, and orders, and all provisions of the MAIN CONTRACT which provisions are incorporated by reference and to be bound by the provisions attached hereto.

It clearly refers to work rules and, even if it is construed more generally, no clause in the main contract provides that Kanag'Iq has a right to extend its subcontracts if the government extends Kanag'Iq's contract.

Moreover, even general incorporations by reference of prime contracts into subcontracts are properly read as including only those clauses relating to the performance of the work and the furnishing of materials. <i>See</i> <u>Reed v. Long</u>, 327 F.2d 611, 614(6th Cir. 1964) cert. den. 379 U.S. 835, 85 S.Ct. 69, 13 L.Ed.2d 43 (1964)(finding that a subcontract similar to the subcontract in this case incorporated only those conditions relating to the furnishing of material and performance of the work applicable to the subcontract and did not incorporate the indemnity provisions of the contract); <u>United States for the Use of T/N Plumbing & Heating</u>

OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT - PAGE 18

Co. v. Fryd Construction Corp., 423 F.2d 980, 983 (5th Cir. 1970) cert. den. 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)(reiterating that "a general incorporation by reference, of the terms of the principal contract, refers only to 'the quality and manner of the subcontractor's work, not the rights and remedies he may have against the prime contractor'"(citations omitted); John W. Johnson, Inc. v. Basic Construction Co., 429 F.2d 764, 773 (D.C. Cir. 1970)(construing a provision in a subcontract incorporating the prime contract by reference as applying only to the character and manner of the work to be done by the subcontractor).

Kanag'Iq's claim, that GMW was bound by the terms of the written subcontract for years after the subcontract itself said it expired, should be rejected. In any event, Kanag'Iq and GMW long ago amended the terms of that contract.

III. SUMMARY

The evidence and testimony illustrate a pattern and course of conduct by which the parties operated during construction on the Elmendorf project. GMW provided its bids to Kanag'Iq and then was told to go to work. GMW did so with the understanding that it would be paid the sum for which it had agreed to do the work, and it was paid that way until very late in the project, after most of the work was done, when Kanag'Iq suddenly sought to change the rules.

Regardless of whether the subcontract was extended because the prime contract was extended, whether the subcontract prohibited

changes except in writing, or whether the contract was originally written as a unit price contract, the contract was modified by the conduct of the parties.

Kanag'Iq's motion for partial summary judgment should be denied. In fact, the Court should instead rule that the parties amended the contract and that GMW is entitled to be paid based on its bids and the invoices it sent to Kanag'Iq.

RESPECTFULLY SUBMITTED this 17th day of July, 2006.

SARAH J. TUGMAN
Attorney at Law
Alaska Bar No. 8310101

Sarah J. Tugman

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was ☐ mailed ☐ hand-delivered to Tom Gingras this 17th day of July, 2006.

Frances Evans