GMW v. KANAG'IQ

Page 19

1     the case - they're by delivery order number, if that

2     would be helpful to you later --

3          A.    Okay.

4          Q.    -- in reviewing the documents.  Okay.  What

5     experience does Kanag'Iq have with fire alarms or

6     sprinkler systems?

7          A.    I'm not sure I know how to answer that

8     question.  Can you put --

9          Q.    Well, this project for the government that

10    we're discussing today has to do with a fire

11    requirements contract at Elmendorf Air Force Base,

12    correct?

13         A.    Correct.

14         Q.    Right.  Before this contract, did Kanag'Iq

15    ever do any projects for anybody, government or

16    otherwise, that had to do with fire alarm or

17    sprinkler systems?

18         A.    No.

19         Q.    Can you personally install a fire alarm or

20    sprinkler system?

21         A.    Yes.

22         Q.    Anyone else on your staff at Kanag'Iq that

23    can do that?

24         A.    No.

25         Q.    Do you need any kind of government

GMW v. KANAG'IQ

```
 1   is that correct?

 2       A.   Yes.

 3       Q.   And that's a complete copy of Modification

 4   No. 6, then, according to your comparison to the

 5   contract?

 6       A.   I would have to check my records to see if

 7   it's complete.

 8       Q.   Okay.  Take a look at the next modification

 9   that's part of my Exhibit No. 1, Modification No. 7.

10       A.   (Complies.)

11       Q.   That consists of two pages; is that

12   correct?

13       A.   Yes.

14       Q.   Okay.  Okay.  Now, put these back in the

15   box, this contract, before it gets fouled up again.

16       A.   Here I can do that.

17       Q.   That's okay.  Let me just -- I'll put it

18   over to the side so we can get on with it here.

19   Thank you.

20            All right.  Okay.  Would you take a look at

21   this Exhibit No. 1 for me, Mr. Jury?  And the first

22   page of it, which has -- which is on the fire

23   protection requirements, what does it -- what does

24   the contract provide with respect to joint

25   measurement?
```

Page 40

```
 1        Q.    Okay.  Is there no other written contract?

 2        A.    There is a verbal.

 3        Q.    There is a verbal contract.  What was the

 4   verbal contract?

 5        A.    The government exercise option year one, we

 6   continued with GMW.

 7        Q.    What were the terms of the contract?

 8        A.    Same as the base year.

 9        Q.    What were the specific terms?

10              MR. GINGRAS:  Object to form.  Asked and

11   answered.

12              THE WITNESS:  The same as this base year

13   contract.

14   BY MS. TUGMAN:

15        Q.    Now, your prices went up?

16        A.    Yes.

17        Q.    Did GMW's prices go up?

18        A.    No.

19        Q.    Did you agree to a second option year with

20   the government?

21        A.    Yes.

22        Q.    Did you have a contract with GMW for the

23   second option year?

24        A.    Verbal.

25        Q.    Now, your prices went up, Mr. Jury?
```

Page 41

1    A.   Yes.

2    Q.   Did GMW's go up?

3    A.   No.

4    Q.   Which prices did you agree to with GMW?

5    A.   Base year.

6    Q.   Which is?  Can you show me which exhibit

7  that is?

8    A.   I would have to check my records to verify

9  GMW's pricing.  I believe these are Kanag'Iq's total

10  contract price.

11    Q.   I'm sorry.  I don't understand.

12    A.   GMW provided me base year, option year one,

13  option year two pricing.  I don't know without

14  looking at my records that this is GMW's price and

15  Kanag'Iq.  I'd have to verify.

16    Q.   So GMW gave you estimates like you had with

17  the government; is that correct?

18    A.   GMW gave me three years of pricing.

19    Q.   Could you find that if I brought out the

20  contract documents that I got from Mr. Gingras?

21    A.   I believe I can.

22    Q.   Okay.  Let me bring those in.

23         MR. GINGRAS:  If you're going to have him

24  go through that, we've been going for a little over

25  an hour, could we take a short break?

Page 42

1              (Recess held.)

2    BY MS. TUGMAN:

3         Q.    You forgot something about the subcontract,

4    Mr. Jury?

5         A.    Yes.  May I see a subcontract?  Right here.

6    Item 2 is telling us that to be bound by the laws,

7    government regulations and orders and that the main

8    contract -- the subcontractor is also tied to the

9    main contract.  So we were bound by option year one,

10   option year two.  Therefore GMW was bound by option

11   year one, option year two.

12        Q.    So their prices went up?

13        A.    No.  My price went up.

14        Q.    You got more but GMW didn't?

15        A.    Yes.  They were given that option but

16   didn't raise their price.

17        Q.    Anytime you want to take a break or get

18   water or anything, just let me know, and we'll quit

19   and you can go ahead.

20              Okay.  Now, did you ask GMW for quotes

21   once -- on each delivery order?

22        A.    Estimates were provided.

23        Q.    By who?

24        A.    GMW.

25        Q.    And then what happened?

GMW v. KANAG'IQ

```
 1      A.    They were given direction to go do the
 2   work.
 3      Q.    And then what happened?
 4      A.    I'm not sure in what tone or what
 5   perspective are you asking then what happened.  I
 6   don't understand.
 7      Q.    Did you provide GMW with a contract?
 8      A.    No.
 9      Q.    Did you provide GMW with an agreed price
10   that you would pay them?
11      A.    No.
12      Q.    How did you reach an agreement as to how
13   you would pay GMW?
14      A.    Unit pricing.
15      Q.    And what was your agreement?
16      A.    To pay for what was installed.
17      Q.    And how was that identified?
18      A.    Identified by the federal government.
19      Q.    And did the federal government come after
20   installation and make a list of what was installed?
21      A.    I really don't remember.
22      Q.    How were you paid, Mr. Jury?
23      A.    By the government estimate.
24      Q.    Were the amounts ever modified?
25      A.    I don't recall.
```

GMW v. KANAG'IQ

Page 48

```
 1        A.    GMW provided an in-house estimate.

 2        Q.    Why?

 3              MR. GINGRAS:  Objection.  Foundation.

 4              THE WITNESS:  An estimate is a general idea

 5   of what a project should cost.

 6   BY MS. TUGMAN:

 7        Q.    What was the purpose of that?

 8        A.    Just to get a general idea.  It was an

 9   estimate of what things should cost.

10        Q.    When was the amount for each delivery

11   order, the amount due to GMW for each delivery order,

12   determined?

13        A.    I'm not sure I understand the question.

14        Q.    When did you decide how much you should pay

15   GMW for each delivery order?

16        A.    After a delivery order was complete.

17        Q.    GMW billed you prior to completion of each

18   delivery, did it not?

19        A.    Yes.

20        Q.    Those bills stated a contract amount, did

21   they not, for each delivery order?

22              MR. GINGRAS:  Object to form.  Ambiguous.

23   BY MS. TUGMAN:

24        Q.    Did you see the bills from GMW, Mr. Jury?

25        A.    I don't get too much involved in billing.
```

GMW v. KANAG'IQ

Page 65

1    A.    No.

2    Q.    Okay.  What kind of fire alarm system was

3    installed for Delivery Order 5008?  Which was what

4    building?

5    A.    I think it was 381st Intelligence.  I don't

6    know what building it was.

7    Q.    I think so, too.  Okay.  What kind of fire

8    alarm system was GMW asked to install in the 381st

9    building?

10    A.    They were asked to provide what was in the

11    contract.

12    Q.    Who asked them to provide it?

13    A.    The government.

14    Q.    Do you know if the government asked GMW to

15    provide programmable fire alarm?

16    A.    I don't know.

17    Q.    Do you know what kind of fire alarm was

18    installed, whether it was traditional or

19    programmable?

20    A.    I believe it was programmable.

21    Q.    Is there a line item on that estimate for a

22    programmable fire alarm system, Mr. Jury?

23    A.    I don't believe so.

24    Q.    Did Kanag'Iq provide any materials for

25    Delivery Order 5008?

Page 100

```
 1        Q.   And GMW went ahead and did the work without
 2    knowing how much they were going to get paid by you?
 3             MR. GINGRAS:   Object to the form of the
 4    question.  Argumentative.  Go ahead.
 5             THE WITNESS:   Yes.
 6    BY MS. TUGMAN:
 7        Q.   So what's the purpose of this document?  Do
 8    you know?
 9        A.   It's an estimate, estimated total.  That's
10    the purpose of this document.
11        Q.   Okay.  Let's take a look at 34.
12             (Exhibit 34 marked.)
13        Q.   What's this document?
14        A.   It's an invoice from GMW.
15        Q.   Does it indicate a contract amount?
16        A.   It does.
17        Q.   And what is that amount?
18        A.   $65,692.75.
19        Q.   Was GMW paid on this invoice?
20        A.   I don't know.
21        Q.   Did you object to this amount?
22        A.   I don't recall.
23        Q.   This is document No. 35.
24             (Exhibit 35 marked.)
25        Q.   Is that a Kanag'Iq-generated document?
```

GMW v. KANAG'IQ

Page 112

```
 1    not 2,000 feet of pipe like his billings often

 2    reflect.

 3         Q.   Mr. Jury, I'd like you to show me the line

 4    items for some of the work that GMW did on this

 5    project.  If you could show me where they are.  There

 6    is a lot of things --

 7         A.   Okay.  I'm not sure I'm following your --

 8              MR. GINGRAS:  Object to the form of the

 9    question.  It's overly broad and ambiguous.

10    BY MS. TUGMAN:

11         Q.   Was there an item, a line item for a foam

12    bladder for a tank on the base warehouse job?

13         A.   No.

14         Q.   Okay.  So did GMW put a foam bladder?

15         A.   Yes.

16         Q.   And how were they to be paid for that,

17    Mr. Jury?

18         A.   Good question.  It's not in their

19    subcontract.

20         Q.   The government asked them to install that

21    foam bladder, did it not?

22         A.   Kanag'Iq wasn't involved in that

23    conversation.

24         Q.   Did GMW install -- put foam into the foam

25    tank?
```

GMW v. KANAG'IQ

Page 113

```
 1          A.    I don't know if they did or not.

 2          Q.    Were you aware that was part of the job?

 3                MR. GINGRAS:   Object to the form.

 4    Ambiguous.

 5                THE WITNESS:   I think it's something that

 6    the government and GMW worked out beyond Kanag'Iq

 7    being involved.

 8    BY MS. TUGMAN:

 9          Q.    Did GMW install CPVC piping and fittings

10    instead of steel piping and fittings in the Susitna

11    Officers Club?

12          A.    Yes.

13          Q.    Is there a line item for that?

14          A.    No.

15          Q.    Again, you don't know how GMW was supposed

16    to get paid for that?

17          A.    It's not in his contract.

18          Q.    Did GMW install all programmable alarm

19    devices and panels instead of what the contract

20    called for, which was analog type?

21          A.    I believe they did.

22          Q.    You didn't know about that?

23          A.    Not until it was brought up later.

24          Q.    Did anyone from Kanag'Iq know about this?

25          A.    I don't know.
```

GMW v. KANAG'IQ

Page 114

```
 1              MR. GINGRAS:  Object to form.

 2   BY MS. TUGMAN:

 3        Q.   If someone from Kanag'Iq had had

 4   information, who would I be likely to find that

 5   information out from?

 6              MR. GINGRAS:  Object to form.  Ambiguous.

 7              THE WITNESS:  Possibly Phil Young.

 8   BY MS. TUGMAN:

 9        Q.   Okay.  Did GMW install wiring for magnetic

10   door holders?

11        A.   On the project?

12        Q.   Uh-huh.  Wasn't called for.  There was no

13   line item in the contract.  Do you remember that?

14              MR. GINGRAS:  Object to form.  Ambiguous.

15              THE WITNESS:  I think they started to, and

16   they pulled them out.  So the answer would be no.

17   BY MS. TUGMAN:

18        Q.   Do you know if they were asked to do that?

19              MR. GINGRAS:  Object to form.  Ambiguous.

20              THE WITNESS:  Asked to do what?

21   BY MS. TUGMAN:

22        Q.   Install magnetic door holders.

23        A.   Put in or -- I don't know.

24        Q.   Did GMW demo the existing fire alarm panels

25   at the 381st?
```

Page 115

1      A.   I believe they did.

2      Q.   Was there a line item in the contract for

3    that?

4      A.   No.

5      Q.   Did GMW demo the existing fire alarm

6    detection and notification appliances at the 381st?

7      A.   Say that again, please.

8      Q.   Did they demo the existing fire alarm

9    detection and notification appliances at the 381st?

10     A.   I don't know.

11     Q.   Was there a line item in the contract for

12    that?

13          MR. GINGRAS:   Object to form.  Ambiguous.

14          THE WITNESS:   I don't believe so.

15    BY MS. TUGMAN:

16     Q.   Did GMW demo the existing fire alarm panels

17    at the snow barn?

18     A.   I'm not sure.

19     Q.   Do you know if there was a line item in the

20    contract for doing that?

21     A.   I don't believe there was.

22     Q.   Did GMW demo the existing fire alarm

23    detection and notification appliances for the

24    survival building?

25     A.   I don't know if they did or not.

Page 116

1      Q.   Is there a line item in the contract for

2   doing that?

3           MR. GINGRAS:  Object to form.  Ambiguous.

4           THE WITNESS:  I don't believe there is.

5   BY MS. TUGMAN:

6      Q.   Did GMW demo the existing fire alarm

7   detection and notification appliances at the Civil

8   Air Patrol building?

9      A.   I don't know if they did or not.

10     Q.   Is there a line item in the contract for

11  that?

12     A.   I don't believe so.

13     Q.   Did GMW demo the existing fire alarm

14  detection and notification appliances in the AGE

15  building?

16     A.   I don't know.

17     Q.   Do you know if there is a line item in the

18  contract for at that?

19     A.   I don't believe there is.

20     Q.   Did GMW install the lighting in the

21  surviving -- survival building and the sprinkler

22  rising room -- the survival building sprinkler riser

23  room?

24     A.   Okay.  I'm sorry?

25     Q.   Did GMW install the lighting in the

GMW v. KANAG'IQ

Page 117

1    survival building sprinkler riser room?

2        A.    In which delivery order?

3        Q.    Well, the survival building.  I think the

4    sprinklers were 4012.  Or 5012 or 5014, one or the

5    other.

6            MR. GINGRAS:  Object to form.  Compound.

7    BY MS. TUGMAN:

8        Q.    Did GMW install lighting in the survival

9    building sprinkler riser room?

10       A.    Yes.

11       Q.    Was there a line item for that in the

12   contract?

13       A.    Some line item, yes.

14       Q.    Did GMW install heating and controls in the

15   survival building sprinkler riser room?

16       A.    Yes.

17       Q.    Was there a line item in the contract?

18       A.    Yes.

19       Q.    Did GMW install lighting in the snow˝barn

20   sprinkler riser room?

21       A.    Yes.

22       Q.    Was there a line item for that?

23       A.    Yes.

24       Q.    Did GMW install heating and controls in the

25   snow barn sprinkler riser room?

```
 1       A.   Yes.

 2            MR. GINGRAS:  Say that three times fast.

 3   BY MS. TUGMAN:

 4       Q.   Was there a line item for that?

 5       A.   Yes.

 6       Q.   Could you find me those line items for the

 7   lighting and the heating?

 8       A.   Yes.

 9       Q.   Okay.  What would you need to look at to

10   find them from?

11       A.   Go to the back of -- the very bottom of the

12   line items, and you'll find a riser building lump

13   sum, and there will be a description that entails.

14       Q.   But wasn't that work that Kanag'Iq was

15   supposed to do?

16       A.   We did some of that.

17       Q.   Did you do the heating and the lighting,

18   this work that you've just testified GMW did?  You

19   didn't do that work?

20       A.   We did the riser building.  There was a

21   lump sum, and in that lump sum was heating, lighting

22   and the building of the building.  We built the

23   building.

24       Q.   But GMW did that other work --

25       A.   And we sided the building.
```

Page 138

1           MR. GINGRAS:  Gross?  Net?  Are you talking

2    about profit?

3           MS. TUGMAN:  I'm asking how much money he

4    expected to get off this contract.

5           MR. GINGRAS:  Same objection.

6    BY MS. TUGMAN:

7      Q.   You can answer however way you want.

8      A.   I can't answer that.  I mean, I had an

9    early conversation with GMW and said, "Look.  I want

10   you to make your 15 and 10."

11     Q.   How much did you expect to make off this

12   contract?  How much money did you expect to gross --

13     A.   Fifteen percent.

14     Q.   -- from this contract?

15     A.   Fifteen percent overhead, ten percent

16   profit.  And the higher the risk, the higher the

17   profit.

18     Q.   What percentage of the work would you say

19   you performed on this project?

20     A.   Be hard to quantify.

21     Q.   Less than ten percent?

22     A.   I don't know.

23     Q.   Probably not, right?

24           MR. GINGRAS:  Object to form.

25   Argumentative.

GMW v. KANAG'IQ

1      A.    No.

2      Q.    Okay.  Take a look at 51.

3            (Exhibit 51 marked.)

4      Q.    Do you recognize that document?

5      A.    Yes.

6      Q.    Is that the quote for which GMW agreed to

7   do the work?

8      A.    It's an estimate.

9      Q.    At what time was the amount GMW -- at what

10  time was the amount GMW was to get for doing this

11  delivery order to be determined?

12     A.    I don't understand the question.

13     Q.    At what time was the amount GMW was to get

14  for doing the work, this delivery order, when were

15  you going to figure out what -- how much that was

16  going to be?

17     A.    That would have been after the job was

18  completed and counted.  And that would have been

19  based on our subcontract.

20     Q.    When did you count the job?

21     A.    I wasn't responsible for the count.

22     Q.    Who was?

23     A.    The government.

24     Q.    When did the government count it?

25     A.    I have no idea.

```
 1         Q.    Would you be surprised to find out that the

 2    government never counted it?

 3         A.    Wouldn't surprise me.

 4         Q.    So how was GMW ever to get paid?

 5         A.    Well, we kept paying them all along, so --

 6         Q.    But you stopped paying them.

 7         A.    We didn't stop paying them.  We stopped

 8    paying their overinflated invoices.  We continued to

 9    pay them.  We were trying to do damage control based

10    on severely overpriced invoicing.

11         Q.    Let's take a look at 52.  Oh, wait a sec.

12    Wait a sec.

13              (Exhibit 52 marked.)

14         Q.    Is that another of Kanag'Iq's documents?

15         A.    Yes.

16         Q.    53.

17              (Exhibit 53 marked.)

18         Q.    Was there a modification, price

19    modification for this delivery order?

20              MR. GINGRAS:  By "this order," you're

21    referring to which order?

22              MS. TUGMAN:  We're talking about 5014.  We

23    started back at Exhibit 48.

24              THE WITNESS:  Okay.

25    ////
```

GMW v. KANAG'IQ

WILLIAM JURY
4/25/2006

Page 147

1   referring to?

2          MR. GINGRAS:  Objection.  Foundation.

3          THE WITNESS:  Pardon me, now?

4   BY MS. TUGMAN:

5      Q.   Is this the price to alarm the building in

6   lieu of installation of sprinklers that Mr. Frere was

7   referring to?

8      A.   This is the estimated cost, yes.

9      Q.   Would you take a look at 58.

10          (Exhibit 58 marked.)

11      A.   Okay.

12      Q.   Have you seen that document before?

13      A.   I believe I have.

14      Q.   Is that a quote from GMW for the Civil Air

15   Patrol fire alarm?

16      A.   This is an estimate for the fire alarm at

17   Civil Air Patrol.

18      Q.   It's described in the fax as a quote, isn't

19   it?  The first page, it's described as a quote?  Flip

20   one over.  There.

21      A.   Quotes for munition storage, 5016.  And

22   then this says 5015, Civil Air Patrol.

23      Q.   Keep reading.  Keep reading.  Sprinkler and

24   fire alarm and Civil Air?  I only attached the part

25   on 5015 to this.

Page 157

```
 1    this, but I found the fax cover sheet.  Do you recall
 2    on January 16, 2004, receiving a cost breakdown from
 3    GMW?
 4         A.    January of 2004?
 5         Q.    Um-hum.
 6         A.    I'm sure I've seen it, but --
 7         Q.    Okay.  There is another --
 8               (Exhibit 65 marked.)
 9         Q.    Another one I have here that is dated --
10    wait.  This is -- we have another on -- there is two
11    cover sheets to this.  They're both dated the same
12    day.  Why are there two?  I have no idea.
13               But anyway, there are documents attached to
14    it.  Are these numbers received from GMW on June 14,
15    2004?
16         A.    Yes.
17         Q.    Does it indicate that this is the total
18    contract for work order 5016?
19         A.    It indicates total estimated amount.
20         Q.    What does the fax cover sheet say?
21         A.    It says total contract work, but this is
22    not an agreed-upon amount, because this document says
23    estimated total.
24         Q.    Okay.  Next document is 66.
25               (Exhibit 66 marked.)
```

GMW v. KANAG'IQ

WILLIAM JURY
4/25/2006

Page 177

1    to GMW at the time you received the document or at

2    the time that they did the work?

3         A.    We didn't object to the work.  We objected

4    to the billing.

5         Q.    When did you object to the billing?

6         A.    When we didn't pay them 100 percent of what

7    he was asking for.

8         Q.    So you paid him for a while?

9         A.    We paid a portion of what he was

10   performing.

11        Q.    And then you stopped paying?

12        A.    When there was no more money to be paid, we

13   just stopped payment.

14        Q.    And when did you determine the amount he

15   should be paid?

16        A.    We are finalizing that with the government

17   as we speak.

18        Q.    With the government?

19        A.    (Witness nods head.)

20        Q.    What's the government doing?

21        A.    Counting, verifying.

22        Q.    When did they begin to do that?

23        A.    March, I believe.  April.  Definitely in

24   April.

25        Q.    Now, am I wrong in understanding from