GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                      A05-170 Civil

Page 13

```
 1    Q    Right.  But in terms of seeing it, are you saying that

 2         it's just not done for the subcontractor to see the prime

 3         contract?

 4    A    Yes, I don't get the con -- ever see the contract from the

 5         general contractor to the owner.

 6    Q    Okay.  Whether you've seen it or not, did you become aware

 7         by any means that the prime contract between Kanag'iq and

 8         the government is a unit price contract?

 9    A    That's how it was established.

10                                           (Exhibit A Proffered)

11    Q    I'm going to hand you what's been marked as Exhibit A to

12         yet another Johnson's deposition, the one yesterday which

13         you attended, and ask you to take a look at that.  And

14         after you've looked at it, I'd like you to identify it.

15    A    It appears to be our subcontract.

16    Q    Your subcontract with Kanag'iq?

17    A    That's correct.

18    Q    And on page 2, is that your signature?

19    A    Yes.

20    Q    Okay.  And it looks as though you executed it on October

21         26th, 2000.  Does that sound right?

22    A    That's what it says, yes.

23    Q    Okay.  Looking at the first page, you see about halfway

24         down, there are two paragraphs that have parentheticals in

25         front of them, A and B?
```

Computer Matrix, LLC                Phone - 907-243-0668            jpk@gci.net
310 K Street, Suite 200             Fax   907-243-1473             sahile@gci.net

GLEN F. JOHNSON                        5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                        A05-170 Civil

Page 14

```
 1   A    Yes.

 2   Q    I'd like you to read subparagraph B out loud, please.

 3   A    Unit prices as set forth below which on the basis of

 4        estimated quantities will involve a gross contract price

 5        of approximately, per attached fax, quotation, of zero

 6        dollars.  Subcontractor will be paid by line items.

 7   Q    Okay.  And that's one the terms of your contract with

 8        Kanag'iq, correct?

 9   A    For the first year, yes.

10   Q    We'll get to that in a minute.  Setting aside the time

11        frame for the moment, that is the language for a unit

12        price contract, correct?

13   A    Yes.

14   Q    So you concede that for the first year at least, it was a

15        unit price contract with Kanag'iq, correct?

16   A    That's not how it was handled, even for the first year.

17   Q    So in other words, you don't concede that?

18   A    No.

19   Q    Looking a little further down the first page, I'd like you

20        to read paragraph two out loud.

21   A    To be bound by all laws, government regulations and orders

22        and all provisions of the main contract, which provisions

23        are incorporated by reference and to be bound by

24        provisions attached here unto -- or hereto.

25   Q    Okay.  And this isn't the first contract you ever signed,
```

Page 24

1          2001?

2     A    The same way I had been prior.  They asked for prices, I

3          gave them prices, they said go to work.

4     Q    Who asked for prices?

5     A    Most of the time it was Bill Jury.

6     Q    I'm going to ask you a hypothetical question, so bear with

7          me.  And you need to realize you are going to make certain

8          assumptions but only for purposes of this question.

9          You're not conceding the point for purposes of litigation.

10         A hypothetical question.  Assume that the court in this

11         case, hypothetically, disagrees with your view on the

12         contract term.

13         MS. TUGMAN:  I object to the form of the question.

14         MR. GINGRAS:  Well, go ahead.....

15         MS. TUGMAN:  He's not an.....

16         MR. GINGRAS:  Let me finish the question.

17         MS. TUGMAN:  .....expert witness.  A hypothetical question

18    is inappropriate.

19         MR. GINGRAS:  Let me finish the question before you

20    object.

21    Q    Assume that the court in this case concludes that you're

22         mistaken about the contract term.  That because the prime

23         contract was incorporated by reference, the option years

24         are also incorporated by reference.  Assume that the court

25         disagrees with your views on whether or not a unit price

Page 33

```
 1         considering unit pricing contracts in the abstract, it's

 2         true that engineering would not be included in the unit

 3         price but would be built -- an awkward question, forget

 4         it.  In a unit price contract, if there's engineering

 5         costs, those would ordinarily be embedded in the line item

 6         number for the component being installed, correct?

 7   A     No.  There was a line item for surveying of fire alarm,

 8         and there was a line item for sprinkler number on the top,

 9         and that was for the design.

10   Q     Okay.  So generally speaking, unless there's a line item

11         in a unit price contract, the activity does not get paid

12         for, correct?

13   A     Generally speaking, if there's not a line item that is

14         being done then it should be addressed, which it had been,

15         and it should be either incorporated into the estimate

16         sheet as a new line item or as we had been informed to do,

17         add it in another area.

18   Q     When you say add it in another area, what does that mean?

19   A     Fill.

20   Q     I'm sorry, what?

21   A     We -- we were informed to use additional items to cover

22         costs that were not covered by the contract.

23   Q     Explain to me how that would work.

24   A     Well, in the instance you brought up yesterday, exit

25         signs, that GMW charged $80,000 for removal and work on
```

GLEN F. JOHNSON                     5/17/2006          GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 34

```
 1        exit signs throughout this project.  That was one item GMW

 2        had been informed to use to cover costs that were not line

 3        items.

 4   Q    Okay.  And who do you claim told you that?

 5   A    One person was Steve Frere and I believe we had other

 6        conversations with Phil, possibly Bill, I don't remember

 7        if Bill was part of this.

 8   Q    Okay.  And when you say Phil, are you referring to Phil

 9        Young?

10   A    That's correct.

11   Q    I'm interested in the relationship between time and

12        materials.  In the real world, I mean, you engineering

13        materials are 30 to 40 percent of the job, right?

14   A    No.  I just sent out one today asking for a breakdown, it

15        was 50/50.

16   Q    Okay.  Fifty percent between engineering materials and 50

17        percent the labor?

18   A    Fifty percent materials, 50 percent labor and engineering

19        is how it worked out.

20   Q    Okay.  Is 50/50 a fairly typical ratio?

21   A    There is no typical.

22   Q    Have you ever said that in the real world your engineering

23        materials are 38 to 40 percent of the job?

24   A    I possibly could have.

25        MR. GINGRAS:  Okay.  Let's go ahead and mark this as
```

Page 40

| | | |
|---|---|---|
| 1 | | were no longer under contract? |
| 2 | A | No. |
| 3 | Q | Do you know what the total amount is that has been paid to |
| 4 | | GMW by Kanag'iq? |
| 5 | A | In generalities. |
| 6 | Q | Okay.  In generalities, what is it? |
| 7 | A | A little over one and a half million dollars. |
| 8 | Q | Do you know what he total of GMW's invoices to Kanag'iq |
| 9 | | is? |
| 10 | A | A little over two million. |
| 11 | Q | Who at GMW would prepare invoices to be sent to Kanag'iq? |
| 12 | A | Gretchen Grau (ph) with the information I have given her. |
| 13 | Q | Okay.  So you'd give her the numbers and she'd type them |
| 14 | | up? |
| 15 | A | I will have given her the contract amount in the beginning |
| 16 | | of the project and what percentages were what and how far |
| 17 | | we were done with each items, such as engineering |
| 18 | | materials and installation. |
| 19 | Q | And we'll look at some invoices in a minute but first some |
| 20 | | general questions about format.  Were your invoices to |
| 21 | | Kanag'iq itemized? |
| 22 | A | No. |
| 23 | Q | If someone at Kanag'iq wanted to check your invoice |
| 24 | | amounts against the schedule of prices, the unit prices in |
| 25 | | Exhibit A, who would they be able to do that? |

GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 41

1   A   That wasn't how the projects was run.

2   Q   Well primarily, that's not how the project was billed by

3       GMW, is it?

4   A   That's not how the wha -- project was run.

5   Q   Getting back to my question, I understand your contention

6       that that's not how the project was run.  It will be

7       difficult to track GMW invoices against the price schedule

8       that's part of Exhibit A, correct?

9   A   The price schedule had nothing to do with the invoices.

10      REPORTER:  You need to trade mics.

11  Q   Should the invoices.....

12      REPORTER:  It's okay.

13  Q   You're saying the invoices had nothing to do with the unit

14      price schedule that was part of Exhibit A?

15  A   Part of -- Exhibit A was the original pretend job we bid

16      to Kanag'iq for them to decide which contractor they were

17      going to use.

18  Q   Uh-huh.  (Affirmative)

19  A   Simplex Grinnell I believe was one that provided the same

20      thing.  I never was privy to what their numbers were or

21      anything like that.

22  Q   Okay.  And by way of the background, Kanag'iq was the

23      general contractor for this project, right?

24  A   That's correct.

25  Q   Okay.  And GMW became Kanag'iq's subcontractor for fire

GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                               A05-170 Civil

Page 42

```
 1         alarm.....

 2    A    Yes.

 3    Q    .....and sprinkler systems?

 4    A    Yes.

 5    Q    Did you say the pretend job?

 6    A    Yes.  We were given line items, quantities, and asked to

 7         provide what we could do those line items for and they

 8         were compared with two or three other companies' prices.

 9    Q    Okay.  And you've said that those are the line item prices

10         that you used in doing your estimates for Kanag'iq,

11         correct?

12    A    The price that I provided to Kanag'iq in that format.

13    Q    And since you're using those prices from the schedule

14         that's part of Exhibit A, why did your invoices not

15         reflect the kind of units that were being billed in each

16         particular invoice?

17    A    Because they were used as a tool to come to a bottom line

18         price only.

19    Q    Assume for purposes of this question that Kanag'iq was

20         trusting GMW to bill it fairly.  Was that a fair

21         assumption for Kanag'iq to make?

22         MS. TUGMAN:  Objection.  Argumentative.

23    A    I can't assume what Kanag'iq thought or didn't think.

24    Q    In any event, GMW should have billed Kanag'iq fairly,

25         correct?
```

GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                A05-170 Civil

Page 43

```
 1    A    GMW did bill correctly and fairly as per the prices we

 2         provided to Kanag'iq before we started the projects.

 3    Q    Before this project, had you ever worked with a unit price

 4         contract before?

 5    A    No.

 6    Q    Did you ever ask anybody what a unit price contract was?

 7    A    No.

 8    Q    When you pay your workers on the project, does that result

 9         in a certified payroll document being generated?

10    A    Individuals that are onsite are turned in on certified

11         payroll, that is correct.

12    Q    Okay.  And other than individuals who are onsite who are

13         reflected on certified payroll, is anyone else paid in

14         connection with work on the project?

15    A    Certainly.

16    Q    Okay.  Like who?

17    A    Engineers -- or designers, I should saw.  Shop personnel.

18         Office personnel.  Superintendents.

19    Q    And those individuals are not reflected in the certified

20         payrolls?

21    A    Absolutely not.

22    Q    The people who are onsite are the ones that do the

23         installation work, correct?

24    A    That's correct.

25    Q    And all of the installation work, all that labor is
```

GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 44

1           reflected in the certified payrolls, correct?

2    A      Correct.

3    Q      Did you ever tell anyone at Kanag'iq that you considered

4           the prices schedule that was part of Exhibit A to be for a

5           pretend job?

6    A      Kanag'iq provided that so they could compare my prices

7           with Grinnell Fire Protection and one or two other

8           companies.  It was so they would know apples to apples

9           versus -- that's what it was for.

10   Q      When did this dispute over billing first come up?

11   A      In the best of my recollection, we were probably

12          two-thirds of the way through the project of 2004 when I

13          noticed that we weren't getting paid what we were billing.

14   Q      And did you bring it to someone's attention at Kanag'iq?

15   A      Yes, I did.

16   Q      Okay.  And who did you speak to first?

17   A      Phil Young first.

18   Q      And what did you say to him and what did he say to you?

19   A      I explained to Phil that I had noticed that there were

20          reduced prices on Kanag'iq's paperwork saying Kanag'iq's

21          threshold and I didn't understand what that was about.

22          And that they couldn't just arbitrarily start reducing my

23          pay.

24   Q      And what did he say?

25   A      Well, you need to talk to Bill.

Computer Matrix, LLC                Phone - 907-243-0668                    jpk@gci.net
310 K Street, Suite 200               Fax   907-243-1473                  sahile@gci.net

Page 45

| | | |
|---|---|---|
| 1 | Q | Well, what do you remember him saying?  Or I misunderstand |
| 2 | | you -- I must have missed something.  I was looking at a |
| 3 | | document.  Who were you talking to in this convers..... |
| 4 | A | Phil Young. |
| 5 | Q | Okay.  And what did Phil Young say to you? |
| 6 | A | That I needed to talk to Bill about that. |
| 7 | Q | Okay.  And did you talk to Bill about it? |
| 8 | A | I tried to.  Bill was out of town. |
| 9 | Q | Okay.  So did you try more than once? |
| 10 | A | Yes, there was -- I believe some faxes went back and |
| 11 | | forth, or at least from me. |
| 12 | Q | Okay.  But I'm asking about conversations.  Did you ever |
| 13 | | have a conversation with Bill Jury about the billing |
| 14 | | dispute? |
| 15 | A | I believe one. |
| 16 | Q | Okay.  And about what time frame did that happen? |
| 17 | A | Somewhere, like I said, when we were two-thirds or more |
| 18 | | done with the projects. |
| 19 | Q | But in -- was this in person or on the phone? |
| 20 | A | I don't remember. |
| 21 | Q | How long did the conversation last? |
| 22 | A | I don't remember that either. |
| 23 | Q | What did you say to him and what did he say to you? |
| 24 | A | I said that I didn't understand him changing numbers or |
| 25 | | what his threshold was.  He said that he believed two of |

GLEN F. JOHNSON                          5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                        A05-170 Civil

Page 46

```
 1        my invoicing was out of line and that he had gotten -- or

 2        two of my prices was out of line and that he had gotten a

 3        price for some other work and he wanted me to rework them,

 4        the prices.

 5    Q   And what was your response, if any?

 6    A   I told him I would look at that.  I did want to get paid

 7        and I did look at the two projects and I did reduce the

 8        prices for him.

 9    Q   Which two projects are you talking about?

10    A   The snow barn and the Susitna Club.

11    Q   And with respect to those two projects, how much did you

12        reduce the price?

13    A   Well, the snow barn I believe was substantial.  I'm not

14        sure exactly.  It was over $50,000, I believe, lowered.

15    Q   Okay.  How about the Susitna Club?

16    A   Somewhere in the same range.  I'm not sure.

17    Q   So a total reduction of approximately $100,000?

18    A   Somewhere in that range, that's correct.

19    Q   Is that reduction reflected in the amount you're claiming

20        in the lawsuit?

21    A   Yes.

22    Q   So you adjusted your billing amount.  Then what happened

23        next?

24    A   We continued to work on the projects and we were informed

25        we were going to receive monies and it was going to be
```

Computer Matrix, LLC                    Phone - 907-243-0668                      jpk@gci.net
310 K Street, Suite 200                 Fax    907-243-1473                      sahile@gci.net

GLEN F. JOHNSON                    5/17/2006         GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                          A05-170 Civil

Page 47

| | | |
|---|---|---|
| 1 | | rectified and that didn't happen. |
| 2 | Q | Did you ever talk to Bill Jury after that one |
| 3 | | conversation? |
| 4 | A | I don't recall. |
| 5 | Q | Other than Bill Jury and Phil Young, did you talk to |
| 6 | | anyone else about the billing dispute at Kanag'iq? |
| 7 | A | At Kanag'iq? I don't recall talking to anyone besides -- |
| 8 | | oh, Ray Hamilton in 2005. |
| 9 | Q | Okay. And tell me when in 2005 that conversation |
| 10 | | happened? |
| 11 | A | I believe it was in February. I don't recall the exact |
| 12 | | dates. |
| 13 | Q | Was it in person or on the phone? |
| 14 | A | Both. |
| 15 | Q | More than one conversation? |
| 16 | A | Yes. |
| 17 | Q | Okay. How many conversations did you have? |
| 18 | A | We had some email go back and forth and he came over to my |
| 19 | | office. |
| 20 | Q | Okay. During the course of those conversations, as best |
| 21 | | you recall, what did you say to him and what did he say to |
| 22 | | you? |
| 23 | A | I said that I expected to be paid and he said he expected |
| 24 | | -- well actually, he said that Bill was requiring me to |
| 25 | | recount all the items on all the projects. |

GLEN F. JOHNSON                    5/17/2006         GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                        A05-170 Civil

Page 49

```
 1        such as that.

 2   Q    Okay.

 3   A    And I explained to him that those items were for items

 4        that there were no line items for, such as lighting,

 5        heating, and controls, demo and such.

 6   Q    Uh-huh.  (Affirmative)

 7   A    And he wanted that reflected and recounted.

 8   Q    Okay.  Did you say anything else to him?

 9   A    I may have.  I couldn't recall.

10   Q    Okay.  How about the second conversation?  Was that also a

11        meeting in person?

12   A    Yes.

13   Q    And was that the one where Ray came to your office?

14   A    He came to my office, that's correct.

15   Q    Okay.  And was that the one where, according to you, he

16        suggested that Kanag'iq would pay some additional money?

17        Or was that the first meeting?

18   A    I don't remember which meeting.  I think it was the first,

19        but I don't know.

20   Q    Okay.  At the second meeting, what did you say to him and

21        what did he say to you?

22   A    He said he was -- had expected my -- me to recount and I

23        said, well, I know you expected that but I hadn't said I

24        was going to do that.  I didn't feel like that was my job.

25        And he told me that if I didn't recount it, I wouldn't get
```

GLEN F. JOHNSON                    5/17/2006         GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                A05-170 Civil

Page 50

```
 1        paid.
 2   Q    Let's pause there for a moment.  Would you agree that
 3        Kanag'iq should only have to pay for stuff that was
 4        actually installed?
 5   A    No.
 6   Q    They should have to pay for items that were not installed?
 7   A    They should have to pay for the agreed amount that I
 8        provided.
 9   Q    Here's what I'm asking, suppose that the schedule for a
10        particular building says the estimate is 5,000 widgets.
11   A    Uh-huh.  (Affirmative)
12   Q    Okay.  And in fact GMW only installed 4,000 widgets.
13   A    Uh-huh.  (Affirmative)
14   Q    Should Kanag'iq have to pay for 5,000 widgets?
15   A    There are items that were not line items that were used,
16        those things were used as fillers to cover those costs.
17        So your hypothetical request for me answer, I cannot
18        answer that the way you'd like me to.
19   Q    In the abstract then, not talking about this project,
20        would you agree as a general principle that in a unit
21        price contract, the general contractor should only have to
22        pay for items that are actually installed?
23   A    This contract was never handled as.....
24   Q    I'm not talking about this contract.  In the abstract, in
25        a unit price contract situation.....
```

GLEN F. JOHNSON                    5/17/2006                    GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                              A05-170 Civil

Page 51

1          MS. TUGMAN:  Objection.  Calls for speculation.  Assumes

2     facts not in evidence.

3          MR. GINGRAS:  Please, Sarah, let me finish my objection

4     before you make it.

5     Q    In a unit price contract situation, in the abstract, would

6          you agree with the principle that the general contractor

7          should not have to pay for items that are not installed?

8     A    If that contract is handled all the way through the

9          project per only line items, yes.

10    Q    So your contention is that somehow this unit price

11         contract is different and that it was run differently?

12    A    It was always run differently from day one.

13    Q    What I'm going to do is hand you a stack of invoices and

14         ask you to take a look at them.  I tried to hit all of

15         them as possible but I missed one or two because there are

16         a number of them but I'll -- going to be asking you some

17         different questions about them.

18    A    Yes.

19    Q    First, you know like I say, take a quick look to make sure

20         that you recognize them.

21         MR. GINGRAS:  And I don't have a duplicate set of those,

22    Sarah, you're welcome to look over his shoulder or whatever

23    you'd like to do.

24         (Pause)

25    A    Okay.

Page 53

 1          then that's where the 20 percent or 15 or 50 percent would

 2          come in.  That's how the billing would be done.

 3   Q   To the extent that those invoices reflect items actually

 4          installed in the project, the prices for those items

 5          should be the same price contained in the schedule that's

 6          part of Exhibit A, correct?

 7   A   The price here is reflective only of the bottom line

 8          number that was given to Kanag'iq through the tool of the

 9          estimate sheet.

10   Q   But the bottom line number that you're talking about.....

11   A   Uh-huh.  (Affirmative)

12   Q   .....necessarily includes some components that are being

13          installed, correct?

14   A   Certainly.

15   Q   Okay.  And my question is, to the extent that the invoice

16          reflects components that have been installed, the prices

17          for those components should be the prices from the

18          schedule in Exhibit A, correct?

19   A   Please repeat that.

20   Q   Sure.  To the extent that the invoice reflects the

21          installation of components, the price for those components

22          should be the price reflected in schedule A -- in the

23          schedule to Exhibit A?

24   A   This doesn't reflect items on that, other than the lower

25          bottom price.  I'm -- I'm missing.....

GLEN F. JOHNSON                    5/17/2006         GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 54

1    Q    Yeah.....

2    A    .....what you're trying to get.....

3    Q    .....you're not understanding my question.

4    A    No.

5    Q    I realize that there are line items that do not appear on

6         the invoice.  What I'm asking is that to the extent that

7         the price of components is built into the general invoice

8         amount, the prices for those components should be prices

9         taken from the schedule that's part of Exhibit A?

10        MS. TUGMAN:  He's answered it three times and he's said

11   no.

12        MR. GINGRAS:  That's a different question.  You

13   misund.....

14        MS. TUGMAN:  No, I don't.....

15   A    I'm not understanding.  This is reflective only on the

16        bottom line price.  It had nothing to do with quantities

17        of anything.

18   Q    So your position is that you could invoice Kanag'iq for

19        whatever lump sum amount you felt was appropriate based on

20        your estimate without regard to the unit price schedule

21        that was part of Exhibit A?

22   A    The way this project was handled throughout, Kanag'iq

23        asked for a price, GMW provided a price from year one to

24        year -- the final year, we were paid on that price we

25        provided, we installed off of that price, and we were

Page 55

```
 1        completely paid off of that.  There was not recounts.

 2        There was nothing.  It was bottom line project every time.

 3                                    (Exhibit 12 Proffered)

 4   Q    Let's see, did I give you Exhibit 12?

 5   A    Yes.

 6   Q    Okay.  And again, like I said -- never mind that.  It's

 7        the same thing, no line item reflected, right?

 8   A    That's correct.

 9                                    (Exhibit 21 Proffered)

10   Q    Okay.  How about let's flip to Exhibit 21.  Do you have

11        Exhibit 21 in front of you?

12   A    Yes.

13   Q    You see that there's a reference to 100 percent

14        engineering and 25 percent installation?

15   A    Yes.

16   Q    And the amount being billed is $140,000?

17   A    Yes.

18   Q    Explain to me the breakdown between 100 percent

19        engineering and 25 percent installation.  What does that

20        mean?

21   A    It means we had completed the engineering and we had done

22        25 percent of the installation of the work.

23   Q    Okay.  Is it your intention through this invoice to bill

24        Kanag'iq for engineering work?

25   A    No, it's to -- the engineering -- yes, of course, I'm
```

GLEN F. JOHNSON                    5/17/2006          GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                          A05-170 Civil

Page 58

1          that's how I would come up with that.

2     Q    When you send an invoice like this, Exhibit 24 I think

3          we're on, is that correct?  I got it.....

4     A    That's the one we're one.

5     Q    Yeah.  When you send an invoice like Exhibit 24 and it

6          refers to the contract amount, did you send a cover letter

7          to the billing person at Kanag'iq saying that when you

8          were talking about contract, you don't mean the

9          subcontract?

10    A    Each one of these were individual contracts, work orders.

11    Q    But the answer to my question is, no, you didn't send a

12         cover letter saying that when I use the word contract.....

13    A    No.

14    Q    .....I don't mean the subcontract?

15    A    No.

16    Q    Okay.  Before this project, did you know Steve Frere?

17    A    No.

18    Q    During the course of this project, did you become

19         acquainted with Steve Frere?

20    A    A little bit.

21    Q    When you say a little bit, what does that mean?

22    A    I didn't have a lot of dealings with Steve myself.  Thomas

23         did.  Clayton did.  But day to day, I didn't have much to

24         do with Steve.

25    Q    You heard Thomas Johnson yesterday testify that according

Page 61

```
 1   A    Because I don't know him.

 2   Q    After this billing dispute arose, the one with Kanag'iq,

 3        did you ever talk to anyone with the government about

 4        Kanag'iq in terms of their non-payment?

 5   A    Yes.

 6   Q    Who with the government did you speak with?

 7   A    Sergeant Brown.  Lucy.  Steve Frere.

 8   Q    Okay.  And during the course of those conversations, what

 9        did you say to them about Kanag'iq?

10   A    That I had not been receiving payments due me.

11   Q    Anything else?

12   A    That's the gist of it.  There might have been a few other

13        things but that was the gist of the argument.

14   Q    Did you make any comments about Kanag'iq that could be

15        interpreted as negative comments?

16   A    Don't recall.

17   Q    Did you make any comments trying to dissuade the

18        government from giving Kanag'iq additional work?

19   A    No.

20   Q    With respect to the current project involving Steve Frere

21        and the government, is GMW the general contractor or the

22        sub?

23   A    The subcontractor.

24   Q    Who is the general?

25   A    Windsor Construction.
```

GLEN F. JOHNSON                              5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                         A05-170 Civil

Page 65

```
 1            MR. GINGRAS:  Let me go off record for a minute, Wanda.

 2            REPORTER:  Off record.

 3            (Off record)

 4            (On record)

 5            REPORTER:  We're back on record.

 6    Q       On the base warehouses, do you recall whether or not there

 7            were more than eight groove flanges installed?

 8    A       I do not recall.

 9    Q       And if I understand your position correctly, and I want to

10            make sure I do, what you're saying is it doesn't matter if

11            the quantities changes according to your view because of

12            the way you believe the contract was working?

13    A       Yes.

14    Q       So you don't care whether the quantities installed match

15            the estimate that you gave Kanag'iq or not?

16    A       Most cases I tried to be as close as possible.

17    Q       Why would you do that?

18    A       Because I tried to be fair.

19    Q       When you were working on some of these buildings, did you

20            change the unit pricing?

21    A       There was the corruption I discussed with your earlier

22            that Ray Hamilton brought to my attention.

23    Q       Okay.  On some.....

24    A       That was not intentional.

25    Q       Okay.  On some of the buildings, did the unit pricing
```

GLEN F. JOHNSON                    5/17/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                    A05-170 Civil

Page 66

1    change from your end a number of times?

2  A   No.  Not a number of times.  The bottom price did.

3  Q   And how would those changes come about?

4  A   The 381st, there was a change because conduit was supposed

5      to be used in the beginning, our price was over the

6      budget, they needed to reduce it, so they allowed us to

7      use cabling instead, which reduced the price.  Same thing

8      with Susitna Club.  There were things such as that that

9      made prices change.

10 Q   One general principle I'd like to establish.  Even under

11     your view of the contract -- with which we disagree, by

12     the way -- but even under your view of the contract, GMW

13     should not bill Kanag'iq for the same item twice, correct?

14 A   I'm.....

15 Q   For example, if you have a situation where there are alarm

16     bells used in the system and GMW bills Kanag'iq for the

17     alarm bills used say in the fire prevention system, it

18     shouldn't bill Kanag'iq again for the same fire alarm bell

19     in the sprinkler system, should it?

20 A   The sprinkler system bell would have been provided but not

21     installed by the sprinkler side of it.  The sprinkler bell

22     would have been installed by the fire alarm side, which

23     would have the labor in part -- in its part of the

24     estimate.  So that is -- it appears that it's double

25     billed but it's not.