Page 13

```
 1              to look at this in the framework of the contract and als

 2              -- I mean, you -- you -- everything in that unit price has

 3              to incorporate all these requirements, okay.

 4    Q    For example.....

 5    A    Well, if you -- this -- see, this type of contract is --

 6              is -- the government likes these types of contracts

 7              because they're fully transparent and therefore

 8              audit-able.  So when you go out, you -- you work -- you

 9              have that list of tasks or the unit price schedule is what

10              I would always call that.  And if you're going out there

11              and doing an audit, you see an elbow up there, a two and a

12              half inch elbow, that's what you'd get.  All right.

13              There.....

14    Q    And that's what you pay for?

15    A    You pay for it.  That's -- that's the government's mind

16              set in regards to these types of contracts.  That's why

17              they like them.  It doesn't matter what kind of a story

18              about that elbow is.  How difficult or how easy it was, it

19              doesn't matter.  You get paid for that elbow.

20    Q    And that helps clarify for me what this unit price

21              reference mean because for example, the definition from

22              the contract says each -- the unit price on the bid

23              schedule for each item includes all materials, labor,

24              equipment, tools, quality control testing, mobilization,

25              demobilization, overhead, profit, bonding, and submittals
```

Page 15

```
 1        down on that unit price schedule.
 2   Q    Because the contractor, the general contractor, is putting
 3        himself at risk if he underestimates the cost of doing a
 4        unit price item.....
 5   A    Yeah, it's a -- it's -- it's a -- you know, the government
 6        likes them because it's very indisputable.  I mean, if
 7        you've got a piece of equipment that's installed, that's
 8        what you get.  So any -- you know, if there are any
 9        disputes then they can be resolved by means of an audit.
10        In other words, you can -- differences in line items and
11        quantities can be resolved by an audit.
12   Q    You can go look at the job.
13   A    Yeah.  That's why -- that's the -- that's the -- the --
14        the premise is that the government really loves these
15        things because these types of contracts are full
16        transparent and audit-able, all right.  It's -- it's a --
17        that's the basis of the contract, is the unit price
18        schedule in the context of the project documents.
19   Q    And during the course of your deposition, Mr. Frere, I'm
20        going to refer to either the project or the job.
21   A    Uh-huh.  (Affirmative)
22   Q    Whenever I say that, I'm going to be referring to the
23        project that brings us here, the Elmendorf fire protection
24        contract.  Is that okay with you?
25   A    Yes.
```

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

STEVE FRERE                           5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                      A05-170 Civil

Page 22

1           be paid like 1.9 million?

2    A      In a meeting with -- I think it was Ray Hamilton and Bill

3           Jury.

4    Q      Okay.

5    A      We -- in the fall we got -- every once in awhile we would

6           get together and go over where we were fund-wise because I

7           was always terrified of not having sufficient funds to --

8           to pay Kanag'iq in accordance with the terms of our

9           contract.  Because the terms of our contract is about as

10          unambiguous as terms of a contract I've ever dealt with.

11          So every decision I made on this contract was in the

12          context of the terms of this contract.

13   Q      And looking at the third page of Exhibit G, there's email

14          from -- are you on the third page?  There's an email from

15          you to Bill Jury dated Friday, March 3rd, where you refer

16          to the assumption that our contract was with GMW?

17   A      Right.  Well, the thing is, is I had assumed that they had

18          had a fixed price con -- that's what I was hearing.

19          That's -- you see that GMW and Kanag'iq had had a fixed

20          price contract.  I say, why would Bill Jury be doing

21          something like this under a -- you know, and something

22          like this was performing an audit, you see.  Why would --

23          if he had a fixed price contract, then he'd be doing it

24          for some reason -- basically he'd be say -- be building a

25          case against himself is what I felt.  I was saying, this

Page 26

1        to the emails, Exhibit G, and I'm still on page 3, looking

2        at the bottom, and I'm referring to an email from you

3        that's dated March 3rd, it's late afternoon.  You're

4        saying, Bill, Elmendorf is extremely satisfied.  It got

5        what it paid for.  Is that a true statement?

6    A   Yes, it is and at the end of the -- and from a -- first of

7        all, I was always terrified of not having sufficient funds

8        to pay Kanag'iq, I mean, on this contract.  And this type

9        of contract, it is so transparent, it's so clear cut, is

10       that -- I mean, we go out and do an audit, you're going to

11       know how much you're going to get paid, okay.  Now this

12       thing has got warts.  All contracts are not perfect.  But

13       it's staggering how easy it is to come up with a -- I can

14       see why the government likes doing these things though

15       because they're very easily -- in the -- at least from the

16       government's standpoint, it's easy to der -- to determine

17       how much a contractor is worth or gets for that contract.

18   Q   So.....

19   A   So, yeah.

20   Q   So when all is said and done, Elmendorf felt that

21       Kanag'iq.....

22   A   Oh yeah.

23   Q   .....had been properly paid?

24   A   Well, yeah.  And for -- well, from my perspective, yes.  I

25       never went back and did an audit, which is what I should

STEVE FRERE                    5/18/2006               GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                         A05-170 Civil

Page 27

```
1     have done, but I said I haven't been hearing anything from

2     Kanag'iq, okay, so I figured if they -- we were having

3     money problems, that I would have heard of it.  I also

4     knew what the contractor who did the vast majority of work

5     on this contract, what amount he was -- at least in my

6     understanding, would have been -- would accept in, you

7     know, the 1.9 million, which is what I understood he was

8     going -- GMW was going to get after the meeting with Ray

9     Hamilton.  And then I now know the amount that what -- or

10    at least I -- what GMW is suing G -- Kanag'iq for.  I

11    said, yeah, we're -- I mean, I see that amount of money on

12    that job, I mean, one of the best decisions I ever made in

13    a contract was to cut it off when I did because I mean the

14    price -- I had no idea what -- what it was going to cost

15    as it rolled on, but yes, I know that to -- from a

16    reasonable and practical standpoint, 2.6 million dollars

17    to Kanag'iq.

18              I know that the contractor that did the vast

19    majority of the job is not suing for the, you know, all of

20    that.  So yeah, I'm -- we're extremely satisfied.  I mean,

21    this was such a wonderful contract.  It was a dream

22    contract until things got -- until it turned into a

23    runaway train in the final option here.  But we had the

24    worst fire prevention record in the Pacific Air Force.

25  Q   When you said.....
```

Page 28

```
 1   A     And we became the best after the term -- after we bid

 2         this, after the three years or so we had this contract.

 3   Q     When you say it became a runaway train in the third option

 4         year, what are you talking about?

 5   A     Well, I had no idea how much it -- we're -- you know, I

 6         had 2.6 million dollars and I could not afford anything

 7         more than that.  And I -- I mean, I had no idea what -- I

 8         had nothing else to turn to but to turn to say this is,

 9         you know, Steve, you've got to be able to -- it was a

10         runaway train because I could -- the -- the bids, the

11         prices that I was looking at would fluctuate from when I'd

12         sit down with Bill, we were all over the place.

13              I mean, I'd hear -- I've looked at these bids

14         and I'd go what the heck are you doing, Bill?  Are you

15         paying -- been paying them what they've been asking for,

16         or something similar to that.  If I didn't say it, I said

17         something similar to that.  I could never pin down prices

18         because that's all I had to gauge, was whether we could do

19         this work in the amount -- the money in these bids that I

20         would see in the con -- that I was obligated to pay

21         Kanag'iq in accordance with the terms of the -- the

22         contract.  And I had no confidence in any of these prices

23         that we were getting because they were changing as often

24         as -- seemingly changed as often as the outdoor

25         temperature was changing, so.....
```

STEVE FRERE                          5/18/2006            GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                A05-170 Civil

Page 29

1    Q    What was the source of those price changes as you

2         understood it?

3    A    Well, I -- well, they had -- they were coming in from the

4         subcontractors, Kanag'iq wasn't doing anything.

5    Q    Looking at the fourth page of Exhibit G.....

6    A    I assume that they were coming from the sub -- I mean,

7         these -- where these prices were coming from because

8         Kanag'iq doesn't do the -- didn't do anything other than

9         manage the contract.  And they did do some outdoor work,

10        you know, but -- so that's -- they had to have been coming

11        from -- at least I assume they were.....

12   Q    Yeah.

13   A    .....from the subcontractors.  I mean, they should have

14        been coming and I had assumed they had been coming from

15        the subcontractors.

16   Q    Okay.  Looking at the fourth page of Exhibit G, at the

17        top, there's an email where you're saying to Bill, quote,

18        it's even worse than I thought.  Our bogus conclusions

19        were based not -- on not only fictitious contract and

20        three or more bogus assumptions.  Jeez, I hope Glen didn't

21        spring for champagne and dinner for his staff at the

22        Corsair based on what Steve said that he was building a

23        case against KCCI for fraud.  Please don't sue me.  End

24        quote.  Was this after you had done your investigation and

25        you realized that you had made some mistaken assumptions?

STEVE FRERE                          5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                A05-170 Civil

Page 30

```
 1   A    Yeah, I made an assumption that -- that I couldn't prove

 2        that I could not -- see, I was adamant.  I figured that --

 3        that Kanag'iq was stiffing GMW.  I was adamant about this

 4        because I said what's this guy doing?  Why is he

 5        emphasizing unit prices now when he never did?  And see,

 6        that was one assum -- why would -- was -- because I -- the

 7        assumption was that he had a fixed price contract, okay.

 8        And then I go well, if he's due -- has a contract similar

 9        to what we have between ourselves then he's doing what he

10        should be doing, all right.

11             So there was one assum -- the other one is that

12        the prime contractor always stiffs the subcontractor.  And

13        I went into that.  And then I -- two -- or the third one

14        was is that I -- I thought I had privileged information

15        that GMW, that hey, it was my understanding that Kanag'iq

16        was going to pay GMW 1.9 million and then I find out later

17        that he gets 1.6.  I -- he's dead meat, all right.  He

18        never emphasized the unit prices.  Prime contractor always

19        stiffs subcontractor.  And then, what was the third one, I

20        can't remember but I rattled them off.

21   Q    Okay.  Going on to -- let's see, I'm losing count here.

22   A    I didn't think I'd see these here, but like I say, I got

23        to tell the truth.

24   Q    I thought about it, but you said show them to anybody,

25        so.....
```

STEVE FRERE                           5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                  A05-170 Civil

Page 33

1   A    You know, this is how unreason -- impractical these are

2        for an administrator, these contracts.  You really don't

3        know what the estimated quantities and what -- are until

4        you go back and do the -- you know, you do an audit.  And

5        that's why I said this, I said well, there's no sense of

6        me trying to do -- modify these contract deliveries and

7        modify these deliveries to make, you know, shift the unit

8        -- you know, the change to the units and then change the

9        quantities.

10             I mean, it was really impractical to expect me

11       to do that, to be down to the level of accuracy that's

12       necessary to determine what a contractor is going to get

13       paid.  I just said, well, it's this type of a contract,

14       Steve, I said to myself, we'll pay them -- you know, I'll

15       pay Kanag'iq as we go and then at the end of the contract,

16       I was prepared to go out and do an audit and go, you know,

17       here we go.  This -- because that's the only way you can

18       determine how much the -- I mean.....

19  Q    Sure.

20  A    .....it was pointless for me to con -- to do

21       modifications.  The intention for -- because it would be

22       overwhelming -- one, I didn't want to do it because it

23       would be overwhelming our contracting squadron with a

24       flood of amendments.  And that's the reason why I quit

25       doing them, you know, by the book.  Because even if I sent

Page 34

1    them my best -- and I tried this on several occa -- there

2    -- there were mods even when I did my best to try to

3    modify each delivery order but they were never going to be

4    accurate anyway so why waste the time.  Let's just pay

5    these guys while we're going along and when we're done we

6    come back and we do an audit and that's that.  I never

7    would have proceeded with this contract unless I knew that

8    -- you know, why waste your time trying to make it

9    accurate just to -- you know, just to do it for the -- to

10   maintain the integrity of the process.

11           So -- so what we did, as I said, we're going to

12   throw it all into one delivery, all these delivery orders

13   into one delivery order and bill against these delivery

14   orders.  And then at the end of contract, go out and do an

15   audit and see exactly what a contractor is supposed to get

16   paid.

17  Q  Earlier I had asked you about Mr. Johnson making negative

18   comments about Kanag'iq and you mentioned that, I believe,

19   he had.  And I'm not sure if I followed up on them.  What

20   kinds of negative things did Mr. Johnson say about

21   Kanag'iq?

22  A  Well, you know, the only things that I heard him say

23   negative about Kanag'iq was that he was stiffing him.

24   Okay, that's really the only -- you know, in this

25   business, I've known a subcontractor not to have -- not to

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 36

1       it was a -- just the King Salmon one.  The King Salmon

2       probably because that was a -- I know that he had had

3       trouble there and the 3rd contracting squadron was

4       involved in that.  So there may have been some negativity

5       to that respect to Kanag'iq but it wasn't generated by

6       Glen.  You look at the fence project with Hazim Eunice

7       (ph), who is our -- Hazim is H-A-Z-I-M, they have a

8       fencing contract.  I mean that thing is a good contract.

9       There's never been any negative -- negativity in that

10      respect.

11            But I think the problem -- and this was my

12      perspective to what -- what I -- the most negative -- I

13      think my primary criticism with Kanag'iq would be is that

14      they were not really involved in their contract.  That

15      they are not effectively -- they're not effective managers

16      of these contracts.  They have very little to contribute

17      to the contract, at least on this one.

18            I think that Kanag'iq was let down by people

19      that they didn't trust to manage this contract, you see.

20      Norm -- and that was part of the problem but I don't think

21      anything -- I don't think there's been anything -- any

22      negativity by anyone in regards to the -- to the status of

23      Kanag'iq at Elmendorf.  I think that the contracting

24      squadron based their decisions on our contractors'

25      capabilities and what they see.  And -- but I don't think

STEVE FRERE                          5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                               A05-170 Civil

Page 37

 1        there's any reason why there should -- Kanag'iq shouldn't

 2        do work on this base but at the same time, I don't think,

 3        at least on this contract, that they were fairly clueless.

 4        They had no idea what was going on in the field.  That is

 5        just my opinion.  So.....

 6    Q   When you had discussions with Glen Johnson, did you ever

 7        talk to him about whether or not GMW had a unit price

 8        contract with Kanag'iq?

 9    A   No.  I never discussed that with him.  I did -- I thought

10        that -- I think when I talked to Glen I think we told --

11        he was getting -- he was giving lump sums.  So I assumed

12        that's what it was.  I assumed that Glen was giving bids

13        to Kanag'iq and that was it.  And that our contract, I

14        knew what it was and I still know what it is, so -- and

15        that somehow -- I don't -- I didn't even know Kanag'iq was

16        even exercising this contract or ev -- maybe -- or

17        assuming their prices, the bids they were getting from GMW

18        in the context of a unit price contract, you see.  I --

19        I.....

20    Q   Did you ever see whatever submittals GMW gave to Kanag'iq?

21    A   I think Glen would show me some -- you know, he -- but I

22        never really did.  I -- I saw them, they were on the form

23        -- they were on the unit -- like the unit price bid.  He

24        would show me like -- I think he had showed me the one for

25        the -- he didn't give it to me but he showed me the one

Page 41

```
 1   A   I -- I -- when you start getting into the fire, I mean, I
 2       have a fundamental understanding but that's about it.  I'm
 3       not familiar with this -- with this boilerplate stuff.
 4   Q   Okay.  On that specific regulation, and I won't hold it to
 5       you in any context that matters, but what is your general
 6       understanding of what that dispute regulation is or does?
 7   A   Well, if there was a dispute between the government and
 8       the -- Kanag'iq, for example, if you're going to put it in
 9       context, that we would reconcile the disputes in the -- in
10       the -- with that regulation, within the terms of that
11       regulation.
12   Q   Do you have a general sense of what that regulation
13       provides?
14   A   No.
15   Q   I mean, does it call for arbitration for example or
16       anything like that?
17   A   I have no idea.
18   Q   Let's see.  Is GMW currently doing work as a subcontractor
19       on Elmendorf?
20   A   Yes.
21   Q   Is that fire protection work?
22   A   Yes.
23   Q   Who is the prime contractor on that project?
24   A   Windsor.  Windsor Construction.
25   Q   Does Windsor have a unit price contract with the
```

Page 53

1       deposition today?

2   A   You mean -- did I what?

3   Q   Did you review any documents to prepare for your

4       deposition today?

5   A   Yes.

6   Q   What kind of documents did you review?

7   A   I reviewed -- I had some notes here that I brought, just

8       in general notes about what type this contract was because

9       -- so I had -- I've done this before and I'd -- so I had

10      some, you know, this describes what type of a contract

11      that is in clear terms.  I also looked at -- I also

12      brought the clo -- the price schedule.  And then I also

13      brought some correspondence between myself and my boss

14      about these material -- this -- these -- oh, what would be

15      -- DD form 1354, transfer and acceptance of military real

16      property.

17              I brought those -- when I had spoken to Sharon

18      [sic] -- or Sarah, when I had spoken to her at last time,

19      I told her that I was performing these audits with Bill

20      Jury and that I'd -- she brought up this document, said

21      the transfer of acceptance of military real property and

22      what those were and I brought them with me just to explain

23      why they were very inaccurate.  That I was going to have

24      to go back and do them.  And that the audit was going to

25      help me do that.  So I brought that stuff just to -- and I

STEVE FRERE                          5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                          A05-170 Civil

Page 54

1        brought the correspon -- basically these were really bad

2        and they were so ridiculous I went to my boss and I said,

3        listen, you know, I don't know who it was that gave you

4        these to sign but -- but basically I wanted to explain why

5        -- why these were way off.

6    Q   First you mentioned some notes.  Let's talk about that for

7        just a second.  Are those notes that you made recently or

8        were those notes that you made at the time.  I mean.....

9    A   You mean.....

10   Q   You referred to some notes about the contract.

11   A   Oh yeah.

12   Q   Are those notes that you made recently or are those notes

13       that you made during the course of conversations with, for

14       example, Bill Jury or.....

15   A   Oh no, these are just ones I write down, hey Steve, if

16       they ask you this then, you know, this might help you

17       answer.  That's basically -- I never am given the list

18       before of questions.

19   Q   Okay.

20   A   No, these are things that -- because I can get rattled

21       when I do these things sometimes and not think straight.

22   Q   Yeah.  You mentioned that you had been deposed once

23       before.  What kind of case was that?

24   A   That was a -- that was Alaska Mechanical versus the Air

25       Force and it was a -- I was wi -- I was actually deposed

STEVE FRERE                           5/18/2006                      GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 59

1   Q    And that's when you discussed those real estate transfer

2        forms?

3   A    Yeah, she had asked me -- she had asked me -- you know, I

4        had told her that -- that I was doing a performance -- or

5        I was doing this survey and why I had to do this.  That I

6        had no alternative but to participate in this survey.  And

7        then she had asked about these and I had said I had to

8        reconcile these.  You see, what I've got to do is put it

9        onto these -- what exactly went into these things.

10  Q    Sure.

11  A    So.....

12  Q    And when you say these, you're talking about those real

13       estate transfer forms.

14  A    Yeah, yeah.  They were awful bad.  And they were so bad

15       that I had to go up to my boss and apologize.  That they

16       were.....

17  Q    Do you know who prepares those?

18  A    Yeah, I think Bill Jury did.

19  Q    Getting back to your conversation with Ms. Tugman, when

20       you told her that you were doing a survey and that you had

21       to do it, what was her reaction, if any?

22  A    Well, she warned me that I needed -- I should -- should

23       watch out and I -- from her demeanor, I detected a -- you

24       know, a sincere concern for my well being.  And that --

25       that's the gist of it.  And -- but I wanted to bring this

STEVE FRERE                              5/18/2006                    GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                              A05-170 Civil

Page 63

```
 1        Kanag'iq in accordance with the terms of the contract.

 2        But I would say that I never heard the term unit price

 3        ever during the -- until the end when -- when Ray Hamilton

 4        and -- had started doing some surveys and some counts but

 5        I never assumed that I would ever have to emphasize the

 6        unit pricing except where there was a situation between --

 7        to settle a dispute.  To reconcile differences in the

 8        estimated quantities in the -- and the actual quantities.

 9        See I don't think there was any dispute between the

10        government and the -- Kanag'iq's terms because I always

11        knew, no matter how it was practiced into the field, I had

12        to account for it in the terms of this contract between

13        Kanag'iq and -- and the government.  There was no other

14        way that -- I mean, those were the terms of the contract

15        but I never heard -- unit pricing was -- it was never

16        discussed.

17   Q    At the time -- let me see if I can explain what it looks

18        like to me the process was, and then I'd like you to

19        correct me if I'm wrong.  That originally each delivery

20        order -- and I'm talking now about 2004.

21   A    Yes.

22   Q    But then I'm going to go back and.....

23   A    Sure.

24   Q    .....I'm going to talk about before that.  In 2004, you

25        would do an estimate of what you thought it might take to
```

STEVE FRERE                    5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 64

```
 1          do the fire requirements con -- the fire requirement

 2          stuff.....

 3     A    Yeah.

 4     Q    .....for a particular building, for example, and then

 5          there would be -- you would present that estimate to

 6          Kanag'iq to have Kanag'iq sign off on it, is that correct?

 7          MR. GINGRAS:  Object to form.  Compound.  Go ahead.

 8     A    Okay.  Those -- the process -- if you look at those

 9          estimates, I knew that those estimates were not accurate,

10          nor were the dollar amounts accurate.  We awarded these --

11          and you know the bottom line -- we awarded these contracts

12          within a few days.  We had what's called money -- end of

13          year money.

14                    And those -- what we had -- for it -- applied

15          -- after we awarded all of those delivery orders at those

16          amounts, I always intended to go back and reconcile those

17          differences and fi -- and move funds by and then from

18          those projects where there was a surplus of funds and move

19          those into those delivery orders, for example, where there

20          was a shortfall.  Those dollar amounts that you saw on

21          those 10 delivery orders that were -- were issued, were

22          what are called a programmed amount.  The programmed

23          amount is the maximum amount that the con -- that the Air

24          Force has for that project.  It's done on an estimate that

25          was made several years ago.  So -- and they're never
```

STEVE FRERE
Vol. 1

5/18/2006

GMW FIRE v. KANAG'IQ CONST.
A05-170 Civil

Page 65

1  accurate.  But that's what I was going to do.  We were --

2  I was going to come back -- which we can, by amendment, by

3  -- and move funds from those that have a surplus into

4  those that -- where there was a shortfall.

5         And that's how we did it in terms of the --

6  this is how we did it in the field.  I kept -- I tried to

7  do it by the book but I never knew exactly what the

8  amounts were going to be and I just listen, if we're going

9  to exercise this contract, the only way we're going to do

10  it is if there's a dispute, to be able to settle it in

11  accordance with the terms of the contract.  But those

12  dollar amounts you see on those delivery orders, those 10

13  of them, were the maximum amount the Air Force had for

14  those projects and I awarded them for that amount.  But

15  with -- always with the understanding to move funds around

16  between those to pay for the work.

17  Q  And did you not do some change orders to move funds from

18     one project.....

19  A  Yes.

20  Q  .....to another?

21  A  Yes, we did.

22  Q  And did those change orders, the line items on those

23     change orders, actually reflect the change or was it just

24     a way to move money from one.....

25  A  It was just.....

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

STEVE FRERE                          5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                        A05-170 Civil

Page 66

1              MR. GINGRAS:  Object to form.  Compound.  Go ahead.

2      A    Just a way to move funds from one to the other.  I tried

3           to get the accuracy down but it was so impossible.  But I

4           would say that it was that way, yeah, it was to move funds

5           from one to the other, was what those modifications were.

6           And I'd try and reconcile them but that's when I said, you

7           know, there's only -- how am I going to know what it costs

8           until I get to the end of the contract and perform a

9           survey.  Because that's the contract between the

10          government and Kanag'iq.  You see, that -- I could not

11          deny that.

12     Q    You paid -- the government paid Kanag'iq the amounts of

13          those delivery orders unless they were changed by change

14          order, isn't that true?

15     A    Could you repeat that again?

16     Q    Kanag'iq was paid by the government the amounts reflected

17          on those delivery orders unless that sum was changed by a

18          change order?

19     A    Say that one more time.

20     Q    Kanag'iq got paid the amount of the -- that was indicated

21          on the delivery order award.....

22     A    Yes.

23     Q    .....unless it was changed by change order and increased

24          or decreased?

25     A    They got paid for -- for the delivery orders whether they

Page 67

1    were modified or not.  You got to understand that really

2    what we did is we took all those delivery orders and put

3    them into one big.

4  Q   And so.....

5  A   But -- but in reality, the amounts on there in no way were

6    -- the amounts on those delivery orders in now way were

7    accurate to actually what the amounts that were in those,

8    the work that was done in each building.  In other words,

9    you could have something on that -- that delivery order,

10   it could not -- would not even resemble what was being

11   installed in there.

12        All these were were convenient vehicles to move

13   funds around to pay for the work in each one of these --

14   that's all they were.  It was a means of tracking funds so

15   that we have enough money to do it all, all right.

16  Q   So the contract operated in the field like a lump sum

17   contract?

18        MR. GINGRAS:  Object to form.  Argumentative.  Asked and

19   answered.

20  Q   Is that true?  Is that a fair.....

21  A   No.  Well, it may have been between Kanag'iq and GMW but

22   all I was doing is I -- I was in the position where I had

23   to be able to pay Kanag'iq in accordance with the terms of

24   the contract.  That's the way I was looking at it, you

25   see.  That we would move -- I always anticipated that

STEVE FRERE                        5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                      A05-170 Civil

Page 68

```
 1        we've have to perform an audit to reconcile the

 2        differences in line items and also the -- in the

 3        quantities.

 4                  And there was no way to get these things

 5        accurate until -- there's no way -- there was going to be

 6        no way for me to decide -- to determine how much contract

 7        go paid except by doing an audit in accordance with the

 8        terms of the contract between Kanag'iq and the government.

 9   Q    Are you going to change the prices paid to Kanag'iq based

10        on an audit performed after.....

11   A    You mean.....

12   Q    .....Kanag'iq's already been paid?

13   A    .....are we going -- yeah, and -- yeah, I'm obligated to

14        pay them that, you see.

15   Q    So they may have to pay you money back?

16   A    It is possible.  I asked -- I asked that question.

17   Q    I'm going to give you what I'd like to have marked as

18        Exhibit.....

19        REPORTER:  All right.  In order?

20        MS. TUGMAN:  And I prepared this.  My numbers may be off

21   but you can get a general idea from the -- this is I.

22        REPORTER:  I.  Exhibit I.

23                               (Deposition Exhibit I marked)

24        MR. GINGRAS:  Do you have a copy for me, Sarah?

25        MS. TUGMAN:  I don't but would.....
```

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
310 K Street, Suite 200             Fax   907-243-1473               sahile@gci.net

STEVE FRERE                           5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                      A05-170 Civil

Page 72

 1    Q    And what percentage of the work do you think Kanag'iq did

 2         on this project?

 3         MR. GINGRAS:  Object to form.  Foundation.

 4    A    Oh well, you know, the actual work, I think they built the

 5         riser buildings.

 6    Q    Were there four?

 7    A    No, there were more than that.  I would say one, two,

 8         three, four.  The Snow Barn.  Is that all?  Yeah, maybe

 9         it's just four.  There was the survival equipment shop and

10         then two out at the -- out at the missile storage

11         warehouse.  I think that's four, yeah.

12    Q    So what percentage of the total work would you say

13         Kanag'iq performed on this project?

14         MR. GINGRAS:  Objection to form.  Foundation.

15    A    Well, those were about 10 grand a piece.  Four times

16         10,000.  They may have done some patch work.  I don't know

17         if they did any demo.  I don't know.  But that was --

18         that's about it.  That's right off -- those are the only

19         things that stand out, are those four riser buildings.

20    Q    Well, assuming there wasn't a contract at all between

21         these parties and you were going to pay them -- you were

22         going to take the total amount paid and divide it between

23         the parties, how would you divide it up?

24         MR. GINGRAS:  Object to form.  Incomplete hypothetical and

25    argumentative.  Go ahead, if you know.

STEVE FRERE                        5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 74

1          gotten more money, all right.

2    Q     You looked at Exhibit A earlier and I'll give it to you

3          again.  You may -- probably have a copy with an official

4          -- did you note that on Exhibit A, which purports to be a

5          subcontract between Kanag'iq and GMW, that.....

6    A     Yeah.

7    Q     .....this ended after the first year?

8          MR. GINGRAS:  Object to form.  Argumentative and assumes

9    facts not in evidence.

10   A     Yeah, in fact I noticed that.  And I was going to comment

11         on that, but yes, I -- yeah, I saw that it was for just

12         one year.

13   Q     So do you know for a fact what the contract was?  I mean

14         you've made a couple of comments assuming there was a unit

15         price contract as opposed to a quote from GMW for what

16         they'd do the work for.  Do you know for a fact that the

17         contract was between GMW and Kanag'iq?

18   A     No.  No.  I had made it - I would -- I had as -- I had

19         assumed that there was a lump sum.  This is what was

20         strange, was -- is I assumed that the unit pricing was

21         based on what the subcontractors gave me, and that the

22         price -- it -- that the unit prices that the government

23         and Kanag'iq agreed to was a markup on the prime con -- or

24         on the subcontractor's work.  So I had assumed that you

25         had -- that GMW had that type of contract with Kanag'iq.

STEVE FRERE                    5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                            A05-170 Civil

Page 77

```
 1        warehouse project.

 2   Q    Well, now Kanag'iq was paid off those delivery orders.....

 3   A    Yeah.

 4   Q    .....as it progressed, is that.....

 5   A    Yeah, well.....

 6   Q    .....true?

 7   A    .....we paid them and they would pay their subcontractors

 8        from that.

 9   Q    Right.

10   A    That's the -- my main concern was getting money to the

11        subcontractors because they were struggling and -- so hell

12        I was giving them anything I was asked, and I would give

13        it to -- you know, any -- I never disapproved a pay

14        estimate.  So -- so.....

15   Q    Did -- you didn't -- the project documents called for a

16        count at the end of the project, is that right?

17   A    I don't know if they -- what they called for is an

18        estimate before, okay.  But do you see under -- where I

19        was, they said Steve, you've got 2. -- you've got 11

20        projects, all right.  You got -- they were awarded for 2.7

21        and when we ended, the total was that.  But you know that

22        joint estimate form, did you ever see those?

23   Q    Yes.

24   A    Hell, I think we were burning up the fax machine.  We

25        didn't have the time to get out there and do an estimate.
```

STEVE FRERE                       5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                             A05-170 Civil

Page 78

```
 1        What I did is I obligated those funds, you see.  That's

 2        the deal is each one of those delivery orders that we had,

 3        the bottom line was the maximum amount that -- I didn't

 4        say well we don't need this much, hell, I said I'm going

 5        to take everything that we got.  So I filled in the blanks

 6        and -- so I could get the money, all right.  Never are

 7        these amounts of money that are the con -- that the Air

 8        Force had programmed them for accurate.  I knew it when I

 9        was doing that but this is what we do when we get this

10        money, you got four days to award 10 delivery or 11

11        delivery orders.

12   Q    Right.

13   A    Ridiculous.

14   Q    And you were trying to get.....

15   A    I got as much.....

16   Q    .....the best job, the best fire protection system you

17        could for the government with the money that you had.

18   A    Yeah.  Those -- remember that all -- what I did is -- and

19        you see what's ironic, our contracting squadron has

20        finally realized that it's insane to impose this type of

21        pressure on the engineer.  Because where you sit, you've

22        got to do a joint estimate and you've got this amount of

23        money to do it with.  And it wasn't -- every one of those

24        damn delivery orders amounts I knew were nowhere near

25        accurate.  All I wanted to do is get the money and then
```

Page 79

1    once I got the money, we would go out and we would do

2    joint estimates, bids if you would, that I would have to

3    translate into the unit prices that I gave -- that I had

4    to pay Kanag'iq for.  But I had always assumed -- and I

5    tried.  I was tak -- I don't want to say taking money,

6    those are two things you just don't say, take or give.

7    You pay, you reallocate, but you don't say take or give.

8    Our contracting officer -- one of our engineers was, well

9    I was going to give him $25,000, and Lucy goes give?

10   Give?  You know, she stood up, the government doesn't give

11   money to anybody, they pay the contractor, but they don't

12   give any money.

13        So -- so that's -- you see, this is what I was

14   up against.  I was -- I was trying to do it by the book,

15   sending modifications up to contracting, that were nowhere

16   near accurate anyway, just to reall -- to be able to

17   reallocate it by the book.  We were overwhelming poor

18   Becky Rosa, she was, how can you have so many

19   modifications on this contract?  And said, you don't want

20   to know.  So -- and it wasn't working.  So we took it

21   among ourselves to say this is what we're going to do,

22   we're going watch this thing, you see.  We're going to

23   watch it so that it doesn't get out of control.  So all

24   those amounts, all those delivery orders I got, they could

25   no more ri -- that you saw when we did our joint

STEVE FRERE                          5/18/2006                  GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                        A05-170 Civil

Page 81

1        unit prices, I'm going I'm going to get hosed here if I do

2        -- silence was what -- I didn't hear any -- any -- any

3        noise and I said, hey now when you pay 2.6 million dollars

4        out for all this work, that's a 2.6 million dollar

5        project.  And then I also felt relieved that you see that

6        GMW is going to get 1.9 million.  So I said, all right,

7        2.6 that Kanag -- GMW will -- will -- is going to get 1.9

8        million and -- all right.  And I thought that we were all

9        over.

10   Q   Do you know how much GMW has actually been paid?

11   A   No.  Well, I heard 1.6 million, I think is what it was.

12       See, and that was.....

13   Q   Okay.

14   A   Yeah.

15   Q   Okay.  Why are you doing a count now?  I'm not -- a count

16       now?

17   A   Well, I have to.  I have to.  I have to determine what the

18       government -- what -- whether I'm high or low -- you see

19       you're never going to come out right on the button.  It's

20       either -- you're going to -- it will be either the

21       government owing Kanag'iq or Kanag'iq owing the

22       government, all right.

23   Q   Uh-huh.  (Affirmative)

24   A   That's what it -- that's what it comes down to.

25   Q   Is the only reason you're doing a count now because of Mr.

STEVE FRERE                    5/18/2006         GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                          A05-170 Civil

Page 82

1       Jury asked you to because of this litigation?

2   A   No, he never asked me for anything.  I just felt that I

3       have to do this now, you see.  And if they want me to be

4       going out and doing these counts with them then, you know,

5       I made it clear that it's not going to be baloney.  I

6       mean, if we screw up quantities and -- and screw them up

7       and we go back and do them over again.

8   Q   Well, what.....

9   A   But we -- but I have to -- I -- I was wondering, you know,

10      essentially why we were doing this but I understood

11      because it's this type of con -- if he has this type of

12      contract with GMW, he's doing what he should have been

13      doing all along, doing what I should have been doing all

14      along too but I said the heck if I'm going to be doing it

15      all along.  I mean, it was enough -- can you imagine what

16      we in -- and everybody was under tremendous pressure on

17      this contract.  I mean, I know that I was.

18  Q   Did GMW do a good job on the contract?

19  A   Are you kidding?  They did -- they were the best.  Heck,

20      they're the reason -- they're the reason why -- they are

21      the reason why they're working with Windsor on this

22      contract -- the current contract.  You know, Glen came to

23      me and he apologized when this ruc -- you know, he was

24      sucker punched by -- when all this came down where they

25      were behind schedule, didn't know what was going on.  He

STEVE FRERE                     5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                          A05-170 Civil

Page 84

```
 1        because of this contract.  We -- you know why we did it,

 2        is because we obligated money, that's the commanders care

 3        -- we got the money, we executed.  And there were times

 4        when I thought I was going to can -- I was going to cancel

 5        this because I couldn't do it by the book procedurally.  I

 6        couldn't be -- there was no other way that we could have

 7        got this job done other than the way we did it.  The heck

 8        if I'm going to stop because I -- work because I can't do

 9        the paperwork the way it's supposed to be.  It was that

10        type of contract.

11                 We had so much trust.  I mean, it was like a

12        big old family and everything.  I mean, there was

13        bickering and sniping, back -- not much back -- there was

14        never any back stabbing or anything like that but we were

15        all totally open.  And -- and we went from first -- we

16        went from worst to first because of this contract.

17    Q   Did Kanag'iq always have a representative at inspections?

18    A   No, their absence was staggering.

19    Q   In fact, did GMW's people sign off for Kanag'iq on some of

20        the final inspection documents?

21    A   God, I wouldn't know.

22    Q   Okay.

23    A   Probably.  I mean, if there was somebody from Kanag'iq

24        there, they would -- they would just stand back and let

25        -- let, you know, we had -- GMW ran the show.  I just sat
```

STEVE FRERE                          5/18/2006          GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 88

1    A    Yes.

2    Q    .....I'm not going to make you go through them.  I get the

3         point that they're not -- the don't.....

4    A    They're -- they were such -- the most ridiculous documents

5         I had ever seen.  I went up to the poor guy -- see my boss

6         kind of goes, God -- and he takes this stuff seriously,

7         you know, he's -- that's his job and I go Keith, give me

8         those things, will you?  I'm -- he was -- he takes this

9         stuff seriously and he's -- I'm trying to get these to add

10        up and I said, Keith, Keith, just give them to me.  I'll

11        take care -- and I had to go apologize to my boss.  I said

12        I don't know who made you -- delivered these to you before

13        you sign them, but I mean, you've got all the big shots in

14        the squadron -- you know, they don't -- they assume that

15        what they're getting is -- is competent and so I said,

16        give me those things, will you.  I'm going to be the one

17        that signs them this time.

18   Q    But you didn't prepare those documents?

19   A    No.

20   Q    Okay.  I noticed on a few of them there's kind of

21        relatively large sums for ceiling tile removal.  Who did

22        the ceiling tile removal project?

23   A    I don't know.  I don't know.  You see what -- let me --

24        you know, when you see ceiling tile removal, yeah, you --

25        to me, on those original delivery orders, ceiling tile --

STEVE FRERE
Vol. 1

5/18/2006

GMW FIRE v. KANAG'IQ CONST.
A05-170 Civil

Page 89

```
 1          those ceiling tiles could have been -- I mean, I could

 2          have four fire hydrants is equivalent to 2,000 square feet

 3          of -- I mean, when we're doing the survey and the audit,

 4          we're doing it with the understanding that in the terms of

 5          what it was intended, so you're right, if 50,000 square

 6          feet of ceiling tiles weren't removed and reinstalled,

 7          then you don't get paid for 50,000 square feet of ceiling

 8          tiles that were removed and reinstalled.  So.....

 9   Q      Okay.

10   A      So -- but yeah, these are the initial delivery orders.

11          Those were just a place to fill in the blanks to execute

12          the pro -- to get the money.

13   Q      Okay.

14   A      And remember the idea was to go back and try and get these

15          things accurate, which was impossible.

16   Q      Did you -- when you did this count or watched Mr. Jury

17          count or did you count.....

18          MR. GINGRAS:  Object to form.  Compound.

19   Q      .....this Exhibit H?  Who counted for Exhibit H?

20   A      I didn't do all -- you know, I didn't do all the sprinkler

21          heads, for example.  You know, I was there with him but I

22          didn't -- you know, I'm not going to count.  The thing

23          about it is, is I figured my contractor is going to, you

24          know, I have confidence when I'm going out there that

25          they're going to do the right thing.  So I went along with
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

STEVE FRERE                          5/18/2006                    GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                        A05-170 Civil

Page 92

```
 1          But I think that's about it.  I think all the stuff that

 2          was exposed we saw.  I think the counts for the expose

 3          stuff were accurate.  I do.  I.....

 4    Q     Did.....

 5    A     But I didn't get out there with a tape measure and start,

 6          you know, I didn't do that.  Bill had a wheel, you know,

 7          and he was doing the linear and then.....

 8    Q     Did you do a count at the end of contract year 2000?

 9    A     No.

10    Q     2001?

11    A     No.  I did.....

12    Q     2002?

13    A     No.

14    Q     2003?

15    A     No.

16    Q     So this was the only year you did a count?

17    A     Yes.

18    Q     Okay.  And actually you did it in 2006?

19    A     Well, yeah, we're doing it now.  We never did -- you see,

20          I nev -- remember, I never thought it would ever be

21          necessary to do this unless there was trouble.  But I

22          always had -- you know, I'll tell you, as long as I didn't

23          hear any griping, that's how this contract worked, really,

24          but.....

25    Q     Do these counts in Exhibit H, do these show demolition
```

STEVE FRERE                        5/18/2006               GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                    A05-170 Civil

Page 93

1          work done by GMW?

2    A     No, they don't.  And that's one line item that I -- I had

3          wished I have had in there, you know.  When you go out

4          there and do these types of contract, you know, I think

5          the wide body -- I mean, the work is very transparent, you

6          see, and -- and a contractor, he's going to enter in a

7          contract like this, he's got to be -- he's got to assume

8          he's going to have to work in the context of that

9          contract.

10               And so if there's some incidental demolition,

11         that I'd assume he'd have that in there.  But one of the

12         line items I would put in if -- are going to do a new one

13         would be, I would call it selective demolition and I'd

14         probably want to have that as an negotiable amount because

15         demolition is just so difficult to pin down on a price.

16   Q     It depends on the -- what you're demo-ing, doesn't it?

17   A     Oh yeah, yeah.  I -- that is one thing that -- that is one

18         that thing that -- but you know I had always felt that,

19         you know, after we -- if there's any disputes -- and if I

20         was using the contract, you know, that if we go out there,

21         we do our surveys -- we go out there, we do our surveys

22         and you get an idea of who and what you're dealing with

23         and -- when you're doing these surveys and then you take

24         that back to the table and then you negotiate a unit

25         price.  But that's if you're prac -- if you're practicing

STEVE FRERE                     5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                         A05-170 Civil

Page 94

```
 1        this contract in that manner, that's what you would do for

 2        missing line items, okay.  And we did do it, like for fire

 3        pumps.  I want -- you know, the bladders for example, that

 4        one there.  I mean, what did we pay for that?  We prob --

 5        I don't know, how many square feet of -- of -- of ceiling

 6        tiles did we -- you know, that's basically what they were

 7        was currency.....

 8   Q    Sure.

 9   A    .....to pay for other -- that.....

10   Q    Exit signs, same thing, currency?

11   A    Well, it depends.  You see, you got to understand that

12        from my perspective, if we're going to do it like this --

13        and I'd see -- I -- when I would see exit signs down

14        there, that would bother me if that's how you were

15        practicing this con -- see, the exit signs, I would -- for

16        example, if I would have been able to do -- I would have

17        taken those exit -- those exit signs, I wouldn't have in

18        there anywhere.  What I was trying to do when these

19        contract -- I was taking exit signs out.  When I was doing

20        my mods, I was trying to reconcile what -- you know, I

21        wouldn't have left in anything for demo if those exit

22        signs would have been out there.  My mods were trying to

23        be per exactly what is in there.  Of course, I had --

24        didn't see the drawings until maybe three months after.

25        Do you see what I'm saying?  That's what -- I was trying
```

Page 96

```
 1        There was -- there -- see there was -- the compressor had

 2        a unit price that included the -- included the disconnect.

 3        It included a package for that and I think it was around

 4        1400 bucks or whatever it was, I can't remember.  And that

 5        was a complete unit right there.  Now the wiring to it,

 6        there would be a separate -- there were the means to --

 7        there was conduit and wire that they could connect this

 8        package from air compressor, okay.  So the way -- if you

 9        read the language in the specifications of what -- I

10        describe the air compressor complete with the exception to

11        the hookups to a electrical demo.  So.....

12   Q    Okay.

13   A    .....the compressor prices, you know, that compressor

14        price is quite high to -- I noticed that.  And that's

15        because that was -- it required a complete unit.

16   Q    Okay.

17   A    So.....

18   Q    Let's see.  What kind of alarm systems did GMW install on

19        this project?  Were they addressable or conventional?

20        MR. GINGRAS:  Object to form.  Compound.

21   A    They were addressable, and that's another thing.  What we

22        were going -- what I had planned to do was when we -- you

23        know, I paid Kanag'iq, I don't know, what, $4,000 for a --

24        we didn't have a line item for an addressable.  But I had

25        the line -- we had a line item for conventional.  And when
```

STEVE FRERE                    5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                        A05-170 Civil

Page 101

 1   Q   Okay.

 2   A   I think they may have done some concrete and landscaping

 3       work in there.  In that mod, for that mod.

 4                                       (Exhibit 63 Proffered)

 5   Q   I'm going to show you what was marked at Mr. Jury's

 6       deposition as Exhibit 63 and it appears to be a fax from

 7       you to Kanag'iq.  Is that illustrative of what you were

 8       talking about, moving the money around?

 9       MR. GINGRAS:  What number Exhibit was that?

10       MS. TUGMAN:  It says 63.

11   Q   You were talking about having a limited time to award the

12       contracts.....

13   A   Yeah, absolutely.

14   Q   .....and move the money around.

15   A   This is -- this how we did it.

16   Q   Okay.

17   A   Remember the bottom line there is what the maximum that

18       the Air Force had allotted for that project, which are

19       always totally unreliable, all right.  These were amounts

20       that I had, the maximum amount that the Air Force could

21       pay for each of these delivery -- if you look at those

22       delivery -- all the delivery orders, the bottom line on

23       all those delivery orders, when we initiate them, the

24       joint estimate, you see, the bottom line was what the Air

25       Force had budgeted.  Because that's what I could do, I

Page 102

```
 1           could -- but I had the intent to go back and, you know,

 2           move by modification funds where we had a -- a surplus

 3           would go in to pay for the -- those that had a shortfall.

 4    Q      Okay.

 5    A      But that would have been -- I would have been doing that

 6           continually throughout the entire contract.

 7    Q      Okay.

 8    A      So yes, this is how we did it.

 9    Q      Okay.

10    A      I mean, I say I got -- we've got this project, we got an

11           award, it's coming in.  I mean, sign it and give it back

12           to me.  We'll go back once it's awarded and reconcile and

13           do any changes that are necessary in estimated quantities.

14    Q      And Kanag'iq, for the most part, didn't ask you to make a

15           lot of changes, did they?

16           MR. GINGRAS:  Objection.  Argumentative.

17    A      No, it's more -- I should have been the one that would be

18           making those changes for -- see that was my

19           responsibility.  So it wouldn't have been Kanag'iq's

20           responsibility, it would have been mine to make the

21           changes.  But I didn't think it -- it -- well, I tried to

22           make the changes but those changes were never really

23           accurate.

24    Q      Does.....

25    A      Because in the terms of the contract, I have to -- every
```

STEVE FRERE                     5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                 A05-170 Civil

Page 103

```
 1        -- I got to have every estimated quantity and every

 2        description of work identical that -- it's out there in

 3        the building, which is impossi -- unreasonable and darn

 4        impossible to do.

 5   Q    Well, I sure wouldn't want to be the one counting four or

 6        five thousand sprinkler heads.

 7   A    Well yeah.

 8   Q    Did -- there was something about a bladder and a foam

 9        tank?

10   A    Yes.

11   Q    What was that?

12   A    That was -- yes, there was the bladder.  I was going to do

13        a mod for that one.  But we were going to pay for that

14        work from what -- a surplus that we had on another

15        delivery order.  And I had made that clear.  In fact, that

16        was my understanding, that you had been paid for that, all

17        right.  But that was going to be like we did any other

18        delivery order, you see, we would move funds from that 2.6

19        million, we had to -- see that was important.  We had 2.6

20        million and as long as I could pay for the work with the

21        2.6 million, technically there should have been mod but by

22        a handshake and agreement and responsibilities, that GMW

23        would get paid from that pool of -- that started with 2.6

24        million dollars.

25        MS. TUGMAN:  Okay.  Thank you.  I have no further
```

STEVE FRERE                         5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                              A05-170 Civil

Page 106

```
 1          did not somehow turn the contract into anything but a unit

 2          price contract?

 3    A     No -- well, I always assumed that, okay.  And I don't

 4          think there was ever any dispute between the government

 5          and Kanag'iq over the terms of their contract.....

 6    Q     Okay.

 7    A     .....you see.

 8    Q     Right.

 9    A     But I had never felt it was necessary to do it because I

10          -- we had sufficient funds all the time.  And everybody

11          was happy, that was one of the primary reasons, is that

12          people weren't complaining.

13    Q     Okay.

14    A     But I always had prepared to come back and do this audit,

15          because that is the contract.  I mean.....

16    Q     Yeah.

17    A     .....if anybody tried to tell me otherwise, no, you know.

18    Q     And the prime contract had a base year and two option

19          years or how ever many are contained in the contract.

20    A     Yeah, I forget how many actually but I think there were

21          three years.  Yeah, two option years.

22    Q     And earlier Ms. Tugman was asking you some questions about

23          Exhibit A, the Kanag'iq contact with GMW.  Had you ever

24          seen that contract until today?

25    A     No.
```

STEVE FRERE                              5/18/2006                    GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                                                A05-170 Civil

Page 111

```
 1    A    Yeah, I told them you guys -- you know, what are you guys

 2         doing, paying them for everything?

 3    Q    And what kind of response did you get?

 4    A    Nothing.

 5    Q    Did anyone ever tell you that it was going to be sorted

 6         out towards the end of the contract?

 7    A    No.

 8    Q    Isn't it fair to say that the way Kanag'iq was running the

 9         project vis-a-vis GMW was very much the way the project

10         was being run as between the government and Kanag'iq, that

11         is time pressure, getting it done, and we'll sort it out

12         at the end of the survey?

13    A    Yeah, they were -- I always assumed that this is what we

14         would have to do, that we would sort it out at the end of

15         the con -- this -- I was always prepared to have to do

16         this because this was the terms of the contract between

17         the government and -- it was when they started doing these

18         surveys, I said well these guys actually know what type of

19         contract they do if they're doing these surveys, all

20         right.

21    Q    Okay.

22    A    That's what -- that's what led me to believe that Kanag'iq

23         was -- was beginning to understand the terms of their

24         contract and when they started doing their -- when they

25         started doing their surveys.  I mean, what else would they
```

STEVE FRERE
Vol. 1

5/18/2006

GMW FIRE v. KANAG'IQ CONST.
A05-170 Civil

Page 117

```
 1   Q    Mr. Frere, you said that you assumed that Mr. Jury and

 2        Kanag'iq, because they were taking counts, had a item --

 3        unit price contract with GMW?  That's an assumption?

 4   A    That.....

 5   Q    You didn't know that for a fact?

 6   A    That's a -- that as an assumption that -- yes, that was an

 7        assumption, that they had that same type of contract.  It

 8        was also an assumption that they had that type of contract

 9        with us too.  I made that assumption on that, that -- I

10        said he's actually doing what he's supposed to be doing in

11        terms of -- but it was an assumption in my -- that the

12        type of the contract that GMW had with Kanag'iq, it was an

13        assumption then.  But then that later changed when I was

14        hearing that -- that it wasn't.  I don't know if it was

15        from Glen or who.

16             So I really didn't know what type of a contract

17        that GM -- GMW had until I did this investigation and --

18        and, you know, exactly what type of contract do you have.

19        And he says, well, it's a unit price.  So I said, you've

20        got one just like we do with you, you know, with them.

21        That's what I thought.  But I kept thinking you had some

22        weird hybrid type of contract.  You know, it didn't make

23        any sense with me.  But I knew the type of contract we had

24        with -- with Kanag'iq, I mean.  And that's what was on my

25        mind.  But it wasn't until the end or near the end of the
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

STEVE FRERE                      5/18/2006              GMW FIRE v. KANAG'IQ CONST.
Vol. 1                                                          A05-170 Civil

Page 118

```
 1        final year, option year, that it was emphasized, the unit

 2        pricing by Kanag'iq.

 3    Q   Did you see Kanag'iq ever do counts or surveys prior to

 4        2004?

 5    A   No.

 6        MR. GINGRAS:  Form.  Compound.

 7        MS. TUGMAN:  Thank you.  That's it.

 8                            STEVE FRERE

 9    testified as follows on:

10                       REDIRECT EXAMINATION

11    BY MR. GINGRAS:

12    Q   I think I already asked you this, but having looked at

13        Exhibit A, which I'll represent to you is the subcontract

14        that was executed between Kanag'iq and GMW, that reads as

15        a unit price contract, correct?

16    A   Yes.

17        MR. GINGRAS:  That's all I have.

18                            STEVE FRERE

19    testified as follows on:

20                       RECROSS EXAMINATION

21    BY MS. TUGMAN:

22    Q   Do you know how the two thou -- in 2000 year, how the

23        project operated in the field?

24    A   In what year?

25    Q   How Kanag'iq and GMW, do you know the billing practices
```