Source: Legal > Cases - U.S. > Federal Court Cases, Combined 🔲
Terms: **subcontract /p oral /p modification and "miller act"** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
🔲

*2003 U.S. Dist. LEXIS 21388, \**

UNITED STATES OF AMERICA for the use of ASCHER BROTHERS CO., INC., a domestic corporation, Plaintiff, v. AMERICAN HOME ASSURANCE CO., a foreign corporation, and PAUL H. SCHWENDENER, INC., a domestic corporation, Defendants. PAUL H. SCHWENDENER, INC., a domestic corporation, Counter-Plaintiff, v. UNITED STATES OF AMERICA for the use of ASCHER BROTHERS CO., INC., a domestic corporation, Counter-Defendant.

View the Full Docket from LexisNexis CourtLink for 1:98cv995
Case No. 98 C 0995

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2003 U.S. Dist. LEXIS 21388

March 18, 2003, Decided
March 20, 2003, Docketed

**PRIOR HISTORY:** United States ex rel. Ascher Bros. Co. v. American Home Assur. Co., 1999 U.S. Dist. LEXIS 13345 (N.D. Ill., Aug. 16, 1999)

**DISPOSITION:** Judgment entered.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff subcontractor filed suit against defendant general contractor under the **Miller Act,** 40 U.S.C.S. § 270a et seq., for common law breach of contract and fraud. The subcontractor also sued the general contractor's surety under the **Miller Act** on the surety's payment bond. The general contractor filed a counterclaim against the subcontractor for breach of contract.

**OVERVIEW:** This action arose out of the construction of a residential facility for the United States Navy. The subcontractor's scope of work under the **subcontract** included the painting of the walls, ceilings, door frames and window frames of the living quarters, together with the painting of the interior hallways, laundry and mechanical rooms, storage rooms, electrical closets and offices at the bachelor enlisted quarters. Although the general contractor received full payment from the Navy, the general contractor maintained that it was entitled to certain back charges or set offs against the amount due because the subcontractor failed to perform certain of its contract obligations. The court found in favor of the general contractor on the fraud claim. The court reasoned that there was no basis in the evidence to draw an inference that the general contractor set about to trick the subcontractor into doing work that it never intended to pay for. Rather, there was ultimately a difference of opinion among the various players as to whether the work was contemplated by the **subcontract.** The court also found that the surety was liable on the payment bond secondarily to the general contractor.

**OUTCOME:** Judgment was entered in favor of the general contractor on the fraud claim.

Judgment was entered in favor of the subcontractor on the suretyship claim.

**CORE TERMS:** subcontract, coat, ceiling, paint, finish, submittal, patching, painting, concrete, specification, subcontractor, contractor, personnel, pinhole, punch, Miller Act, quality control, coat of paint, promissory fraud, modification, memorandum, mil, breach of contract, authorization, manufacturer, coverage, upgrade, premium, ticket, sheets

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims 

Torts > Business Torts > Fraud & Misrepresentation > General Overview 

*HN1* ★ Fraud must be pled with particularity, Fed. R. Civ. P. 9(b), and proved by clear and convincing evidence. More Like This Headnote

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN2* ★ In Illinois, the elements of common law fraud are (1) a false statement of material fact; (2) defendant's knowledge or belief that the statement was false; (3) defendant's intent to induce plaintiff to act; (4) plaintiff's reliance on the truth of the statement; and (5) plaintiff's damages resulting from that reliance. Normally, the fraudulent statement must relate to a past or present fact, as opposed to a false promise to do an act in the future, which is fraudulent inducement or promissory fraud. More Like This Headnote | *Shepardize:* Restrict By Headnote

Torts > Business Torts > Fraud & Misrepresentation > General Overview 

*HN3* ★ For promissory fraud, if the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable. To establish promissory fraud, the plaintiff must prove a scheme to defraud. To prove a scheme to defraud, the plaintiff must establish a pre-existing intent to defraud. It must also prove an elaborate artifice of fraud. More Like This Headnote

Contracts Law > Breach > General Overview

Contracts Law > Defenses > Fraud & Misrepresentation > General Overview 

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN4* ★ Promissory fraud is a disfavored cause of action in Illinois. Because promissory fraud is easy to allege and difficult to prove or disprove, the burden on a plaintiff claiming promissory fraud is deliberately high. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid. More Like This Headnote

Civil Procedure > Trials > Jury Trials > Province of Court & Jury 

Contracts Law > Contract Modifications > General Overview

*HN5* ★ A contract **modification** must satisfy all the requirements of a valid contract. Whether a **modification** existed, its terms and conditions, and the intent of the parties are questions of fact. More Like This Headnote

Contracts Law > Contract Modifications > Oral Modifications 🔳

Contracts Law > Types of Contracts > Oral Agreements 🔳

*HN6*⚓ A written contract may be modified by a subsequent **oral** agreement, even where the contract precludes **oral modifications.** Further, a contract is validly modified if the party which did not propose the changes is shown to acquiesce in the **modification** through a course of conduct consistent with acceptance. More Like This Headnote

Contracts Law > Contract Modifications > General Overview 🔳

Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof 🔳

*HN7*⚓ The Illinois requirements for proving contract **modifications** has been long and well established. A contractor seeking to receive extras has a burden of proving, by clear and convincing evidence, the following: (a) the work was outside the scope of its contract; (b) the extra items were ordered by the owner; (c) the owner agreed to pay extra, by either by its words or conduct; (d) the extras were not furnished by the contractor as its voluntary act; and (e) the extra items are not rendered necessary by any fault of the contractor. The contractor sustains this burden by proving that the extra work was requested by the owner, and there is no evidence indicating that the work was necessary or voluntarily performed due to fault by the contractor. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview 🔳

Contracts Law > Breach > General Overview 🔳

Contracts Law > Remedies > Compensatory Damages > General Overview 🔳

*HN8*⚓ In a counterclaim, set-off or recoupment action to recover damages for breach of contract, burden of proof is on the party claiming such damages to prove that such damages were caused by default of the party to be charged. More Like This Headnote

Contracts Law > Remedies > Compensatory Damages > General Overview 🔳

*HN9*⚓ As a general rule, the measure of damages, or the credit due the purchaser, when performance by the builder has been less than full performance, is the cost of correcting the defects or completing the omission, rather than the difference in value between what ought to have been done in full performance and what was actually done. But this general rule only applies where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results obtained. If to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed according to the contract and that which was actually performed. More Like This Headnote

Governments > Federal Government > Property 🔳

Public Contracts Law > Performance > Subcontracts & Subcontractors 🔳

*HN10* ⬇ Because federal property is not subject to a state's mechanics lien laws, Congress enacted the **Miller Act**, 40 U.S.C.S. § 270a et seq. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Cross-Claims > General Overview 🔖

Public Contracts Law > Performance > Subcontracts & Subcontractors 🔖

*HN11* ⬇ Under the **Miller Act**, 40 U.S.C.S. § 270a et seq., a claimant, in addition to establishing that it has met the jurisdictional requirements of the Act, must also prove the other elements of its case. More Like This Headnote

Contracts Law > Types of Contracts > Guaranty Contracts 🔖

Public Contracts Law > Performance > Subcontracts & Subcontractors 🔖

*HN12* ⬇ Where a suretyship exists, it is the duty of the principal to the surety to satisfy the surety's obligation by performing his own duty to the creditor in the absence of a defense between himself and the creditor, which is also available to the surety. More Like This Headnote

**COUNSEL:** **[*1]** For ASCHER BROTHERS CO., INC., plaintiff: Hugh B. Arnold, John F. Etzkorn, John Joseph Toomey, Steven F. McDowell, Arnold & Kadjan, Chicago, IL.

For AMERICAN HOME ASSURANCE CO., defendant: Howard Marks, Berger, Newmark & Fenchel, P.C., Chicago, IL. Gary L. Griffin, Harold E. McKee, III, Riordan, Donnelly, Lipinski & McKee, Ltd., Chicago, IL. Paul Arthur Brocksmith, Brocksmith & Brocksmith, Chicago, IL.

For PAUL H. SCHWENDENER, INC., defendant: Roger L. Price, Andrea C Okun, Seyfarth Shaw, Chicago, IL.

For SCHWENDENER INC, counter-claimant: Roger L. Price, Seyfarth Shaw, Chicago, IL.

For ASCHER BROTHERS CO., INC., counter-defendant: Hugh B. Arnold, John F. Etzkorn, John Joseph Toomey, Steven F. McDowell, Arnold & Kadjan, Chicago, IL.

**JUDGES:** JOAN HUMPHREY LEFKOW, United States District Judge.

**OPINIONBY:** JOAN HUMPHREY LEFKOW

**OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL**

This case arises out of the construction of a residential facility for the United States Navy (the "Navy") at the Illinois Naval Training Center, Great Lakes, Illinois (the "Project"). The facility is known as the Bachelor Enlisted Quarters ("BEQ"). Ascher Brothers Co., Inc. ("Ascher Bros. **[*2]** "), the painting subcontractor for the project, has sued the general contractor, Paul H. Schwendener, Inc. ("PHS"), under the **Miller Act**, 40 U.S.C. §§ 270a *et seq.,* for common law breach of contract and fraud claiming damages in the amount of $ 304,282.50, plus interest. Ascher Bros. has also sued PHS's surety, American Home Assurance Company ("American Home"), under the **Miller Act** on American Home's payment bond. PHS has filed a counterclaim against Ascher Bros. for breach of contract. This court has held a trial, without a jury, heard 16 live witnesses during eight trial days, considered the testimony of two more witnesses tendered by way of deposition excerpts, and admitted into evidence and reviewed hundreds of pages of exhibits. Based on the court's evaluation of the evidence, including the credibility of the witnesses and the weight of the evidence, the court finds as follows:

**The Parties**

1. Ascher.Bros. is an Illinois corporation with its principal place of business in Chicago, Illinois. Ascher Bros., which is owned by Richard Ascher, its president, and his brother David Ascher, was at all relevant times in the business of providing painting **[*3]** services.

2. PHS is an Illinois corporation, with its principal place of business in Westmont, Illinois. PHS was at all times, among other things, a general construction contractor. Currently, PHS engages in the construction of public facilities such as schools, sanitary district facilities, and jails. PHS's president is Michael S. Schwendener ("Schwendener").

3. American Home is a New York corporation, duly registered with the Illinois Department of Insurance as a foreign insurance corporation.

**The Project**

4. On or about June 5, 1995, PHS entered into a contract with the Navy for the construction of the new BEQ. The project consisted of the construction of five interconnected buildings designed to house 455 suites, which would serve as living quarters for Navy enlisted personnel. The buildings were identified as Main, A, B, C and D. The Main building was planned to be seven stories tall, while the other buildings were to be five stories tall. Each suite was to consist of two bedrooms, a kitchen area and a restroom. PHS's initial contract with the Navy, designated Navy contract No. N62467-94-0637 (the "Contract") had a contract value of $ 39,816,031.

5. Lieutenant Phillip **[*4]** Trent Carter ("Carter") acted as Project Manager for the United States Navy, responsible for overseeing performance of the construction contract. He reported to the Resident Officer-in-Charge of Construction, Lt. Commander Smith. Larry Campion ("Campion"), a civilian, was the Navy's construction representative responsible for quality assurance on the construction site.

6. At all times material to this litigation, the project manager for PHS was Mark Schafer ("Schafer"). Schafer was assisted principally by James Krupa ("Krupa"), the Project Superintendent, and Gary Wonsowski ("Wonsowski"), the Assistant Project Superintendent. Schafer dealt with the subcontractors and project managers and addressed specific issues on site as they arose. He conducted weekly subcontractors' meetings held at the job site. Additionally, Schafer reported to the Navy on a weekly basis regarding the status of the BEQ and addressed any issues or concerns raised by the Navy. He was on site on a weekly basis at the beginning and the middle of the project, and on a daily basis towards the end of the project. Krupa and Wonsowski were on site on a daily basis throughout the project. As the project continued and **[*5]** certain problems arose, PHS's Chief Operating Officer, Joseph Zosky ("Zosky"), as well as its president, Schwendener, became involved. Schwendener would go on periodic walk-throughs of the BEQ with Lieutenant Carter.

7. PHS's contract with the Navy also required PHS to retain independent quality control personnel. To fulfill that need, PHS retained an outside consultant, the architectural firm of Stowell, Cook and Frolichstein. The architectural firm assigned H. Thurber Stowell ("Stowell") and others to the job. The Navy had three phases of quality control: first, a preliminary stage with meetings on defined features; second, an initial stage, seeing the work installed and reviewing it with the relevant parties; and third, a follow-through stage, insuring that all subsequent work conformed to the standards of the specifications and drawings. Stowell's job was to manage and implement the quality control program at the BEQ. He conducted weekly quality control meetings, reviewed and processed all submittals, kept track of all rework, administered tests and logged testing procedures.

8. As required by the **Miller Act,** on or about July 25, 1995, PHS as principal and American Home as surety, **[\*6]** furnished a payment bond in the penal sum of $ 2,500,000 to the United States of America. By virtue of its subcontract with PHS, Ascher Bros. is a "person having a direct relationship with the Principal" as defined in the payment bond, and Ascher Bros. is also a "person" as that term is defined in the **Miller Act,** 40 U.S.C. § 270d.

9. PHS self-performed certain work on the project, including substantial concrete work. In addition to doing its own work, PHS entered into subcontracts with over thirty (30) trades to complete work on the project. The subcontractors performed such activities as excavation, electrical work, heating, ventilation and air conditioning, mechanical, carpentry, erection of drywall, painting, roofing, masonry and landscaping, among other tasks.

10. The contract between PHS and the Navy included an incentive award program by which PHS could receive bonuses in each of four designated periods over the life of the project. Under this program, at the conclusion of each award period, PHS provided the Navy with a written self-evaluation of its performance in the categories of timeliness, quality control, management and community impact. The contractor's **[\*7]** self-evaluation report was then reviewed by the Navy's Award Fee Evaluation Board, which made a recommendation to the Commanding Officer, Engineering Field Activity Mid-West. The Evaluation Board rated the contractor's performance along a continuum ranging from outstanding through highly satisfactory, satisfactory and unacceptable and, according to a formula, PHS could then receive a percentage from zero to 100 percent of the possible bonus for that period. The final determination of an award was made by Captain Rice, the Commanding Officer for the award incentive program.

11. The individuals most directly involved in this project on behalf of Ascher Bros. were David Urban, the estimator and project manager for the project; David Halloran, the project superintendent; and Jack Crowley, the foreman on the project who, in addition to providing painting services himself, supervised Ascher Bros.'s crew at the BEQ. According to Crowley, most of Ascher Bros.'s work was done between September, 1996 and March, 1997.

12. Urban was most involved at the beginning of the project, preparing and negotiating Ascher Bros.'s bid for the Subcontract. Urban signed the Subcontract on behalf of Ascher **[\*8]** Bros. Thereafter, Urban was involved in fifteen to twenty other projects and was not regularly at the project site. At the time the project began, Halloran was new to Ascher Bros., having started work there in 1996. As the project progressed, both Urban and Halloran became involved in discrete issues as they arose.

13. The Contract called for the construction of the facility to be undertaken pursuant to certain construction drawings and specifications. These specifications (the "Specifications") set forth, in detail, how each trade, including for paint and concrete work, was to perform on the project. The specification for the concrete work was designated as Section 03300 (the "Concrete Specification"). The specification for painting was designated as Section 09900 (the "Painting Specification").

14. Ascher originally bid the project at $ 703,900 but reduced it at PHS's request. Ultimately, in May 1996, Ascher Bros. and PHS executed a Subcontract agreement (dated March 25, 1996) (the "Subcontract"), pursuant to which Ascher Bros. agreed to perform all painting work for the BEQ for a total lump sum of $ 635,000.

15. Ascher Bros.'s scope of work under the Subcontract included the **[\*9]** painting of the walls, ceilings, door frames and window frames of the living quarters (suites), together with the painting of the interior hallways, laundry and mechanical rooms, storage rooms, electrical closets and offices at the BEQ. The square footage of the interior walls alone exceeded 700,000 square feet. Paragraph 20(a) of Schedule A of the Subcontract provides that Ascher Bros.'s scope of work was to be in accordance with the Painting Specification.

16. The Painting Specification provided, as relevant here, as follows:

INTERIOR CONCRETE, CONCRETE MASONRY, PLASTER AND WALLBOARD SURFACES

| | SURFACE/ AREA | PRIMER | DFT | INTERMEDIATE COAT | DFT | TOPCOAT | DFT |
|---|---|---|---|---|---|---|---|
| F. | Wallboard Not Specified Otherwise | FS TT-P-19 | 1.5 | N.A. | | FS TT-E-509, "Eggshell" | 1.5 |

As written, the specification required a primer coat at 1.5 mils (millimeters) of DFT (dry film thickness) and a topcoat of the same thickness. (PX 7, § 3.6.4, Table V, Section F) DFT is a measure of the paint on a wall after the wet paint dries. Different paints may have different DFTs. DFT can be measured with mil gauges in the field.

**The Walls**

17. Prior **[*10]** to beginning work on the Project, the various trades had to present certain information known as "submittals" to PHS for approval by PHS and the Navy. Submittals show the products and methods the particular trade intends to use in order to meet the requirements of the Specifications. The architect and the Navy reviewed the submittals to determine whether they conformed to the specifications. If they conformed, the submittal was approved and the trade was to then proceed with the work as stated in the submittal. If the submittal was not approved, the trade had to make corrections and resubmit it until it was approved. A trade could not commence any work on the project without an approved submittal. Once a submittal was approved, a subcontractor could not deviate from it without getting a new submittal approved in writing. Approval of a submittal included the Navy's general expectation that a manufacturer's method of direction for applying the product would be followed.

18. On March 1, 1996, Ascher Bros. submitted to PHS its initial submittal in anticipation of being awarded its Subcontract. To prepare this submittal, Urban met with Larry Fortino, then a sales representative for Sherwin **[*11]** Williams, a large manufacturer and distributor of paint products. Urban and Fortino went through the Painting Specification and together decided what should be included in the submittal.

19. In a letter, Fortino submitted certain "painting specifications" for Urban's "consideration." For the interior walls at the BEQ, Fortino recommended as follows:

I. Gypsum Wall Board

Primer: ProMar 400 Latex Primer B28W400

Finish: ProMar 400 Latex Eg-Shel B20W400

Finish: ProMar 400 Latex Eg-Shel B20W400

20. Fortino also supplied certain product data sheets for each paint product specified for gypsum wallboard of which the interior walls of the BEQ were constructed. In both of those product data sheets, under the "specifications" section, Sherwin Williams called for the application of one coat of ProMar 400 Latex Wall Primer and two coats of ProMar 400 Latex series Wall Finish.

21. In the product data sheets, in the section called "characteristics," Sherwin Williams indicated that, at a coverage rate of 400 square feet per gallon, the ProMar 400 Latex Primer would achieve 1.2 mils DFT. With respect to the Eg-Shel enamel, at the same coverage rate, one coat of the enamel finish would achieve **[*12]** 1.1 mils DFT. Consequently, at that coverage rate, two coats of finish paint would be required to achieve the Painting Specification minimum of 1.5 mils for finish paint. Another better grade Sherwin Williams product available for use was ProMar 200, one coat of which at the same coverage rate would have yielded a dry film thickness of 1.6 mils, more than required for the BEQ specifications. Fortino did not recommend ProMar 200. Rather, Fortino specified "finish, finish" to conform with these specifications using ProMar 400 paints.

22. No one knew the characteristics of Sherwin Williams paint better than the persons who prepared the Sherwin Williams product data sheets. In sending those sheets to Urban, Fortino was recommending a Sherwin Williams system, and he intended both PHS and the Navy to rely on those recommendations.

23. Urban accepted Fortino's recommendations and included Fortino's letter and product data sheets with Ascher Bros.'s submittal.

24. Ascher Bros.'s initial submittal package was received by PHS on March 6, 1996 and ultimately sent to the Navy. The Navy's architect rejected the submittal and requested further information, including, specifically, the designation **[*13]** of federal product numbers for each of the identified products.

25. On June 24, 1996, Ascher Bros. sent to PHS a second submittal regarding the paint to be used in the BEQ. As with the first submittal, Ascher Bros. included a Sherwin Williams specification letter and related information. Once again, Ascher Bros.'s submittal contained a letter from Fortino, this one dated May 29, 1996. While Fortino added the federal product numbers for the products identified in his letter, he maintained the same recommendation regarding the system to be used at the project, again indicating one coat of primer paint and two coats of finish for application to the gypsum wall board. He made no other change to the section regarding painting gypsum wall board. This second submittal was certified for use by the authorized contract quality control representative, Thurb Stowell, on July 1, 1996, approved by the architect on the project, Knight Architects Engineering Planners, Inc., on July 12, 1996, and finally approved by the resident officer in charge of construction on July 17, 1996.

26. All of Fortino's recommendations were consistent with a Sherwin Williams painting guide provided to architects which **[*14]** notes that two thin coats of paint are preferable to one thick coat of paint. Fortino agreed that the guideline would be applicable to the ProMar 400 Finish product.

27. Gary Zwayer ("Zwayer") is an architect and senior services consultant with Wiss, Janey & Elstner Associates. Called as an expert witness by Ascher Bros., he agreed that at the coverage rate identified in the Sherwin Williams product sheets contained in the Ascher submittal, two coats of finish paint would be required to achieve the DFT required under the Painting Specification.

28. Ascher Bros.'s Project Manager, Urban, also acknowledged that the submittals called for two coats of finish paint.

29. The Subcontract was executed after the first set of paint submittals was transmitted to the Navy, and PHS's witnesses, including Mr. Schwendener, claimed to have selected Ascher Bros. in part because it planned to use three coats of paint. Nevertheless, PHS's Project Construction Schedule (dated July 30, 1996, PX 27) provides for but one coat of finish paint, indicating that whatever Schwendener's understanding was, the Project Superintendent must

have expected one coat of finish paint. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 In March or April, 1996, Ascher Bros. painted a "mock-up" suite at the site. According to Halloran, Ascher Bros. applied two coats of finish coat to the mock-up. Tr. at 721.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*15]**

30. Ascher Bros. always intended to apply only one coat of finish paint and Ascher Bros.'s personnel (Halloran and Crowley) heard nothing to the contrary from PHS until well into the project. n2 PHS never made a written demand for a third coat of paint. Before or around the beginning of the project, other than as reflected in the submittals, the parties did not communicate about whether there would be one or two finish coats.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 According to Halloran, he first learned of it after Buildings B, C, D and "a lot" of Main were finished. Tr. at 732-33.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

31. The project submittals were approved on July 17, 1996. In September, 1996, Ascher Bros. began painting the walls at the BEQ.

32. In performing its work, Ascher Bros. applied only one coat of primer and one coat of finish paint.

33. Ascher Bros.'s foreman, Crowley, attended construction meetings on October 30, 1996, November 6, 1996 and November 13, 1996. According to the minutes, Crowley reported that the "first coat" of finish paint had been applied to a particular **[*16]** area. Both Crowley and Urban received copies of these minutes. Upon their receipt, Urban forwarded copies of these minutes to Halloran. At no time did Crowley, Urban or Halloran raise any question as to what was meant by "first coat" or indicate that Ascher Bros. planned to apply only one coat of finish paint.

34. During October and November 1996, PHS also sent to Urban several letters which indicated that two coats of finish paint were to be applied to the suite walls. Urban never disputed or questioned PHS's statements regarding multiple coats of finish paint. See Ex. 111, 115, Tr. 509).

35. Urban did not review the paint submittals with respect to DFT requirements and paid no attention to Fortino's letter with respect to the numbers of coats recommended. Urban never told Halloran, Crowley, or the painters about the DFT requirements or discussed with them the application of any particular number of coats.

36. Halloran, who was new to Ascher Bros., had the duty as project superintendent to educate the foreman on the scope of work for the project. Yet, he never reviewed the Painting Specification and was not aware of any DFT requirement. Thus, Halloran never told Crowley about either **[*17]** a DFT requirement or required number of coats.

37. Crowley, the senior Ascher Bros. employee on the project on a daily basis who was

responsible for directing the work of all the painters on the BEQ, acknowledged that he was given no specific instructions for this job regarding any DFT requirements. He was not aware of the Subcontract and never reviewed the Painting Specification. His supervisors never directed him to apply two finish coats. In fact, he was specifically told to put one coat of finish paint on the walls.

38. There is no evidence that Ascher Bros., during its performance of the Subcontract, made a measurement of the paint that was applied on the BEQ project, and Halloran, Crowley and Fortino had no idea what the actual DFT was of the paint that Ascher Bros. applied at the BEQ.

39. Ultimately, Schafer asked Ascher Bros. to submit a credit proposal for the value of applying a full second coat of finish paint to the interior walls at the BEQ, but Ascher Bros. did not respond. PHS secured an estimate of $ 108,150 to apply a full second coat of paint to the drywall surfaces at the BEQ from All American Corporation.

40. The full second coat, however, was never applied.  **[*18]**  Rather, Ascher Bros. did 40 hours of touch up work in an effort to satisfy PHS's concerns about voids in the paint surface.

41. The Navy accepted the project without reducing or backcharging PHS for failure to apply the third coat of paint.

**The Ceilings**

42. In addition to painting the walls at the BEQ, under its Subcontract Ascher Bros. was to coat the ceilings of the suites. The Painting Specification called for the final coating on the ceilings to be U.S. Gypsum Imperial QT Textured Finish, often called a "popcorn" finish. Ascher's witness, Gary Zwayer ("Zwayer"), of Wiss Janey & Elstner, stated that the purpose of a QT Textured Finish is to mask or hide minor ceiling imperfections such as pinholes.

43. The ceilings were formed when concrete was poured into wooden forms. PHS performed the concrete work on the BEQ, including preparing the forms and pouring the ceilings. After the forms were removed, the Concrete Specification (§ 3.5.1) called for the concrete trade (in this case, PHS) to "repair formed surfaces" and remove "gross defects" defined as "minor honeycombs, pits greater than 1-square inch surface area or 0.25-inch maximum depth, or otherwise defective areas.  **[*19]**  "

44. As concrete cures, small air bubbles escape and form what are known as pinholes, which the witnesses variously described as holes smaller than the size of an eraser or about the size of a pen tip or a pinhead. Zwayer, among others, testified that pinholes are not defects. Rather, pinholes are a normal and ordinary characteristic of cast-in-place concrete ceilings such as those at the BEQ. Nobody understood that it was the obligation of the concrete subcontractor to either eliminate, fill or otherwise treat pinholes.

45. In or around April, 1996, Ascher Bros. applied the QT Textured Finish to the ceiling of a mock up suite at the BEQ. After this was done, some of the pinholes showed through the QT Textured Finish. The parties dispute whether the Navy accepted or approved the mock-up ceiling. There is no documentary proof that the Navy did or did not accept the ceiling of the mock up suite at the BEQ, nor is there evidence that anyone voiced disapproval of it to Ascher Bros. at that time.

46. In September, 1996, PHS undertook the correction of gross defects in the suite ceilings, as defined in the Concrete Specification, through a process of grinding and removing fins and patching  **[*20]**  the large pits. PHS did not address air voids or pinholes.

47. On or around September 13, 1996, Schwendener acknowledged in writing to Ascher

Bros. that some of the concrete ceilings were not in compliance with the Concrete Specification and, after talking to Ascher Bros., authorized Ascher Bros. in writing to take over the patching of the exposed concrete ceilings in Buildings C and D on a time and materials basis. Crowley confirmed with Stowell that the instructions were limited to the patching of gross defects as defined in § 3.5.1 of the Concrete Specification.

48. Based on that authorization memorandum, Ascher Bros. undertook to patch gross defects in the exposed concrete ceilings in Buildings C and D. There is no document that authorized Ascher Bros. to do any patching of any ceilings beyond those in Buildings C and D. Like PHS, Ascher Bros. did not, nor was it expected to, address air voids or pinholes while doing this authorized patching of gross defects work. During this same time period, Ascher Bros. was also applying the QT Textured Finish directly to ceilings after patching of gross defects as needed.

49. As the work on the ceilings progressed, in late September or **[*21]** early October, 1996, the Navy expressed dissatisfaction with their appearance and refused to accept them. The Navy expressed two concerns: (1) the coverage of the textured finish was not adequate and uniform, and (2) pinholes could be seen through the textured finish.

50. PHS's field personnel promptly informed Ascher Bros.'s field personnel of the Navy's dissatisfaction. Wonsowski, however, assured Crowley that hiding the pinholes was not required under the contract and told him to continue work on the project.

51. At a meeting a week or so later held to address these concerns, Campion raised the issue as to whether the textured finish had been applied by Ascher Bros. pursuant to the manufacturer's recommendations. n3 He pointed to the instructions on a bag of QT Textured Finish (PX 77) which he interpreted to call for the use of a product called Cover Coat on the ceilings prior to the application of the textured finish. Campion pointed this out to Schwendener at an inspection walk through. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Everyone who testified about the subject agreed that following a manufacturer's instructions regarding the application or use of its product is good practice. From the Navy's perspective, Campion testified that all materials had to be installed in accordance with written instructions. Lt. Carter agreed that the Navy expected that a manufacturer's recommended method for applying its product would be followed. The instructions on the QT Textured Finish bag plainly state that a ceiling should be leveled or filled with Cover Coat prior to the application of QT Textured Finish. **[*22]**

n4 That Campion first identified Cover Coat as a product to resolve the Navy's concern with the appearance of the ceiling was corroborated both by Schwendener and Zosky. Ascher Bros. contends that it initiated the use of Cover Coat. Its Proposed Finding of Fact ("FOF") No. 32 states, "At [PHS's] direction, Ascher [Bros.] tested several new products and new techniques in order to fill the air voids or 'pinholes.'" Ascher Bros. does not cite to the record for this statement and it is thus disregarded. Further, Ascher Bros.'s Reply to PHS's Proposed FOF does not dispute the statements made in P51 above.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

52. In early October, Ascher Bros. began to use Cover Coat. Cover Coat was used as a skim coat over the entire ceiling after patching of gross defects and before application of the QT

Textured Finish. This corrected the pinhole problem.

53. PHS directed Ascher Bros. to continue to apply Cover Coat to all of the suite ceilings at the BEQ. At the time, Ascher Bros. contended that the application of Cover Coat would constitute an extra to its Subcontract. There is no document in evidence which **[*23]** reflects any agreement to pay extra for this work.

54. Everyone agrees that PHS directed Ascher Bros. to proceed with the Cover Coat process and to keep a record of time spent and materials used in applying Cover Coat to the ceilings. Ascher Bros. did keep a record of time and materials used on that aspect of the project, submitting to PHS tickets characterized as "Additional Work Authorizations" or "AWAs," which purported to itemize the hours worked and materials used by Ascher Bros. for its Cover Coat work.

55. Ascher Bros.'s personnel testified that PHS personnel stated it would "approve" the AWAs. PHS personnel said that they promised only to "sign" them and that written authorization was necessary to obtain payment for this claimed "extra" work.

56. AWAs presented by Ascher Bros. contained the following language:

> Ascher Bros. Co., Inc. is hereby authorized to perform the following work WHICH IS IN ADDITION to all contract work. Ascher Bros. Co., Inc. will be paid for this work based on current labor rate and material cost.

Either Krupa or Wonsowksi signed the AWAs on behalf of PHS, after stamping them with a legend, which stated,

> "VERIFICATION OF WORK **[*24]** COMPLETED - SUBJECT TO CONTRACT VERIFICATION BY PROJECT MANAGEMENT."

57. Crowley saw the stamps as they were used by PHS and never objected to them. Halloran was also aware PHS was stamping the AWAs and did express his concern regarding their use. Nevertheless, Ascher Bros. continued its work without resolving this potential dispute.

58. Ascher Bros. applied Cover Coat to the suite ceilings in all of the buildings at BEQ (A, B, C, D and Main). Ascher Bros. characterizes its Cover Coat application work as a continuation of the patching work that it had previously been authorized to do in Buildings C and D, thus an extra to the contract, while PHS characterizes it as part of the ceiling finish work under Ascher Bros.'s contract with PHS.

59. Whether or not this work was an extra to the Subcontract, a matter discussed below, the process of patching and the process of applying cover coat were distinct processes: patching of gross defects under the Concrete Specification (§ 3.5.1) was designed to mend gross defects and was accomplished generally by one person applying materials like Dura-Bond or topping mud directly to the spot in question. By contrast, Cover Coat is a different **[*25]** compound designed to prepare or "prime" the ceiling for QT Textured Finish by skimming the entire area of the ceiling rather than spot covering it.

60. Cover Coat did not take the place of patching. (Tr. 977-78.) Ascher Bros. still had to patch gross defects, even after it began to use Cover Coat on the ceiling.

61. Shortly after Ascher Bros. began to apply Cover Coat to all ceilings, on October 8, 1996, Schafer wrote a memorandum to Stowell concerning the appearance of the finished suite ceilings. The memorandum was intended to respond to "the Navy's request that the appearance of the bedroom ceilings be upgrades [*sic*] so no air pockets in the concrete work will show through the USG/Imperial QT Texture Finish." After describing the testing and identification of the USG Cover Coat material, the memorandum states: "Although this exceeds the requirements of the contract, we propose at no additional cost to the Navy to apply the product where needed to the concrete ceiling surface with USG's Cover Coat compound following their 'Roller Application' method." On October 9, 1996, Stowell transmitted this memorandum to the Navy, certifying the Cover Coat material as in compliance with **[*26]** the contract drawings and specifications.

62. The memorandum apparently became part of a submittal designated "Up-grading Coating on Exposed Concrete Ceilings" sent by PHS to the Navy. The Navy's architects and engineers approved the submittal on October 22, 1996. Carter, then the Navy's Project Manager, sent a letter to PHS dated October 25, 1996, stating that the submittal was approved. Stowell then sent that information, including the October 8, 1996 memorandum, to David Urban on October 28, 1996.

63. At the time, PHS believed that use of Cover Coat exceeded the requirements of PHS's contract with the Navy. n5 At the same time, PHS was embarrassed by what it considered to be a lapse in its quality control procedures and issued the memorandum in an effort to "save face" with the Navy. Richard Ascher testified that he believed that Schafer was truthful in stating that as his reason, but he also believed that Ascher Bros. was to be paid on a time and materials basis for applying the Cover Coat (Tr. 145).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 Based on the preponderance of the evidence, the court rejects PHS' Proposed FOF # 64 that PHS's people did not believe it was actually an upgrade. (*E.g.,* Testimony of Crowell, Tr. 952-54.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*27]**

64. Neither Urban nor anyone else in the Ascher Bros. organization saw the October 8, 1996 memo prior to October 28, 1996 and admittedly did not rely on it in connection with its work of applying Cover Coat to the suite ceilings. Rather, Ascher Bros.' personnel took their directions from PHS. Ascher Bros. not only finished the project with Cover Coat but also went back and removed the popcorn finish in some areas and applied Cover Coat before re-applying the popcorn finish.

65. For purposes of the Navy's incentive award program (*supra,* P10), the third performance award period covered the time from April 20, 1996 through September 27, 1996. The overall rating for the quality of PHS's work for that period was the lowest of the four rating periods -- only "satisfactory." In the quality of work category, the Navy rated PHS at only 30%, the lowest grade received by PHS on the entire project. This was the time period during which Ascher Bros. initially applied the QT Textured Finish to the ceilings without a prior application of Cover Coat, and PHS casts the blame for its lowest rating on Ascher Bros. This is not borne out by the record, however, for although the evaluation for the **[*28]** third period makes reference to substandard ceiling finish work, it was one of multiple problems, cited merely as an example of PHS's lack of improvement over the preceding period in enforcing quality standards.

66. By contrast, the Navy praised PHS's work in the fourth incentive award period which

covered the time from September 28, 1996 through the end of the project, May 30, 1997, noting that the project was completed on time and that the Navy's concerns about quality control had been "completely alleviated by [PHS's] dedicated efforts in this area during the [fourth] award fee period," by adding quality control staff and keeping them on site throughout the project. Thus, the court finds that PHS, rather than Ascher Bros., was the principal cause of the lower rating in the third period, as well as the principal reason its rating improved during the fourth period.

67. The Navy accepted the work and paid PHS 100% of the contract amount. PHS has paid Ascher Bros. a total of $ 600,353.90.

**Approved Charge Orders**

68. The Subcontract provided for modifications to the contract by way of "Change Requests," "change orders," or "extras." The Subcontract contemplates that PHS **[*29]** would initiate change requests and authorize them in writing, and Ascher Bros. was to perform them thereafter. In practice, however, a decision to do extra work was made on site as needed and PHS later decided whether to authorize it. Sometimes PHS orally authorized an extra and sometimes not. Crowley, who was not familiar with the Subcontract, decided whether to charge work as extra. He conceded that PHS was usually "pretty good" about signing extra tickets when it believed the work was due to someone else's fault. (Crowley, Tr. 366). Ultimately, however, PHS decided whether the work was within the contract or an extra. n6

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 Ascher Bros. Proposed FOF P72 points out that a PHS representative signed some of the AWAs suggesting that this constituted approval of payment. Schwendener testified that this endorsement merely confirmed that the work had been done. It was not approval of payment. This is consistent with P13(d) of the Subcontract ("Any change request submitted for work performed on a time and material basis must be accompanied by Daily Work Tickets signed by the General Contractor's Superintendent") (emphasis in original). PHS's evidence and testimony are credited.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*30]**

**Change Order Requests**

69. At PHS's request, Ascher Bros. performed work beyond the scope of the Subcontract. Eight written change orders, or amendments to the Subcontract, totaling $ 122,863, were approved by PHS.

70. Ascher Bros., however, seeks an additional $ 17,335.70 on these approved change orders. This amount, apparently, is attributable to claims for premium hourly rates on several change orders ($ 6,670.70), and two back charges, for damaged sprinkler heads ($ 4,778) and clean up ($ 5,902). The back charges are addressed below. Ascher Bros. neither points to evidence that premium time was authorized nor proposes any other basis for its assertion that it was entitled to premium time on approved change orders. n7

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 At Proposed FOF P69, Ascher Bros. proffers that PHS owes it $ 17,355.70 under change order requests. It references PX 2A-H. Based on the summary chart at PX2, the total is $ 17,335.70, which is the figure the court uses.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

71. Although written change orders were not prepared or executed **[*31]** for the work, Ascher Bros. seeks $ 129,437.70 additional compensation for the following:

     (a) Patching of concrete: $ 54,771.30 (PX 11)
     (b) Repainting due to carpet and water damage: $ 3,447.00 (PX 15)
     (c) Caulking: $ 19,094.20 (PX 16)
     (d) Duraplex: $ 5,721.80 (PX 17)
     (e) Damage: $ 8,217.80 (PX 18)
     (f) Spot priming of patches after taper: $ 21,489.40 (PX 19)
     (g) Extras: $ 553.00 (PX 20)
     (h) Tapers touchup: $ 12,826.00 (PX 21)
     (i) Remobilization: $ 673.00 (PX 22)
     (j) Premium time: $ 2,644.20 (PX 23)

for a total of $ 129,437.70 dollars in claimed extras. (PX 82.)

72. PHS acknowledges that it asked Ascher Bros. to perform certain of this claimed work, and although it could not verify the amounts charged, PHS agrees that Ascher Bros. is entitled to certain credits, totaling $ 45,982.80, which are attributable to items in P71 (b), (c), (d), and (h) and $ 4,893.80 of (e), excluding AWAs attributable to punch list work.

73. The dispute over patching of concrete ceilings (P71(a) above) concerns whether application of Cover Coat counts as "patching of concrete ceilings," whether $ 54,771.30 billed for concrete ceiling patching was actually, or at least partly, attributable **[*32]** to application of Cover Coat, and whether Ascher Bros. should be paid for application of Cover Coat. In addition, the parties dispute whether Ascher Bros.'s charges for patching in the Main Building are within the Subcontract because there is no change order or other authorization from PHS for it.

74. Based on the evidence presented, the court finds that the application of Cover Coat is not appropriately allocated to concrete ceiling patching. As found above, PP59-60, the two jobs were clearly distinct, and Ascher Bros. has not established that once it began to use Cover Coat it no longer needed to do patching. Thus, it is necessary to allocate the work between the two items.

75. The evidence shows that Ascher Bros. billed $ 3,490.20 for patching in Buildings C and D on one occasion, and $ 914.80 on another occasion for patching in Buildings C and Main. n8 Because PHS did not explicitly authorize patching in Main, however, it objects to that charge. The weight of the evidence is that the patching work required in Main was the same as in C and D. There is no evidence that PHS undertook to patch in Main or to engage another subcontractor to do it. Thus, the court find that PHS intended **[*33]** Ascher Bros. to patch in the Main Building, and if it did not, its failure to stop Ascher Bros. estops them from taking a contrary position now. Thus, the court allocates the disputed amount in P71(a) of $ 4,405.00 to patching.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 This is documented at PX 11, AWA 10720. Although PHS concedes this was patching

work, the court notes that the document indicates that the material used was Cover Coat. Nevertheless, the concession is accepted.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -


76. But the balance of $ 50,366.00 which Ascher Bros has allocated to concrete ceiling patching is not proved to be patching. Ascher Bros relies on the AWAs in PX 11. Other than the AWAs allocable to patching in the preceding paragraph, however, all of those AWAs show that the material used was Cover Coat rather than a patching material. n9 Because there is no evidence that Cover Coat was used as a patching material, it follows that the $ 50,366.00 is more likely than not attributable to application of Cover Coat. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n9 One other exception may be found at AWA 11682, which indicates use of one bag of DuraBond 90, which PHS identifies as a patching material (PHS Prop. FOF P57). Because Ascher Bros. has the burden of proof and it has neither pointed this evidence out or indicated how the work might be allocated, the court disregards it. **[*34]**


n10 Halloran testified, moreover, "The cover coating was a two people process. One person would roll it on, and the other person would trowel it off. It was more time consuming [than patching] as far as the square footage we would cover." Tr. 320.


- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

77. Of the remaining $ 28,703.60 for extras ("punch list" work under (e); (f), (g), (i) and (j)), Ascher Bros. relies on AWAs which were not approved or were signed with the reservation of confirmation. PHS relies on the Subcontract and an understanding between the parties that any extras had to be approved, which these were not. Because there is no practicable basis to decide which extras were authorized other than the documentation (which is what the parties agreed to, after all), the court relies on the documents.

78. Regarding (f), "spot priming," for which Ascher Bros. seeks $ 21,489.40 (Ex. 19), the record contains one letter of authorization for spot priming (PX 19, Schafer Memo to Halloran dated 12/6/96), authorizing spot priming on wall surfaces in Building D where some work had to be redone because of another trade's actions. n11 The exhibits **[*35]** on which Ascher Bros. relies on are "tickets" or AWAs. The tickets include work done on Building C, which is not within the authorization (AWAs 10994, 109996, 10997, 11651, 11653, 11655, 11657, 11659). Two tickets (AWA 10994 and 11640) reflect 32 hours work on two rooms in Building D and nine rooms in Building C plus ceilings in C, totaling $ 2,196.60. The charges do not differentiate between the buildings. Because Ascher Bros. has not established the portion attributable to authorized work, but it is clearly a small portion of this ticket, the court finds it outside the authorization. AWA 11640 further appears to be attributable to painting door frames, so it is also not within the authorization. Thus, Ascher Bros. has not proved that the alleged extras under P71(j) were authorized.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n11 Another memo dated December 12, 1996, from Schafer to Halloran (also within PX 19) notes that Ascher Bros. had been applying finish coat to the walls in Building D, which was

not authorized, and ordered Ascher Bros. to stop applying finish coat.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*36]**

79. The disputed charge for damage under (e), an amount of $ 3,324.00, n12 appears to relate to "punch list" work performed on June 19, 1997 near the end of Ascher Bros.'s work on the project (PX 18, AWA 11645). n13 A punch list was prepared by PHS at the completion of a section of a job to make sure the job was complete. Thus, presumptively, punch list is contract work. The only testimony concerning this AWA was from Crowley, who said, "[A] lot of the stuff on the punch list was after we had already been gone and out of there, and a lot of it was trade damage," meaning damage caused by another trade where repainting was needed. (Tr. 348). Without evidence that this work was authorized orally by PHS, however, Ascher Bros. has not established that this was an extra. Similarly, there is no evidence that item (g) labeled "Extras" $ 553, or (i) "Remobilization" $ 673.00, were authorized in writing (See Richard Ascher testimony, Tr. 159, admits only "oral" authorization of remobilization work).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 The total claimed is $ 8,217.80 (Ex. 18) but PHS has agreed to pay $ 4,893.80 (PHS Proposed FOF PP70(e), 71(a). **[\*37]**

n13 The court so infers because this is the only AWA in the amount of $ 3,324.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

80. The claim for premium time, (j) in the amount of $ 2,664.20, is for overtime spent at end of job when other trades were finished and PHS was in a hurry to meet occupancy date and achieve 100% bonus. The Subcontract, P16, provides,

> . . . In the event overtime work is required because of the subcontractor's own delays to the project schedule, no additional compensation will be granted. In the event overtime is requested by the contractor for other reasons, the subcontractor shall be compensated for the net increased labor costs only. No overtime is to be performed on this project without prior written agreement with [PHS].

The parties dispute whether the overtime was required because Ascher Bros. failed to perform its work adequately or because PHS was in a hurry. Nevertheless, Exhibit 23 reflects that all the AWAs listed, save AWA 2015, totalling $ 2,250.00, were signed by Wonsowski.

**Back Charges**

81. Although PHS received full payment from the Navy, PHS maintains that it is entitled to **[\*38]** certain back charges or set offs against the amount due because Ascher Bros. failed to perform certain of its contract obligations and caused PHS to incur certain expenses to complete and correct Ascher Bros.'s work. (DX 128.) In addition to the two items identified in P70 above, PHS seeks set offs for the following items:

| (a) | Paint piping, ductwork, etc. | $ 35,998.00 |
| (b) | Pipe and conduit identification | $ 20,100.00 |
| (c) | Final coat to all drywall surfaces | $ 108,150.00 |
| (d) | Recaulking windows | $ 4,710.00 |
| (e) | Completion of Ascher Bros. punch list | $ 11,751.00 |
| (f) | Re-priming stairs | $ 6,490.00 |

82. Treating first the back charges under P70, PHS seeks to reduce the value of the Subcontract by $ 4,778 to account for payments by PHS to a fire protection subcontractor to replace sprinkler heads damaged during painting operations. (PX 19, Change Order 3). Ascher Bros. acknowledges that it did some damage but contends that the amount deducted was excessive in that some sprinkler heads were damaged by another subcontractor, not Ascher Bros. There is no evidence that Ascher Bros. made a contemporaneous objection to this back charge; neither does Ascher Bros. **[*39]** point to any evidence as to who in particular caused the damage to the sprinkler heads or under what circumstances so as to lend credibility to its assertion. Thus, the court accepts PHS's evidence as more credible than that of Ascher Bros. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 PHS also points to evidence that in one of its requests for payments, Ascher Bros. executed a Contractor's Affidavit, which reflected the amount of the Subcontract at the time of the request. (PHS Proposed Conclusions of Law P25) That Contractor's Affidavit, verified by Ascher Bros.'s controller, also contains a contract value which can only be calculated by accepting PHS's deduction on Change Order No. 3, thus confirming the validity of the Change Order No. 3 deduction.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

83. PHS also claims a backcharge for $ 5,902 attributed to clean up work required as a result of Ascher Bros.'s non-compliance with the Subcontract. (PX 19, Change Order 7). The Subcontract expressly required Ascher Bros. to be responsible for cleanup and related expenses. Although Ascher Bros. denies **[*40]** that any special cleanup work had to be undertaken, the testimony of Schafer, Krupa and Wonsowski on this point is credible. (Tr. 1210-12, 1217-18, 1225-27).

84. Regarding (a) of P81, the Painting Specification at Paragraph 1.10.5 required the painting of certain piping, ductwork, insulation and support in mechanical and electrical rooms and was included in Ascher Bros.'s bid. Ascher Bros. did at least part of this work, but PHS requested a credit for the work not done. Ascher Bros. refused to estimate the value of that work. PHS received a quote from another painting contractor, All American Corporation, in the amount of $ 35,998 to do the painting. PHS never engaged All American Corporation or any other entity to do this work, however.

85. Regarding (b), Paragraph 1.3.1 of the Painting Specification requires the identification by the painting subcontractor of certain pipes and conduits. The work for such identification was included in Ascher Bros.'s bid. The work was never completely performed by Ascher Bros. In fact, this work was performed by the electrical trade because it was within that trade's contract also. Ascher Bros. refused to provide PHS an estimate of the value of **[*41]** that work. PHS obtained an estimate of the value of the work from All American Corporation in

the amount of $ 20,100, but PHS did not engage All American to do the work.

86. Regarding (c), Schafer asked Ascher Bros. to submit a credit proposal for the value of applying a full second coat of finish paint to the interior walls at the BEQ. Ascher Bros. never provided the requested credit proposal to PHS. PHS secured an estimate of $ 108,150 to apply a full second coat of paint to the drywall surfaces at the BEQ from All American Corporation. The full second coat, however, was never applied.

87. In April, 1997, Carter complained about the appearance of the final paint finish on the walls and discussed these concerns with Lieutenant Commander Smith. (Carter Dep. I, at 47-48). Among the Navy's complaints regarding the paint finish were lack of uniform application, incomplete paint coverage (bare spots or "voids"), and noticeable touch-up marks. Carter considered these problems substantial because of the large number of rooms involved. Carter believed that an additional coat of paint would have resolved these problems. On the other hand, Carter also testified that the painting problems **[*42]** were corrected and that he did not consider three coats of paint necessary.

88. Regarding (e), the Project was substantially completed by the end of May, 1997 and the Navy's remaining complaints were contained in a punch list for correction. After the Navy took possession of the BEQ in the summer of 1997, the Navy and PHS came to an agreement under which the Navy would consider the painting and punch list work completed on the condition that PHS supply a painter for a 40-hour period to follow a Navy representative from room-to-room at the BEQ to do painting work as directed by the Navy representative. PHS asked Ascher Bros. to supply the personnel to do this, but Ascher Bros. refused. PHS then employed its own forces as well as All American Decorating to complete the punch list work that Ascher Bros. refused to do. PHS's evidence demonstrates a direct charge to it of $ 11,751 for this work.

89. The Navy accepted the project without reducing or backcharging PHS for failure to apply the third coat of paint.

90. Regarding (d), during varnishing by Ascher Bros. of window sills, in some instances varnish was brushed onto the aluminum window frames. The varnishing later caused caulking **[*43]** between the sill and the frame to separate from the window frames. To recaulk the windows, PHS hired Action Caulk at a cost of $ 4,727.00.

91. Regarding (f), Paragraph 3.3 of the Painting Specification requires the painter to reprime rusted areas. Ascher Bros. refused to do so. PHS hired and paid Nikolas Painting to perform the work at a cost of $ 5,364.00.

**Administrative Costs**

92. PHS also claims that Ascher Bros. owes it $ 250,637.32 for unusual administrative expenses resulting from ongoing difficulties with Ascher Bros. PHS witnesses testified that Ascher Bros. failed to coordinate its work with other trades and to perform punch list and clean-up work properly, which caused PHS personnel to spend unusually large amounts of time troubleshooting and delayed other trades from performing as required. PHS's witnesses also stated that Ascher Bros. unnecessarily made PHS prove that some of the work was in the Subcontract; that Ascher Bros. took unreasonably long times to complete the various projects, would do half a job and leave it uncompleted, forcing PHS to argue with Ascher to complete its work, and lacked responsiveness to demands for better cooperation. As would be expected, **[*44]** Ascher Bros.'s witnesses testified that they performed the job well and in a workmanlike manner. The court finds credible the testimony that problems existed, it also recognizes that no demand for offset of administrative costs occurred until after this law suit had been filed. The Subcontract does not impose administrative costs on Ascher Bros.

## CONCLUSIONS OF LAW

Count I of the Second Amended Complaint is a claim against American Home, as surety, on the payment bond which PHS obtained on Ascher Bros.'s behalf. The parties have agreed that this claim is subordinate to and conditional on Ascher Bros.'s establishing its claim against PHS for breach of contract in Count II. Count III is a claim of fraud, on which this court entered judgment as a matter of law at the close of all the evidence pursuant to Rule 50(a), Fed. R. Civ. P. (Tr. 1307).

This court has jurisdiction over the parties to and the subject matter of this action. 28 U.S.C. § 1331; 40 U.S.C. §§ 270a et seq. Venue is also proper. 28 U.S.C. § 1391(b). The parties make no representations about choice [*45] of law, but because they cite mostly to Illinois law, the court will apply Illinois law or federal law to interpreting the **Miller Act**. See U.S. ex rel. Aldridge Elec. Co., Inc. v. Pickus Const. & Equip. Co., 249 F.3d 664, 666 (7th Cir. 2001) ("We cite both federal and state cases because the parties have slighted choice-of-law issues; although many courts assume that federal law governs all issues if a bond had been posted under the **Miller Act,** this is far from clear. But there is no salient difference between Illinois law and the principles other circuits have devised for **Miller Act** litigation . . . .")

### A. Fraud

To amplify the record, the court will briefly explain its reasons for entering judgment as a matter of law on the fraud claim. *HN1* Fraud must be pled with particularity, Rule 9(b), Fed.R.Civ.P., Uni*Quality, Inc. v. Infotronix, Inc., 974 F.2d 918, 923 (7th Cir. 1992), and proved by clear and convincing evidence. Europlast, Ltd. v. Oak Switch Systems, Inc., 10 F.3d 1266, 1272 (7th Cir. 1993); LaScola v. U.S. Sprint Communications, 946 F.2d 559, 567 (7th Cir. 1991). [*46]

5. *HN2* In Illinois, the elements of common law fraud are

(1) a false statement of material fact; (2) defendant's knowledge or belief that the statement was false; (3) defendant's intent to induce plaintiff to act; (4) plaintiff's reliance on the truth of the statement; and (5) plaintiff's damages resulting from that reliance.

Orix Credit Alliance v. Taylor Mach. Works, 125 F.3d 468, 479 n.5 (7th Cir. 1997); TRW Title Ins. Co. v. Security Union Title Ins. Co., 153 F.3d 822, 828 (7th Cir. 1998) (also requiring that reliance be justified). "Normally, the fraudulent statement must relate to a past or present fact," Razdan v. General Motors Corp., 979 F. Supp. 755, 759 (N.D. Ill. 1997), as opposed to a false promise to do an act in the future, which is fraudulent inducement or promissory fraud.

The misrepresentations on which Ascher Bros. relies are of the promissory fraud type. Ascher Bros. identifies three statements of PHS regarding the application of Cover Coat to the suite ceilings at the BEQ as misrepresentations: that (1) application of Cover Coat was an "upgrade" which "exceeded the requirements of the Contract," (2) **[*47]** PHS would "approve" Ascher Bros.'s extra work tickets, and (3) PHS would pay Ascher Bros.'s "extra" compensation for the work performed. Although PHS contends that statements (2) and (3) could only pertain to promissory fraud, the court concludes that all three do. All the statements are material only as they predict whether Ascher Bros. would be paid in the

future for application of Cover Coat.

*HN3⨁*For promissory fraud, "if the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable." *Price* v. *Highland Cmty. Bank,* 722 F. Supp. 454, 460 (N.D.Ill.1989). To establish promissory fraud, Ascher Bros. must prove a "scheme to defraud." See *Desnick* v. *American Broad. Cos. Inc.,* 44 F.3d 1345, 1354 (7th Cir. 1995) (Illinois "does not provide a remedy for fraudulent promises ('promissory fraud') unless they are part of a 'scheme' to defraud.") (citations omitted). To prove a scheme to defraud, Ascher Bros. must establish a pre-existing intent to defraud. *Speakers of Sport, Inc.* v. *ProServ, Inc.,* 178 F.3d 862, 866 (7th Cir. 1999); *Mitchell v. Norman James Constr. Co.,* 291 Ill. App. 3d 927, 940, 684 N.E.2d 872, 883, 225 Ill. Dec. 881 (1997); **[*48]** *Doherty* v. *Kahn,* 289 Ill. App. 3d 544, 563, 682 N.E.2d 163, 176, 224 Ill. Dec. 602 (1997). It must also prove "an elaborate artifice of fraud . . . ." *Desnick,* 44 F.3d at 1355. n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 *HN4⨁*Promissory fraud "is a disfavored cause of action in Illinois . . . ." *Razdan,* 979 F. Supp. at 759. Because promissory fraud is easy to allege and difficult to prove or disprove, "the burden on a plaintiff claiming promissory fraud is deliberately high." *Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir. 1992). "'If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid.' (citations omitted.)" *Id.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ascher Bros.'s second amended complaint alleges that PHS made the above misrepresentations in order induce Ascher Bros. to perform the Cover Coat work with the intention that Ascher **[*49]** Bros. would not be paid. It relies on PHS's directive that Ascher Bros. perform the work, that it told Ascher Bros. to prepare AWAs for this work, but that it later repudiated its obligation to pay for it. As further evidence of the scheme, it points to PHS's application to the Navy for an upgrade to apply Cover Coat. Ascher Bros. also includes within its scheme allegations that PHS refused to pay for other requested extras, and that PHS falsely represented to the Navy at the close of the project that all subcontractors had been paid but, in fact, Ascher Bros. had not been paid.

The evidence wholly fails to support proof of a scheme to defraud. There is no evidence that the first statement was communicated to Ascher Bros. at any time that would have induced it to proceed with the work. There is evidence that PHS's personnel told Ascher Bros.'s personnel that Cover Coat would be approved (*e.g.,* FOF PP50, 53), but the preponderance of the evidence is that the matter was unresolved at the time. (*E.g.,* FOF PP56-57). Even if one or more employees of PHS told someone at Ascher that PHS would pay extra, the preponderance of the evidence points to a change of position rather than **[*50]** an intentional misrepresentation intended to induce Ascher Bros. to act to its own detriment. See *Price,* 722 F. Supp. at 459-60 ("[A] change of mind can be . . . a breach of contract but it is not fraud."). The second and third statements merely express the present expectation of a PHS employee. n16 Thus, Ascher Bros. could not reasonably have relied on any such representation in proceeding to do the work. In short, there is no basis in the evidence to draw an inference that PHS set about to trick Ascher Bros. into doing work that it never intended to pay for. Rather, there was ultimately a difference of opinion among the various players as to whether the work was contemplated by the Subcontract. Further, there are no damages attributable to any claimed fraud. All of Ascher Bros.'s claimed damages arise from the failure of PHS to pay Subcontract amounts allegedly due. Richard Ascher acknowledged

that the company sustained no actual damages due to fraud apart from the failure of PHS to pay Ascher Bros. on the Subcontract. (Tr. 183-84).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 The second and third statements merely assert that PHS made allegedly false promises to perform certain acts (to pay "extra" and to "approve" AWAs) at some point in the future.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*51]**

For all of these reasons, the Court grants judgment in favor of PHS and against Ascher Bros. on Count III of the Second Amended Complaint.

## B. Contract

As the plaintiff, Ascher Bros. has the burden to prove that the disputed change orders were modifications to the Subcontract and that PHS breached those agreements. *HN5*⚓"A contract modification must satisfy all the requirements of a valid contract." *United States ex rel. Special Erectors, Inc.* v. *Wil-Freds Constr., Inc.,* 1997 U.S. Dist. LEXIS 75, No. 96 C 2915, 1997 WL 11041, at \*2 (N.D. Ill. Jan. 7, 1997), citing *Hindin/Owen/Engelke, Inc.* v. *G.R.M. Industries,* 869 F. Supp. 539 (N.D. Ill. 1994). Whether a modification existed, its terms and conditions, and the intent of the parties are questions of fact. *A.W. Wendell & Sons, Inc.* v. *Qazi,* 254 Ill. App. 3d 97, 106, 626 N.E.2d 280, 288, 193 Ill. Dec. 247 (1993).

### 1. Change Order Requests

The **Subcontract** here provided that **modifications,** or extras, had to be approved upon written "Change Requests," but the evidence is clear that PHS at times approved changes in writing after the fact or even orally. *HN6*⚓A written contract may be modified by a **[\*52]** subsequent **oral** agreement, even where the contract precludes **oral modifications.** *Wil-Freds,* 1997 U.S. Dist. LEXIS 75, 1997 WL 11041 at \*3, citing *Tadros* v. *Kuzmak,* 277 Ill. App. 3d 301, 312, 660 N.E.2d 162, 170, 213 Ill. Dec. 905 (1995). Further, "[a] contract is validly modified if the party which did not propose the changes is shown to acquiesce in the **modification** through a course of conduct consistent with acceptance." *Wil-Freds,* 1997 U.S. Dist. LEXIS 75, 1997 WL 11041 at \*3, citing *Maher & Assoc., Inc.* v. *Quality Cabinets,* 267 Ill. App. 3d 69, 78, 640 N.E.2d 1000, 1007, 203 Ill. Dec. 850 (1994). *HN7*⚓The Illinois requirements for proving **modifications** has been long and well established. A contractor seeking to receive extras has a burden of proving, by clear and convincing evidence, the following:

    (a) the work was outside the scope of its contract;
    (b) the extra items were ordered by the owner;
    (c) the owner agreed to pay extra, by either by [its] words or conduct;
    (d) the extras were not furnished by the contractor as [its] voluntary act; and
    (e) the extra items are not rendered necessary by any fault of the contractor.

*Watson Lumber Co.* v. *Guennewig,* 79 Ill. App. 2d 377, 389-90, 226 N.E.2d 270, 276 (1967) **[\*53]** (internal citations omitted). n17 "The contractor sustains this burden by

proving that the extra work was requested by the owner, and there is no evidence indicating that the work was necessary or voluntarily performed due to fault by the contractor." *A.W. Wendell & Sons,* 254 Ill. App. 3d at 105, 626 N.E.2d at 287.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n17 Ascher Bros. cites *United States* v. *Summit Gen. Contr. Corp.,* 760 F. Supp. 1004, 1010 (E.D.N.Y. 1991), for the proposition that a contractor who knowingly accepts the benefits of extra work outside the scope of the Subcontract may be liable under the doctrine of quasi-contract. The case, however, cites New York law. This court has found no such doctrine in Illinois cases.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A summary of the claims for extra compensation are set out in Table 1. Rulings on the various claims follow for the reasons stated.

**Table 1. Extras**

| Item | Ascher Bros.'s Claim | PHS's Position | Due Ascher Bros. |
|---|---|---|---|
| Premium time | $ 2,644.20 | 0 | $ 2,250.00 |
| Extras (b) - (e), (h) | $ 49,306.80 | $ 45,982.80 | $ 45,982.80 |
| Patching/Cover Coat (a) | $ 54,771.30 | $ 3,490.20 | $ 54,771.30 |
| Other extras: (f), (g), (i), (j) | $ 28,703.60 | 0 | 0 |
| Total | $ 135,425.90 | $ 49,472.00 | $ 103,004.10 |

**[*54]**

Ascher Bros. has proved that it was entitled to premium time in the change orders identified in Exhibit 23 as indicated in FOF P80. That Wonsowski signed off on AWAs claiming premium time is convincing evidence that it was approved. Ascher Bros. has also proved its claim for extras (b), (c), (d) and part of (e), although it has not proved that portion of (e) ($ 3,324) in dispute, the court having found above, P79, that punch list work was contract work, not an extra. Ascher Bros. has proved that some of the claimed work under (a) for patching was authorized by PHS, in the amount of $ 4,405 (P75). Finally, Ascher Bros. has failed to prove that PHS agreed to pay extra for the items (f), (g), (i), and (j), for the reasons set out in FOF PP77-80 above.

The most important dispute, of course, is whether the application of Cover Coat was an extra or whether it was within Ascher Bros.'s responsibilities under the Subcontract. The Subcontract did not contemplate the application of Cover Coat. Ascher Bros.'s submittal identifies only one product (in contrast to the paint submittal which identifies the primer separate from the finish coat). This, then, is what Ascher Bros. offered to do and **[*55]** what the Navy accepted. PHS relies on the Navy's expectation that products would be applied according to the manufacturer's directions, but this was not part of the Subcontract nor is the argument persuasive that a contractor could never deviate, based on its experience, from manufacturer's directions. That PHS named it an "upgrade" in its submission to the Navy is further evidence that PHS recognized that it was an amendment to the contract which had to be approved. Otherwise, PHS could have made the change without approval, as it was not seeking additional payment.

PHS did order the work to be done, thus the extra was not furnished by Ascher Bros. as a voluntary act. As to whether the extras were not rendered necessary by any fault of the contractor, although application of Cover Coat was necessary to satisfy the Navy's inspectors, it is not fair to say it was made necessary through fault of Ascher Bros. in the sense that it was not Ascher Bros.'s mistake, such as using the wrong color of paint, that caused the extra to be required. Rather, the procedure that Ascher Bros. offered to do turned out, in practice, not to satisfy the Navy and a change was needed. The Navy would likely **[*56]** not have accepted PHS's certification of completion and paid PHS in full, as well as a bonus, had Ascher Bros. not applied Cover Coat. Because it finds that application of Cover Coat was an upgrade or extra, the court allows Ascher Bros.'s claim in the amount of $ 50,366.30 ($ 54,771.30 claimed, including $ 4,405 for patching). n18

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n18 Although one of the elements of proof, as stated in *Watson* cited above, for example, is that the promisor *agreed* to pay extra, either by words or conduct, the issue of payment is obviously the reason litigation arises. Thus, it must be, as in *A.W. Wendell & Sons,* that if all the other elements are proved, *i.e.,* that the item was an extra, then the promisor must pay whether or not it previously agreed to pay. Here, the evidence is clear and convincing that PHS by its conduct of directing Ascher Bros. to apply Cover Coat, to keep track of time and materials and and applying for an upgrade, signaled its expectation or agreement that this was an extra.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## 2. Back Charges [*57]

PHS has the burden to prove that its claimed setoffs are authorized by the Subcontract. *Roy Strom Excavating and Grading Co., Inc.* v. *Miller-Davis Co.,* 149 Ill. App. 3d 1093, 1100, 509 N.E.2d 105, 111 (1986), citing *Edward Edinger Co. v. Willis,* 260 Ill. App. 106, 125 (1931) ([HN8]In a counterclaim, set-off or recoupment action to recover damages for breach of contract, burden of proof is on the party claiming such damages to prove that such damages were caused by default of the party to be charged.).

**Table 2. Setoffs**

| Item | Ascher's position | PHS claims | Allowed |
|---|---|---|---|
| sprinkler heads (P70) | 0 | $ 4,778.00 | $ 4,778.00 |
| clean up (P70) | 0 | $ 5,902.00 | $ 5,902.00 |
| piping, ductwork (a) | 0 | $ 35,998.00 | 0 |
| pipes, conduits (b) | 0 | $ 20,100.00 | 0 |
| third coat of paint (c) | 0 | $ 108,150.00 | 0 |
| recaulking windows (d) | 0 | $ 4,727.00 | $ 4,727.00 |
| punch list work (e) | $ 2,092.00 | $ 11,751.00 | $ 11,751.00 |
| reprime stairs (f) | 0 | $ 6,490.00 | $ 6,490.00 |
| administrative costs | 0 | $ 250,637.32 | 0 |
| Total | $ 2,092.00 | $ 448,533.32 | $ 27,848.00 |

PHS has proved it claim to set offs for replacing sprinkler heads, clean-up (P70), recaulking

windows **[*58]** (d), punch list work (e), and repriming stairs (f). All of these items were Ascher Bros.'s responsibilities under the Subcontract as set out in the Findings of Fact. Where there is a credibility determination on these matters, the court finds PHS's witnesses more credible.

PHS claims a backcharge for the second coat of finish paint (c) that Ascher Bros. never applied. It bases the amount on an estimate from another painting contractor as to what it would have charged PHS to do the job. Ascher Bros. protests because (i) it did not agree to apply the third coat of paint; (ii) PHS never spent the money to have that job done; and (iii) the Navy accepted the project without the third coat.

PHS has established that Ascher Bros. breached the Subcontract by failing to apply sufficient paint to reach the 1.5 mils DFT requirement of the Specification. The only significant evidence suggesting that PHS agreed to something else is that the construction schedule did not provide for the third coat. Nevertheless, the responsibility was on Ascher Bros. to fulfill its contract, either by calling for an amendment to the schedule or seeking an amendment to the Subcontract. It cannot now rest on the **[*59]** schedule as a defense to its failure to meet the Specification. It is equally clear that PHS, including Schwendener and the quality control representative to the Navy, relied on Ascher Bros.'s submittals as they were entitled to do, both in awarding Ascher Bros. the Subcontract and in forwarding the painting submittals to the Navy. Ascher Bros. did not have to make the proposal it made in order to meet the required DFT, but having made the proposal, Ascher Bros. was bound to fulfill it. Thus, Ascher Bros. breached a material term of the Subcontract.

This leads to Ascher Bros.'s fallback position, which is that because the Navy accepted the Project, including the paint job, Ascher Bros. is entitled to full compensation on its Subcontract with PHS. PHS and the Navy negotiated a host of outstanding items at the conclusion of the Project (Tr. 1135-38, 1144), but those compromises do not establish that Ascher Bros. met its burden to show it applied 1.5 mils of finish paint to the walls or exculpate Ascher Bros. from its failure to perform. See _Preski v. Warchol Constr. Co.,_ 111 Ill. App. 3d 641, 647, 444 N.E.2d 1105, 1109, 67 Ill. Dec. 621 (1982) (finding that amount due **[*60]** from the owner to the general contractor is irrelevant to issue of amount due from general contractor to subcontractor under subcontract). Ascher Bros. has cited no authority to the contrary, and thus, the court finds that the fact that the Navy accepted the project without the third coat of paint does not excuse the breach.

As to damages, PHS contends that where a "subcontractor fails to perform all work pursuant to subcontract, the general contractor is entitled to deduct the cost of completing the omission, regardless of whether the general contractor actually completes the omission." (PHS Proposed Conclusions of Law P42.) PHS cites _J-M Builders & Supplies Corp. v. McIntyre,_ 56 Ill. App. 3d 714, 715, 372 N.E.2d 420, 421, 14 Ill. Dec. 409 (1978), for this proposition. This is not a fair statement of the holding of _J-M Builders,_ however, nor the applicable rule of law. Rather, the court in _J-M Builders_ set out the rule as follows:

> _HN9_⧆As a general rule, the measure of damages, or the credit due the purchaser, when performance by the builder has been less than full performance, is the cost of correcting the defects or completing the omission, rather than **[*61]** the difference in value between what ought to have been done in full performance and what was actually done. But this general rule only applies where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results obtained. If to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages

is the difference in value between the work if it had been performed according to the contract and that which was actually performed.

_J-M Builders, 56 Ill.App.3d at 715, 372 N.E.2d at 421_. The cost of correcting the defects was $ 11,751.00, the amount PHS paid for the touch up work on the walls of the BEQ, which were PHS's damages under the first sentence of the quoted text. If the alternative measure is used on the basis that it would have been impracticable for PHS to go back and apply the third coat of paint, PHS has proved no diminution in value. After the touch up work was done, Lt. Carter was satisfied that a third coat was not necessary and accepted the Project. PHS received full payment **[*62]** on the contract. Thus PHS is entitled only to set off $ 11,751.00 against the amount due Ascher Bros. This reasoning applies, as well, to the claimed setoffs (a) and (b) (PP84-85), in that PHS did not correct the non-performance or demonstrate diminution in value. See _Uniroyal Goodrich Tire Co. v. Mutual Trading Corp._, 63 F.3d 516, 525 (7th Cir. 1995) (Where counterplaintiff contended that it lost sales due to breach of contract but failed to offer credible evidence demonstrating lost sales, the trial court did not err in granting judgment as a matter of law on the counterclaim.)

## 3. Administrative Costs

Finally, PHS seeks a backcharge for what it characterizes as unusual administrative expenses incurred by virtue of Ascher Bros.'s conduct. PHS has not proved that it is entitled to impose administrative expenses on Ascher Bros. under the Subcontract. To the contrary, PHS as the general contractor undertook the administrative responsibilities of which it now complains: ensuring that work of the various subcontractors is completed on schedule and in compliance with the contracts. There is considerable evidence in the record that PHS was not fully compliant **[*63]** with its administrative responsibilities, a matter which the Navy addressed in its performance reviews (P65). In any event, PHS received 100% of payment, plus a substantial bonus for the project. It cites no authority for some sort of equitable imposition of administrative costs on Ascher Bros.

### Reconciliation

| | |
|---|---|
| Contract Price | $ 635,000.00 |
| Due to Ascher Bros. for extra work | $ 103,004.10 |
| Allowed set offs | $ 27,848.00 |
| Difference | $ 82,619.30 |
| Total due | $ 717,619.30 |
| Amount paid by PHS to date | $ 600,554.00 |
| Difference (due to Ascher Bros.) | $ 117,065.30 |

Ascher Bros. is entitled to prejudgment interest. _Gorenstein Ent. v. Quality Care USA_, 874 F.2d 431, 436 (7th Cir. 1989).

## American Home

_HN10_ Because federal property is not subject to a state's mechanics lien laws, Congress enacted the **Miller Act**. _See_, 40 U.S.C. §§ 270a _et seq._ As in other civil actions, Ascher Bros. bears the burden of proof in all elements of its claim under the **Miller Act**. _Id._ _HN11_ Under the **Miller Act**, a claimant, in addition to establishing that it has met the jurisdictional requirements of the Act, must **[*64]** also prove the other elements of its case. Because it is

secondarily liable to Ascher Bros., American Home is entitled to rely and has relied on the defenses asserted by its bond principal, PHS. *United States f/u/o Georgia Elec. Supply Co., Inc.* v. *United States Fid. and Guar. Co.,* 656 F.2d 993 (5th Cir. 1981). It has asserted no cross claim against PHS. *See Mercantile Holdings, Inc.* v. *Keeshin,* 187 Ill. App. 3d 1088, 1093, 543 N.E.2d 1031, 1035, 135 Ill. Dec. 463 (1989) (internal citation and quotations omitted) ("**HN12**Where a suretyship exists, it is the duty of the principal to the surety to satisfy the surety's obligation by performing his own duty to the creditor in the absence of a defense between himself and the creditor, which is also available to the surety.").

American Home is liable on the payment bond secondarily to PHS. RESTATEMENT (THIRD) SURETYSHIP AND GUARANTY § 34(1) (1996); *Painters Local Union No. 171* v. *Williams & Kelly, Inc.,* 605 F.2d 535, 539 (10th Cir. 1979). In other words, American Home's liability to Ascher Bros. on the **Miller Act** claim is the same as PHS's **[*65]** liability to Ascher Bros. on that claim. Accordingly, American Home has secondary liability to Ascher Bros. on the Payment Bond in the amount of $ 117,065.30, plus prejudgment interest.

### ORDER

Judgment, therefore, is entered in favor of Ascher Brothers Co. on Counts II and III of the Second Amended Complaint against Paul H. Schwendener, Inc. in the amount of $ 117,065.30, plus prejudgment interest. American Home Assurance Co. is conditionally liable to Ascher Bros. for the same amount. Judgment is entered in favor of Paul H. Schwendener, Inc., and American Home Assurance Co. and against Ascher Brothers Co. on Count I of the Second Amended Complaint.

Dated: March 18, 2003

JOAN HUMPHREY LEFKOW

United States District Judge

### JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to trial before the Court. The issues have been tried and a decision has been rendered.

Date: 3/18/2003

Source: Legal > Cases - U.S. > Federal Court Cases, Combined 🛈
Terms: **subcontract /p oral /p modification and "miller act"**  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, June 27, 2006 - 7:41 PM EDT

* Signal Legend:
● -   Warning: Negative treatment is indicated
🅠 -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
✦ -   Positive treatment is indicated
🅐 -   Citing Refs. With Analysis Available
🛈 -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.


About LexisNexis  | Terms & Conditions

 LexisNexis® Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.