Sarah J. Tugman
Attorney at Law
2509 Eide Street, Suite 4
Anchorage, Alaska 99503
Telephone: (907) 677-7889
Fax: (907) 677-9188
e-mail: sjtugman@qci.net
Attorney for GMW Fire Protection, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

|  |  |  |
|---|---|---|
| THE UNITED STATES for the use of | ) | |
| GMW Fire Protection, Inc., | ) | |
| an Alaska Corporation, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | |
|  | ) | |
| KANAG'IQ CONSTRUCTION CO., INC., | ) | |
| an Alaska Corporation and | ) | |
| WESTERN SURETY COMPANY, a | ) | |
| South Dakota Corporation, | ) | |
|  | ) | |
| Defendant. | ) | |
| _____ | ) | Case No. A-05-0170 CV (TMB) |

MEMORANDUM IN SUPPORT OF
MOTION IN LIMINE

GMW asks the Court to preclude Kanag'Iq from claiming that GMW

violated the Alaska Unfair Trade Practices Act, AS 45.50.471, *et.*

*seq.*, by over-billing it as, under the circumstances, the evidence

does not support such a claim.  Many of the essential facts are set

out in the briefing with respect to the earlier motion for summary

judgment ruled on by this Court, and GMW repeats many of those

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE – PAGE 1

facts here.[1]

I.  <u>BACKGROUND FACTS</u>

This dispute arises out of a construction subcontract under which GMW performed work and provided materials for a fire protection requirements contract at Elmendorf Air Force Base. Kanag'Iq Construction Co., Inc. ("Kanag'Iq"), an 8(a) contractor, had the prime contract from 2000 through 2004, and GMW was its subcontractor and performed the vast majority of work on the project.

GMW had no serious complaints during the first years of the project. It performed its work and was paid according to its quotes and billings until about two thirds of the way through 2004 when Kanag'Iq stopped paying the amounts indicated on GMW's invoices.[2]  The parties disagree about the type and terms of their contract. Kanag'Iq claims that it had "unit price" contract with GMW, and GMW asserts that it provided Kanag'Iq with a lump sum price for which it would perform each delivery order and was then instructed to do the work for the price quoted.  GMW asserts that it is owed money, and Kanag'Iq asserts that GMW over-billed it for the work that GMW did.

Although the prime contract between Kanag'Iq and the

_____

[1]  GMW incorporates a number of the exhibits used in its prior briefing without changing the exhibits numbers, so the numbers may not be consecutive here.

[2]  Deposition of Glenn Johnson at 44.

government was facially a unit price contract, it did not operate that way.  Delivery orders were awarded to Kanag'Iq by the government for certain dollar amounts as noted on an engineer's and contractors's (joint) estimate showing line items of work but which actually reflected amounts budgeted by the Air Force for the project and did not reflect the actual work to be done or materials to be installed as those had not yet been specifically determined.[3] What was indicated on the joint estimate sheets that Mr. Frere prepared and that Kanag'Iq signed,[4] and from which the dollar amounts on the delivery order awards were taken,[5] might bear no resemblance to the materials or quantities that were actually installed.[6]  The estimate sheets were just a place to fill in the blanks to get the money for the projects,[7] and the delivery orders were just a convenient vehicle by which the contractor could bill

---

[3]    Steve Frere's deposition at 33, 64-65, 77-78, 101, 103; Jury deposition at 44; Young deposition at 66, 68.

[4]    Phil Young, who on behalf of Kanag'Iq signed the estimates prepared by Mr. Frere, admitted that he signed all of the estimates without performing any computations or calculations.  He just signed them when he received them.  Further, he admitted that, between the government and Kanag'Iq, only the bottom line totals were used.  Phil Young's deposition at 63 & 74.

[5]    For example, Exhibit 3 is the award for delivery order 5009.  It incorporates, on pages 4 and 5, the estimate prepared by Steve Frere.

[6]    Deposition of Steve Frere at 67.

[7]    *Id.* at 89

for progress payments.[8]

Kanag'Iq was paid based on the sums shown on the delivery orders that were taken from Mr. Frere's estimate sheets, as modified by any change orders that were executed which increased or decreased the bottom-line dollar amount.[9]  Kanag'Iq was not paid based on any list of actual work done or materials installed, or on any afer-the-fact counts done by Kanag'Iq or the government.[10]

GMW and Kanag'Iq entered into a written subcontract in 2000, which appears to be a unit price contract, but unit price terms were not followed from the outset of GMW's work at Elmendorf. Instead, Kanag'Iq asked GMW for its price to perform a delivery order and, upon receiving it, GMW was told to go to work.[11]

---

[8]  *Id*. at 77.  While Mr. Frere had originally planned to do change orders to make the paperwork more accurate – to reflect the actual work and materials, he would have had to do them continually throughout the project and even then he did not feel that they would have been accurate, so he did not waste his time.  *Id*. at 33, 34, 89, 102.  Although he did some change orders to move money from one delivery order to another, those were not accurate either.  *Id*. at 65-66, 79.

[9]  Deposition of Steve Frere at 77. Deposition of Phil Young at 51. Deposition of William Jury at 31, 43.  Deposition of Jule Foland at 43-45.

[10]  While Mr. Frere worried that he might have to actually count what was installed, he believed that would happen only if there was a disagreement. Deposition of Steve Frere at 33, 63, 67-68.  He did not do an audit at the end of the projects, because he believed that Kanag'Iq had been adequately paid and because he heard no complaints.  Deposition of Steve Frere at 26-27, 81, 92, 106, 118.

[11]  Deposition of Glenn Johnson at 14, 24, 51, 54-5. Deposition of July Foland at 26, 27.

The way this project was handled throughout, Kanag'Iq asked for a price, GMW provided a price from year one to year – the final year, we were paid on that price we provided, we installed off that price, and we were completely paid off of that.  There were not recounts. There was nothing. It was bottom line project every time.[12]

Although GMW used itemized estimate sheets similar to those used by Mr. Frere, those forms were only used as a tool in order to provide Kanag'Iq with GMW's bottom line price for each delivery order.[13]  Work was done on the project and materials were provided by GMW for which there were no line items on the bid sheets,[14] and prices for that work and those materials were listed on line items describing other work or materials.[15]

Throughout the project, beginning in 2000, GMW provided the price for which it would do its share of the work on each delivery order, started the work as directed, and then sent a series of billings to Kanag'Iq indicating the "contract amount," and the percent of the work complete on each delivery order, billing

---

[12]    Deposition of Glenn Johnson at 54-55.

[13]    *Id*. at 42-43, 53.

[14]    Deposition of Steve Frere at 89, 93, 94, 96, 100. Deposition of William Jury at 65, 112 – 118, 123 *et. seq.*

[15]    Deposition of Glenn Johnson at 33, 34, 65.  As Steve Frere explained, line items listing work like "ceiling tie removal" were used as "currency" for other work or materials.  Deposition of Steve Frere at 89, 94.

accordingly.[16]     Each delivery order was billed as a separate
contract.[17]   Occasionally, GMW would reduce the original price
quoted and would send revised billings.[18]    GMW expected to be paid
the bottom-line amount shown on its price schedules for the work it
was doing.[19]

Kanag'Iq initially paid GMW on those billings, returning its
"subcontractor progress payments" form indicating a "contract
amount" or an "adjusted contract" amount which mirrored the amount
billed by GMW[20] and making payment based on the percentage of work
complete on each delivery order.[21]    Near the end of 2004, that

---

[16]   Deposition of Glenn Johnson at 40.   *See also* Exhibit *4,*
which relates to work done and materials provided in 2002 for an
ammunition building.   Pages 1 through 15 are GMW's quotes for the
sprinkler and fire alarm work, which correspond to the billings for
a "contract amount" of $186,803.00 and payments made for the same
amount (pages 16-18).

[17]   Deposition of Glenn Johnson at 58.

[18]  On delivery order 5008, the 381st intelligence building, for
example, GMW's original price exceeded the budget, so cabling was
used instead of conduit, and the price was reduced.   Deposition of
Glenn Johnson at 66.   *See also* Exhibit 5 GMW's billing reflecting
a contract amount of $452,067.50 and its revised billing showing a
revised contract amount of $395,617.50.

[19]   Foland deposition at 42-43.

[20]   Compare Exhibit 6 to Exhibit 5.   Kanag'Iq's "subcontractor
progress payments" forms reflect, as the "contract" amount, the
figures contained in GMW's original and revised billings for
delivery order 5008.

[21]   *See* for example, Exhibit 7, which follows the progress of
delivery order 5015, the Civil Air Patrol building.   Page 1 of the
exhibit is a September 19, 2003 fax from Steve Frere to Kanag'Iq
asking for a signature on the estimate he prepared.   Pages 2 and 3

changed.

When Glenn Johnson realized that GMW was not being paid what it billed, he immediately complained.[22]  William Jury told him that he thought GMW's invoicing was out of line on two delivery orders and that he wanted Glenn to rework those prices.[23]  Glenn looked at the billings and reduced the prices on the Snow Barn and the

---

are a copy of the estimate signed by Mr. Frere and Kanag'Iq.  Pages 4 through 9 constitute the September 24, 2003 delivery order award (it incorporates the estimate prepared by Mr. Frere and awards the amount shown on that estimate).  Pages 10-13 are the "bid schedule" sent by GMW to Kanag'Iq on June 9, 2004 for a fire alarm system.  Pages 13-17 are  another transmission from GMW to Kanag'Iq of the same quote.  Pages  18-24 are a change order reducing the price to be paid to Kanag'Iq for this delivery order.  Pages 25-28 are GMW's revised price for the fire alarm.  Page 29 is GMW's bill to Kanag'Iq reflecting the revised price as the "contract amount" and billing part of that price.  Page 30 shows payment by Kanag'Iq.  Pages 31 and 32 are a change order extending the time for performance of this delivery order.  Page 33 is Kanag'Iq's "subcontractor progress payments" form, which indicates a "total adjusted contract" price in the same amount as that indicated on GMW's billing.  Pages 34 and 35 are GMW's next billings.  Pages 36 and 37 are the "transfer and acceptance of military real property" prepared and signed by Kanag'Iq and presented to the government.

Exhibit 8, relates to delivery order 5016.  Pages 1-6 are the quote provided by GMW in the amount of $134,369.14.  Page 7- 15 contain billing and payment information. Page 8 is Kanag'Iq's June 11, 2004 "subcontractor progress payments form" indicating a "contract" amount of $134,369.14.  Page 11 is GMW's billing for a "contract amount" of $134,369.14, dated September 24, 2004.  The following pages show that GMW continued to bill that amount through December of 2004.

[22]  Glenn Johnson complained to Phil Young and Bill Jury of Kanag'Iq, and also to various government representatives.  Glenn Johnson's deposition at 44, 47, 61.

[23]  Deposition of Glenn Johnson at 44-46.

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE – PAGE 7

Susitna Club.[24]  GMW continued to work on the projects and was told
that it would be paid.[25]   It was not.

Suddenly, Kanag'Iq began asserting that the contract with GMW
was based on unit prices[26] and requested that Glenn count the
project.[27]  Eventually it commenced some counts of its own.[28]

At his deposition,[29] Bill Jury claimed that the agreement with
GMW was to pay for what was installed as identified by the federal
government, and that the amount it was to be paid would be

---

[24]  *Id*. at 46.

[25]  *Id*. at 47.

[26]  Steve Frere explained that the first time he ever heard the
term "unit price" was at the end of 2004 when Kanag'Iq started
doing some counts.  Deposition of Steve Frere at 63, 22.  He
wondered why Kanag'iq was taking that position when it never had
before.  *Id*. at 30, 111, 117.  All he had heard about prior to that
was bids. *Id*. at 74.
   As to the bids or price quotes received from GMW throughout
the project, Mr. Jury testified that they were "estimates," not
"quotes" or "bids," but admitted that after they were received GMW
was told to do the work.  Deposition of William Jury at 29, 42-43,
100, 147, 157.

[27]  Deposition of Glenn Johnson at 49-50.

[28]  Steve Frere explained that Kanag'Iq had never done counts
or surveys prior to 2004.  Deposition of Steve Frere at 106.  In
2006, Kanag'Iq requested that Mr. Frere participate in its counts.
*Id*. at 81, 82.

[29]  After his deposition, Mr. Jury provided the court reporter
with an eight page list of requested revisions to the deposition
consisting of approximately 114 alterations and additions, many of
which completely changed his original answers.  For the purposes of
this opposition, GMW ignores those "corrections."

determined only after each delivery order was complete.[30]   He said that he was not responsible for doing the count, the government was,[31] but he did not remember if the government came after the work was done and made a list of what was installed.[32]   He also stated that he would not be surprised if the government never counted the project.[33]   He testified that, at the time of his deposition in 2006, Kanag'Iq and the government were then determining what GMW should be paid.[34]   No offer, or payment has since been received.

## II.  <u>GROUNDS FOR MOTION IN LIMINE</u>

GMW asks the Court to order Kanag'Iq not to mention, in opening argument or otherwise, or to attempt to introduce evidence attempting to show that GMW violated any provisions of A.S. 45.50471, Alaska's Unfair Trade Practices Act, as the evidence is insufficient, as a matter of law, to establish any such claim.[35] If GMW is right about the contract under which the parties

---

[30]   Deposition of William Jury at 43, 48, 140.

[31]   *Id.* at 140.

[32]   *Id.* at 43.

[33]   *Id.* at 141.

[34]   *Id.* at 177.

[35]   A district court may limit evidence to legally relevant proof. Fed.R.Evid. 402, *U.S. V. Komisaruk*, 885 F.2d 490 (9th Cir. 1989).  Evidence may be excluded following an *in limine* hearing if it is insufficient as a matter of law to establish a defense. *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985); *Univest States to Cottier*, 759 F.2d 760, 763 (9th Cir. 1985).

operated, Kanag'Iq's unfair trade practices claim has no basis.  If Kanag'Iq's newly asserted construction of the contract is correct, GMW, at most, was mistaken about the contract terms.  Nothing it did arises to conduct actionable under the Act.

III. <u>GMW DID NOT VIOLATE A.S. 45.50.471.</u>

Although the basis for Kanag'Iq's claim that GMW violated AS 45.50.471 et. seq. by overcharging it is not entirely clear to GMW,[36] even assuming that the Act applies to this transaction which involves construction on real property,[37] the Act was not violated by GMW.

> [A] prima facie case of unfair or deceptive acts or practices under the UTPA requires proof of two elements: "that the defendant (1) engaged in trade of commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."  We have previously ruled that "[a]n act or practice is deceptive or unfair if it has the capacity or tendency to deceive."

<u>Kenai Chrysler Center, Inc. v. Daimler Chrysler Ins. Agency, Inc.</u> 2007 Alas. LEXIS 120 at 37-38 (Alaska 2007).  Acts or practices in the conduct of trade or commerce are determined to be unfair by a

---

[36] Defendant's Unfair Trade Practices counterclaim states only that "Pursuant to A.S.45.50.471 et. seq., GMW owed Kanag'Iq a strict duty not to mislead it with respect to the value of any services or materials provided by it," and that the statutory duty was breached  because GMW over-billed it.

[37] In *Munn v. Thornton*, 956 P.2d 1213 (Alaska 1998) the Alaska Supreme Court did not reach the question of whether the UTPA applied to a dispute between homeowners and a construction contractor building a house for them, although the trial court found that it did not since the case involved a "real property transaction."  *Id.* at 1222 n. 14.

variety of factors including:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers ...

State v. Grogan, 628 P.2d 570, 571-72 (Alaska 1981) *quoting* State v. O'Neill Investigations, Inc., 609 P.2d 520, 535 (Alaska 1980) *quoting* FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5, 92 S.Ct. 898, 31 L.Ed. 2d 170 179 n.5 (1972).

A.    GMW's PRICE SCHEDULES WERE NOT MISLEADING.

GMW's price schedules were no more misleading than the joint estimates signed by Kanag'Iq and the project engineer.  The format in which they were presented was merely a vehicle, although perhaps an inartful one, for presenting bottom line prices for which payment was to be made for the work done on each delivery order. GMW's price schedules misrepresented nothing – they conveyed a promise by GMW to perform for a stated price.  GMW billed in conformance with the price schedules that it had provided before it began to work.

B.    THESE CIRCUMSTANCES ARE NOT THE SAME AS THOSE IN OTHER "ESTIMATE" CASES WHERE UNFAIR TRADE PRACTICES HAVE BEEN FOUND.

The court in State v. Grogan, *supra,* considered the question of whether an aircraft repair company committed an unfair trade practice when it charged a customer more than twice as much as it

stated it would for repairing his aircraft. The court, in remanding the inadequately briefed question, commented that certain courts had found that charging a customer significantly more than an estimated cost without informing and getting the customer's consent could be characterized as conduct that created "a likelihood of confusion or of misunderstanding" and misled or deceived the customer, and recognized that other courts had held that such conduct was not a violation of their respective consumer protection acts. <u>Grogan</u>, *supra,* 628 P.2d at 574.

The same question is not presented here however, where GMW billed its estimated prices, or less, for the work it performed, and Kanag'Iq received the estimates and raised no objections prior to allowing GMW to commence work, only failing to pay when the work was almost completed.[38]

The prices GMW expected to be paid were fully disclosed before Kanag'Iq was billed. In <u>Zuckerman v. BMG Direct Marketing</u>, 290

---

[38] After acting as it did throughout the beginning and the majority of the contract, for Kanag'Iq to now claim that it will not be bound by the quotes provided to it by GMW, and that it intends to rely on an entirely different construction of the contract than it gave GMW every reason to believe it would, is unfair.

> "A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe" that the party did intend to be bound. *Id*.

*Munn v. Thornton,* 956 P.2d 1213, 1218 (Alaska 1998) quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281 (Alaska 1985).

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE – PAGE 12

A.D.2d 330 (N.Y. App. Div. 2002) a customer's complaint that a music club billed its customers in "false" and "inflated" amounts which exceeded its actual shipping and handling costs was dismissed, and the court stated:

> As a matter of law, a disclosure that a specified amount will be charged for shipping and handling cannot cause a reasonable consumer to believe that such an amount necessarily is equal to or less than the seller's actual shipping and handling costs. "Thus," as stated by the motion court, "in a case such as this, where there is no coercion involved, the focus is wether the amount of the charge is disclosed. If so, the question of whether the amount charged is unreasonable or excessive is not an issue for the courts to address" (citations omitted).

Zuckerman, supra. at 330 (citation omitted).[39] *See also* Lum v. New Century Mortgage Corporation, 19 A.D.3d 558, 559 (N.Y. App. Div. 2005)(no violation – premium charged by mortgage company, which was disclosed, was not per se illegal); Taylor v. BMG Direct Marketing, Inc., 299 A.D.2d 181 (N.Y. App. Div. 2002)(fees had been clearly and conspicuously disclosed, at the outset, before customers became obligated to pay them – no violation of the state's deceptive acts and practices law); Sands v. Ticketmaster-New York, Inc., 207 A.D.2d 687 (N.Y. App. Div. 1994)(claim that defendant's fees were excessive was properly dismissed where the fees were always disclosed); Lewis v. Hertz Corporation, 181 A.D.2d 493, 494 (N.Y. App. Div. 1992)(no deceptive practices by car rental company where

---

[39] GMW denies overcharging Kanag'Iq and asserts that its charges were reasonable. For purposes of this motion, however, it believes that the reasonableness of its charges is irrelevant.

the practices were fully disclosed to customers prior to acceptance of rental cars).

Moreover, the estimates GMW presented to Kanag'Iq were not representations of fact, but offers to perform the work necessary for each delivery order for a particular price.  The court in <u>Denson v. Ron Tonkin Gran Turismo, Inc.</u>, 566 P.2d 1177, 1181 (Oregon 1977), ruled that a statement that a particular sum would be charged was generally not a representation of fact, but a promise, and was not actionable under the Oregon Act.

GMW's prices were fully disclosed and were not representations of fact but promises to perform for a specified price.  It did not violate the UTPA in providing the costs for which it would perform work prior to commencing work, and then billing those prices, or less, to Kanag'Iq.

C.     <u>EVEN IF GMW IS WRONG ABOUT THE TERMS OF THE CONTRACT, THE ACT WAS NOT VIOLATED.</u>

Even in the unlikely event that a jury ultimately concludes that GMW was mistaken about the kind of contract into which it entered, it did not violate the UTPA.  A good faith belief that a contract is valid, or a breach of contract, alone is generally not enough to establish a deceptive or unfair trade practice.  <u>Kenai Chrysler Center, Inc. v. Daimler Chrysler Ins. Agency, Inc.</u>, 2007 Alas. LEXIS 120 at 39-40; <u>Bartolomeo v. S.B. Thomas, Inc.</u>, 889 F.2d 530, 535 (4th Cir. 1989)(applying North Carolina law – "A simple breach of contract, even if intentional, does not amount to a

violation of the Act; a plaintiff must show substantial aggravating circumstances to recover under the Act, which allows for treble damages"); <u>Dura-Wood Treating Co. v. Century Forest Products, Inc.</u> 675 F.2d 745, 755-56 (5th Cir. 1982)(applying Texas law – "an allegation of breach of contract – without more – does not constitute a false, misleading or deception action as would violate [the Act]"); <u>United Roasters, Inc. v. Colgate-Palmolive Co.</u>, 649 F.2d 985 (4th Cir. 1981)(breaches of contractual duties, including an implied covenant of good faith, were not unfair or deceptive acts under North Carolina's unfair trade practices act); <u>Emlee Equipment Leasing Corp. v. Waterbury Transmission, Inc.</u>, 595 A.2d 951, 954 (Conn. Super. 1991)(substantial aggravating circumstances in addition to a breach of contract, even an intentional breach, must be shown to recover under Connecticut's trade practices act).

In the case of an ambiguous contract, overcharging by one of the parties to the contract was found not to arise to the level of unfairness sufficient to constitute an unfair trade practices violation, as the defendant's conduct was not immoral, unethical, oppressive or unscrupulous, and did not injure the plaintiff or offend public policy to the extent that a violation should have been found. <u>Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.</u>, 892 F. Supp. 380, 387 (D. Conn. 1994).

Further, no fiduciary duty which might change the rulings above existed between the parties to this case. In <u>Morrell v.</u>

Wellstar Health System, Inc., 633 S.E.2d 68 (Ga.App. 2006) uninsured patients sued a hospital alleging that they were overcharged for medical services, grossly in excess of charges made to private medical insurers or to Medicare/Medicaid benefit programs, alleging that such overcharging violated the state deceptive trade practices act. The court affirmed the trial court's dismissal of the complaint for failure to state a claim upon which relief could be granted, and ruled that a nonprofit hospital generally has no fiduciary duty to a patient with respect to the price it charges for medical care. Similarly, in Munn v. Thornton, 956 P.2d 1213, 1220 (Alaska 1998), the court ruled that there was no fiduciary relationship between a contractor and an owner who had entered into a cost-plus construction contract.

No conduct which should subject GMW to liability under Alaska's Unfair Trade Practices Act has been alleged. Absent a restraint of trade, breach of a fiduciary duty, or some other unfair or deceptive conduct, GMW was permitted to agree to provide materials and to perform work for whatever price it determined was appropriate. GMW's conduct simply did not violate the UTPA. Its motion *in limine* should be granted.

RESPECTFULLY SUBMITTED this 26th day of November, 2007.

s/ Sarah J. Tugman
2509 Eide Street, Suite 4
Anchorage, Alaska 99503
Phone: (907) 677-7889
Fax: (907) 677-9188

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE - PAGE 16

E-mail: sjtugman@gci.net
Alaska Bar No.: 8310101


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of
November, 2007, a copy of the foregoing
document was served electronically on Tom
Gingras, attorney for Kanag'Iq
Construction, Inc.

s/Sarah J. Tugman
2509 Eide Street, Suite 4
Anchorage, Alaska 99503
Phone: (907) 677-7889
Fax: (907) 677-9188
E-mail: sjtugman@gci.net
Alaska Bar No.: 8310101

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE – PAGE 17